**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

STEPHANIE JONES,

                  Plaintiff,

       v.

EASTERN AIRLINES, LLC, JOSEPH
MAROTTA, and STEVEN HARFST,

               Defendants.

**Docket No.: 2:20-cv-1927**

*Electronically Filed*

---

**APPENDIX OF UNPUBLISHED CASES TO DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S COMPLAINT UNDER Fed. R. Civ. P. 12(B)(6)**

---

**FORDHARRISON LLP**

Mark A. Saloman, Esq.
300 Connell Drive, Suite 4100
Berkeley Heights, NJ 07922
Tel.: 973-646-7300
msaloman@fordharrison.com

Counsel for Defendants
*Eastern Airlines, LLC, Joseph
Marotta, and Steven Harfst*

# TABLE OF AUTHORITIES

**Cases**                                                                                                           **Tab (s)**

*Aramburu v. Boeing Co.*,
No. 93-4064-SAC, 1993 U.S. Dist. LEXIS 18620 (D. Kan. Dec. 28, 1993) .......................... 1

*Britting v. Sec'y, VA*,
409 F. App'x 566 (3d Cir. 2011) ............................................................................................. 2

*Burke v. Nalco Chem. Co.*,
No. 96 C 981, 1996 U.S. Dist. LEXIS 10190 (N.D. Ill. July 17, 1996) ................................... 3

*Chaussinand v. Guttman Oil Co.*,
Civil Action No. 08-1714, 2009 U.S. Dist. LEXIS 60830 (W.D. Pa. July 15, 2009) ..............4

*ESI/Employee Sols., L.P. v. City of Dall.*,
CIVIL ACTION NO. 4:19-CV-570-SDJ, 2020 U.S. Dist. LEXIS 55099 (E.D. Tex. Mar. 30,
2020) ......................................................................................................................................... 5

*Matthews v. Freedman*,
Civil Action No. 88-3127, 1993 U.S. Dist. LEXIS 7662 (E.D. Pa. June 8, 1993) ................... 6

*Schrader v. Gulf Oil*,
CIVIL ACTION NO. 93-6794, 1994 U.S. Dist. LEXIS 17129 (E.D. Pa. Nov. 28, 1994) ...... 7

*Thankachen v. Cardone Indus.*,
CIVIL ACTION NO. 95-181, 1995 U.S. Dist. LEXIS 14476 (E.D. Pa. Sept. 28, 1995) ........ 8

**1**

 Positive
As of: June 18, 2020 5:44 PM Z

### *Aramburu v. Boeing Co.*

United States District Court for the District of Kansas

December 28, 1993, Decided ; December 29, 1993, Filed

Case No. 93-4064-SAC

**Reporter**

1993 U.S. Dist. LEXIS 18620 *; 3 Am. Disabilities Cas. (BNA) 439

SANTIAGO ARAMBURU, Plaintiff, v. THE BOEING COMPANY d/b/a BOEING COMMERCIAL AIRPLANE GROUP, WICHITA DIVISION BOEING CORPORATION, and LARRY WHITESELL, Defendants.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > Judgments > Pretrial Judgments > General Overview

Civil Procedure > Judgments > Pretrial Judgments > Judgment on Pleadings

**HN1**[⬇] **Motions to Dismiss, Failure to State Claim**

A motion for judgment on the pleadings under *Fed. R. Civ. P. 12(c)* is treated as a motion to dismiss under *Rule 12(b)(6)*. In considering a motion for dismissal under *Fed. R. Civ. P. 12(b)(6)*, the court must accept all factual allegations of the complaint as true, and draw all reasonable inferences in favor of the plaintiff. Dismissal of a case pursuant to *Rule 12(b)(6)* requires the legal determination that the plaintiff can prove no set of facts in support of his claim to entitle him to relief.

Civil Rights Law > Protection of Rights > Public Versus Private Discrimination

Governments > Legislation > Effect & Operation > Operability

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > General Overview

Civil Procedure > Remedies > Damages > Punitive Damages

Civil Rights Law > ... > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Private Discrimination

Civil Rights Law > ... > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination

Civil Rights Law > ... > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Remedies

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Remedies

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Scope

Labor & Employment Law > Discrimination > General Overview

Business & Corporate Compliance > ... > Discrimination > Disability

Aramburu v. Boeing Co.

Discrimination > Federal & State Interrelationships

Labor & Employment Law > ... > Remedies > Damages > Compensatory Damages

Labor & Employment Law > ... > Remedies > Damages > Punitive Damages

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > Amendments

Labor & Employment Law > ... > Title VII Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Remedies > Damages > Compensatory Damages

Labor & Employment Law > ... > Remedies > Damages > Punitive Damages

## HN2[⬇] Protection of Rights, Public Versus Private Discrimination

Title I of the Americans with Disabilities Act (ADA) prohibits discrimination by certain private employers against individuals with disabilities. *42 U.S.C.S. § 12112(a)*. The remedies available under Title VII of the Civil Rights Act of 1964, *§ 2000e*, are available to those claiming employment discrimination under the ADA. *§ 12117(a)*. Additionally, the Civil Rights Act of 1991 allows plaintiffs to claim compensatory and punitive damages for discrimination under the ADA, just as they can for violations of Title VII. *§ 1981a(a)(2) & (b)*. The ADA was enacted on July 26, 1990, but its provisions relating to employment discrimination did not take effect until July 26, 1992.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

Governments > Legislation > Effect & Operation > Retrospective Operation

Labor & Employment Law > Discrimination > Title VII Discrimination > Amendments

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Scope

Governments > Legislation > Effect & Operation > Prospective Operation

Business & Corporate Compliance > ... > Discrimination > Disability Discrimination > Federal & State Interrelationships

## HN3[⬇] Pleadings, Amendment of Pleadings

The Americans with Disabilities Act is a substantive statute, not a remedial one, and that the Act is not to be applied retroactively.

**Counsel:** [*1]
For SANTIAGO ARAMBURU, plaintiff: Harold S. Youngentob, Goodell, Stratton, Edmonds & Palmer, Topeka, KS.

For BOEING COMPANY, THE, d/b/a Boeing Commercial Airplane Group, Wichita Division Boeing Corporation dba Boeing Commercial Airplane Group, LARRY WHITESELL, defendants: Gloria G. Flentje, J. Steven Massoni, Foulston & Siefkin, Wichita, KS.

**Judges:** Crow

**Opinion by:** SAM A. CROW

## Opinion

MEMORANDUM AND ORDER

Aramburu v. Boeing Co.

On March 22, 1993, the plaintiff, Santiago Aramburu, commenced this action against his former employer, The Boeing Company. Aramburu's complaint seeks to recover damages and secure equitable relief to redress the deprivation of rights secured by the Civil Rights Act of 1991, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, and Title I of the American with Disabilities Act of 1990 (ADA).[1]

On October 21, 1993, the Magistrate Judge entered an order allowing the plaintiff to file an amended complaint which includes a cause of action under the Kansas Act Against Discrimination, *K.S.A. 44-1001, et seq.* The plaintiff filed his amended complaint on October 26, 1993.

The plaintiff claims that the defendants have discriminated against him on the basis of his Mexican American ancestry, as well as his work-related disability of carpel tunnel syndrome.

[*2]
On June 17, 1993, the defendants filed a motion for partial judgment on the pleadings pursuant to *Fed. R. Civ. P. 12(c)* and *12(h)(2)*. Specifically, the defendants contend that Aramburu is not entitled to assert claims under the American With Disabilities Act (ADA), *42 U.S.C. § 12101, et seq.,* because all of his claims arose prior to the effective date of the ADA and that the ADA should not be retroactively applied to claims that arose prior to the ADA's effective date. The defendants also contend that the plaintiff is not entitled to assert "protected speech" claims under the *First* and *Fourteenth Amendments of the United States Constitution* because the plaintiff was a private sector employee.

In Aramburu's spartan four page response, he apparently concedes that his "protected speech" claims are without merit as he fails to respond to the defendants' motion to dismiss these claims.[2]

According to the defendants' reply brief, plaintiff's counsel, during a telephone scheduling conference with the Magistrate Judge, indicated that he would not contest the dismissal of this claim based upon the *First* and *Fourteenth Amendments to the United States Constitution*.

Aramburu does, however, argue that his ADA claims should survive the defendants' motion to dismiss. Aramburu argues that the ADA should apply retroactively and that the defendants' "wrongful acts continued long after" January 29, 1992, the day he was fired.

[*3]
The court, having considered the plaintiff's complaint, the briefs of counsel, and the applicable law, is now prepared to rule.

## Standards for Granting a Motion to Dismiss

*HN1*[⬆] "A motion for judgment on the pleadings under *Fed. R. Civ. P. 12(c)* is treated as a motion to dismiss under *Fed. R. Civ. P. 12(b)(6).*" *Mock v. T.G. & Y Stores Co., 971 F.2d 522, 528 (10th Cir. 1992).* In considering a motion for dismissal under *Fed. R. Civ. P. 12(b)(6)*, the court must

> accept all factual allegations of the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Zilkha Energy Co. v. Leighton, 920 F.2d 1520, 1523 (10th Cir. 1990).* Dismissal of a case pursuant to *Fed. R. Civ. P. 12(b)(6)* requires the legal determination that the plaintiff can prove no set of facts in support of his claim to entitle him to relief. (citations omitted).

*Hospice of Metro Denver v. Group Health Ins., 944 F.2d 752, 753 (10th Cir. 1991)*; see *Thatcher Enterprises v. Cache County Corp., 902 F.2d 1472 (10th Cir. 1990).*

## Analysis

Aramburu's complaint alleges that he [*4] was terminated on January 29, 1992. The defendants contend that the sections of the ADA dealing with Aramburu's employment discrimination claims did not become effective until July 26, 1992, twenty-four months after the ADA's enactment. The defendants argue that "under any reading of the plaintiff's complaint, all of the conduct which he complains necessarily occurred before January 29, 1992, more than six months prior to the ADA's effective date of July 6, 1992." The defendants argue that the ADA does not apply to claims that arose prior to its effective date.

Aramburu replies that although this court has held that the Civil Rights Act of 1991 is not to be applied retroactively, *see Steinle v. Boeing Co., 785 F. Supp. 1434 (D. Kan. 1992)*, the retroactivity of

the ADA has not yet been decided by the Supreme Court. Aramburu argues that Judge Rogers' decision in *Hernandez v. State of Kansas, Dept. of Revenue,* No. 92-4161- *R, 1992 U.S. Dist. LEXIS 17297* (D. Kan. Oct. 7, 1992), "a case filed **after** November 21, 1991, alleging conduct occurring **before** November 21, 1991, bars summary judgment. The ruling of Judge Rogers [*5] would, at a minimum, hold in abeyance any summary judgment ruling upon the facts at issue in this case." [3]

In *Hernandez,* the plaintiff contended that the Civil Rights Act of 1991 applied to her Title VII claims which were filed after November 21, 1991, but were based on conduct occurring before November 21, 1991. In addressing this argument Judge Rogers stated:

> This court has not ruled on the issue of whether the provisions of the 1991 Act should be applied to cases filed after November 21, 1991 based on conduct occurring before November 21, 1991. We note that recently in *Scherzer v. Midwest Cellular Telephone Co.,* 91-2473-O (D. Kan. 8/10/92), Judge O'Connor considered this issue and determined that the 1991 Act should not be applied retroactively to cases involving conduct that occurred prior to the effective date of the 1991 Act but were filed after the effective date. We are not prepared to make a decision on this issue at this time based upon the meager arguments contained in the instant briefs. The court will deny this aspect of the defendant's motion at this time, but we will allow the defendant to renew the matter in a later motion.

Even if *Hernandez* were applicable to this case, it can hardly be viewed as definitive precedent for the proposition for which Aramburu claims it purportedly stands.

[*6]

Aramburu next argues that discrimination was illegal before the ADA under the Rehabilitation Act of 1973 and under Kansas law. Aramburu then argues that the ADA is procedural and that procedural changes apply retroactively.

In *Raya v. Maryatt Industries, 829 F. Supp. 1169, 1171 (N.D. 1993),* the district court succinctly summarized the relevant aspects of the ADA:

> *HN2*[↑] Title I of the ADA prohibits discrimination by certain private employers against individuals with disabilities. *42 U.S.C. § 12112(a).* The remedies available under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e,* are available to those claiming employment discrimination under the ADA. *42 U.S.C. § 12117(a).* Additionally, the Civil Rights

Act of 1991 allows plaintiffs to claim compensatory and punitive damages for discrimination under the ADA, just as they can for violations of Title VII. *42 U.S.C. § 1981a(a)(2)* & *(b).* The ADA was enacted on July 26, 1990, but its provisions relating to employment discrimination did not take effect [*7] until July 26, 1992. See Pub. L. No. 101-336, Title I, § 108 (codified as note to *42 U.S.C.A. §§ 12111-12117*) ("Effective Date: This title shall become effective 24 months after the date of enactment").

*829 F. Supp. at 1171.* In *Raya,* the plaintiff sought to amend her complaint to substitute a claim under the ADA for the disability discrimination claim set forth in the original and amended complaints. The district court denied the plaintiffs' motion. The court held that *HN3*[↑] the ADA is a substantive statute, not a remedial one, and that the Act is not to be applied retroactively. *829 F. Supp. at 1171-1175.*

While courts have greatly divided on whether the Civil Rights Act of 1991 should be applied retroactively, virtually all of the courts considering whether the ADA applies retroactively have concluded that it does not. *See Post v. Kansas Gas & Elec. Co.,* No. 92-1652- *PFK, 1993 U.S. Dist. LEXIS 9702* (D. Kan. June 14, 1993) (plaintiff's ADA claim dismissed; plaintiff's employment with defendant ended prior to ADA going into effect); *Dean v. Thompson,* No. 92- [*8] C-20388, *1993 U.S. Dist. LEXIS 10746* (N.D. Ill. July 9, 1993) ("The ADA is explicitly prospective."); [4]

In *Dean,* the district court imposed *Fed. R. Civ. P. 11* sanctions against the plaintiff's attorney for asserting an ADA claim based upon conduct occurring before July 26, 1992, as the "effective dates for the ADA are explicitly prospective." The court found that a reasonable attorney would have more thoroughly researched the application of the ADA prior to filing the complaint.

*Barraclough v. ADP Automotive Claims Service, 818 F. Supp. 1310 (N.D. Cal. 1993)* ("The ADA did not become effective until July 26, 1992. See *42 U.S.C. §§ 12101-12117.* Since the wrongful termination occurred before the effective date of the ADA, [the plaintiff's] claim under the ADA is meritless."); *but see Clarkson v. Coughlin, 145 F.R.D. 339, 348 (S.D.N.Y. 1993)* (without discussing retroactivity issue, allows leave to amend complaint to add Title II ADA claim which arose before Act's effective date).

Aramburu v. Boeing Co.

[*9]
 This court agrees with the majority of courts addressing this issue and finds that the ADA does not apply to claims which arose prior to its effective date, July 26, 1992.

Aramburu argues in the alternative that his ADA claims did not arise prior to the effective date of the act. Although Aramburu concedes that he was terminated prior to the effective date of the ADA, he argues that he did not receive his right to sue letter until December 1992, and therefore his ADA claim "arose" after the effective date of the Act. Aramburu also argues that Boeing ratified his firing in April and June of 1992. Boeing also denied liability for discrimination before the Kansas Human Rights Commission in August of 1992. Finally, Aramburu argues that Boeing has failed to rehire him, and that his recent requests to be rehired have been rejected by Boeing. [5]
 In support of this last argument, Aramburu has filed an affidavit from his attorney indicating that during a July 22, 1993, telephone conference with the Magistrate Judge, the plaintiff advised the defendant that he seeks reemployment with Boeing and that this offer has been rejected.

[*10]
 The defendants refer to these arguments by the plaintiff as "frivolous." The defendant argues that the plaintiff's complaint only claims that his <u>discharge</u> from Boeing was a violation of the ADA. The defendants argue that Aramburu's cause of action for discrimination accrued based on the alleged disability no later than the date of his termination, January 29, 1992. The defendants contend that there is no authority to support plaintiff's contention that his ADA claims did not accrue until he received his right to sue letter.

As the defendants suggest, these arguments by the plaintiff are not supported, either directly or indirectly, by citation to any case law. While the plaintiff may now wish to claim that he seeks to be reemployed by Boeing and that Boeing's failure to rehire him violates the ADA, the ADA claims in his complaint essentially seek redress for his termination. Aramburu's complaint does not appear to claim that Boeing's failure to rehire him violates the ADA.

The court also rejects the plaintiff's arguments that receipt of the right to sue letter after July 26, 1992, in some way makes Boeing liable under the ADA for the claims stemming from his discharge on January [*11]
 29, 1992. *See generally Gersman v. Group Health Ass'n, Inc., 298 U.S. App. D.C. 23, 975 F.2d 886, 900 (D.C. Cir. 1992)* ("The rights of parties must be adjudicated as they were under the law prevailing at the time of the conduct."), *petition for certiorari filed, 61 U.S.L.W. 3523 (1993).*

IT IS THEREFORE ORDERED that the defendants' motion for partial judgment on the pleadings (Dk. 10) is granted. The plaintiff's ADA claim is dismissed. The plaintiff's protected speech claims under the *First* and *Fourteenth Amendments of the United States Constitution* are also dismissed.

Dated this 28th day of December, 1993, Topeka, Kansas.

Sam A. Crow, U.S. District Judge

---

**End of Document**

**2**

 Positive
As of: June 18, 2020 5:44 PM Z

# *Britting v. Sec'y, VA*

United States Court of Appeals for the Third Circuit

January 25, 2011, Submitted Pursuant to Third Circuit L.A.R. 34. 1(a); February 1, 2011, Filed

No. 10-2554

**Reporter**

409 Fed. Appx. 566 *; 2011 U.S. App. LEXIS 2096 **; 24 Am. Disabilities Cas. (BNA) 131

SUSAN E. BRITTING, Appellant v.
SECRETARY, DEPARTMENT OF VETERANS
AFFAIRS
**Notice:**
NOT PRECEDENTIAL OPINION UNDER
THIRD CIRCUIT INTERNAL OPERATING
PROCEDURE RULE 5.7. SUCH OPINIONS ARE
NOT REGARDED AS PRECEDENTS WHICH
BIND THE COURT.

PLEASE REFER TO *FEDERAL RULES OF
APPELLATE PROCEDURE RULE 32.1*
GOVERNING THE CITATION TO
UNPUBLISHED OPINIONS.

**Prior History:**  [**1]

On Appeal from the United States District Court for
the Middle District of Pennsylvania. District Court
No. 1-08-cv-01747. District Judge: The Honorable
A. Richard Caputo.

*Britting v. Shineski, 2010 U.S. Dist. LEXIS 10190
(M.D. Pa., Feb. 5, 2010)*

## LexisNexis® Headnotes

Business & Corporate
Compliance > ... > Discrimination > Disability
Discrimination > Rehabilitation Act

Labor & Employment Law > ... > Disability
Discrimination > Scope &
Definitions > General Overview

*HN1*[⬇] **Disability Discrimination,
Rehabilitation Act**

The Rehabilitation Act specifies that the standards
used to determine whether this section has been
violated shall be the standards applied under the
Americans with Disabilities Act. *29 U.S.C. §
794(d)*.

Labor & Employment Law > ... > Disabilities
Under ADA > Mental & Physical
Impairments > General Overview

*HN2*[⬇] **Disabilities Under ADA, Mental &
Physical Impairments**

In 2007, the Americans with Disabilities Act
(ADA) was interpreted narrowly and the standard
for determining whether an individual had a
disability included consideration of whether the
impairment had a permanent or long-term impact.

Civil Procedure > Appeals > Standards of
Review > De Novo Review

Civil Procedure > Appeals > Summary
Judgment Review > Standards of Review

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of
Law > General Overview

*HN3*[⬇] **Standards of Review, De Novo Review**

The United States Court of Appeals for the Third Circuit exercises plenary review over the district court's grant of summary judgment and applies the same standard that the district court should have applied.

Governments > Legislation > Effect & Operation > Amendments

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > General Overview

*HN4*[⬇] **Effect & Operation, Amendments**

The ADA Amendments Act of 2008 is not retroactively applicable.

Governments > Legislation > Effect & Operation > Amendments

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > General Overview

Governments > Legislation > Effect & Operation > Retrospective Operation

Labor & Employment Law > ... > Scope & Definitions > Disabilities Under ADA > General Overview

*HN5*[⬇] **Effect & Operation, Amendments**

In deciding whether a statute is retroactively applicable, the first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress's intent is not clear, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. Nothing in the text of the ADA Amendments Act of 2008 (ADAAA) expressly prescribes that the statute is retroactively

applicable. Furthermore, in expanding the definition of disability, the ADAAA clearly increased liability for past conduct. As a result, the United States Court of Appeals for the Third Circuit concludes that the ADAAA cannot be applied retroactively.

Governments > Legislation > Effect & Operation > Retrospective Operation

*HN6*[⬇] **Effect & Operation, Retrospective Operation**

There may be instances where a jurisdictional statute may not be applied retroactively. Such an instance may arise where the new jurisdictional statute affects a party's substantive rights or obligations.

Labor & Employment Law > ... > Disability Discrimination > Evidence > General Overview

*HN7*[⬇] **Disability Discrimination, Evidence**

Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

**Counsel:** For SUSAN E. BRITTING, Plaintiff - Appellant: Robert S. Mirin, Esq., Ralph B. Pinskey, Esq., Harrisburg, PA.

For SECRETARY DEPT OF VETERANS AFFAIRS, Defendant - Appellee: Melissa A. Swauger, Esq., Office of United States Attorney, Harrisburg, PA.

**Judges:** Before: McKee, Chief Judge, and SMITH, Circuit Judge, and STEARNS, District Judge *
The Honorable Richard G. Stearns, United States District Judge for the United States District Court of Massachusetts, sitting by designation.

.

**Opinion by:** SMITH

# Opinion

[*567]
SMITH, *Circuit Judge.*

Susan E. Britting began working as a medical transcriptionist for the Department of Veterans Affairs (VA) in its Lebanon, Pennsylvania facility in 2002. Years before, Britting had been diagnosed with irritable bowel syndrome (IBS). Around May of 2007, Britting's IBS flared up, resulting in an increase in a variety of gastrointestinal symptoms. At about this same time, Britting's performance as a transcriptionist deteriorated, adversely affecting her accuracy rate and the number of lines she was able to transcribe per shift. By [**2]
mid-June, Britting's accuracy rate had fallen from 92% (a "Fully Successful" achievement rate) to 85%. As a result, Jodi Moyer, Britting's supervisor, placed Britting on a Performance Improvement Plan, which afforded Britting 90 days to demonstrate an acceptable level of work. The Plan also provided for biweekly meetings between Moyer and Britting to discuss her work performance.

Within days, Britting provided Moyer with a letter from her physician, Dr. Messmer, which confirmed Britting's affliction with IBS and her frequent need to use the restroom. In an effort to accommodate that need, Britting's work station was moved closer to the restroom. At about this same time, Moyer advised Britting that, because of her diminished accuracy, Moyer would be reviewing Britting's transcriptions before releasing them to the medical care provider.

In mid-July, despite Moyer's directive, Britting herself released several documents to the medical provider before Moyer could complete her review. Britting did this again in August, violating Moyer's order a second time. On September 4, 2007, [*568]
Britting received notice of a proposed three-day suspension based on her persistent failure to follow Moyer's directive. [**3]
Two days later, Britting again released a transcribed report without Moyer's approval. Within a week, Britting received notice that the proposed three-day suspension had been replaced with a fifteen-day suspension. An assessment of her transcription revealed an "[o]verall monthly accuracy average of 83%," demonstrating that her accuracy rate continued to deteriorate.

The interim director of the Lebanon facility reviewed a report that considered whether Britting's suspension was warranted in light of the twelve factors set out in *Douglas v. Veterans Admin., 5 M.S.P.R. 280, 306-07 (1981).* The report noted that Britting's inability to follow the basic instruction not to release her work before it had been reviewed had resulted in serious transcription errors. Furthermore, Britting's lack of accuracy required the supervisor to review all of her work, thereby reducing the department's overall productivity.

On October 15, 2007, Britting received notice of the VA's intent to terminate her employment. Although a vacancy existed at the time in the file room, management rejected such a transfer because the job required a high degree of accuracy and was incompatible with Britting's ability. Britting's [**4]
termination became effective on November 27, 2007. Britting challenged her suspension and termination, but the Merit System Protection Board upheld the VA's actions. Britting then filed a complaint in the United States District Court for the Middle District of Pennsylvania. Britting claimed that she was discriminated against on the basis of her disability, thereby violating the Rehabilitation Act, *29 U.S.C. § 794(a).* [1]
*HN1*[⬆] The Rehabilitation Act specifies that the "standards used to determine whether this section has been violated . . . shall be the standards applied" under the Americans with Disabilities Act. *29 U.S.C. § 794(d).*

She also sought judicial review of the VA's decision to suspend and to terminate her employment under *5 U.S.C. § 7703(b)(2).*

At the time of Britting's *HN2*[⬆] 2007 termination, the Americans with Disabilities Act (ADA) was interpreted narrowly and the standard for determining whether an individual had a disability included consideration of whether the impairment had a permanent or long-term impact. The ADA Amendments Act of 2008 (ADAAA), however, rejected this narrow interpretation and reinstated

the broad scope of protections available under the ADA. *P.L. 110-325, §§ 2* [**5]
and *3, 122 Stat. 3553, 3556 (Sept. 25, 2008)*. In amending the ADA, Congress set forth several rules of construction governing the definition of disability, including that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *Id.* § 3(4)(D), codified at *42 U.S.C. § 12102(4)(D)*.

The VA moved for summary judgment, contending that Britting could not establish a disability under the narrow interpretation of that term that prevailed at the time she was terminated. Britting argued to the contrary. In addition, she asserted that the ADAAA was retroactively applicable. The District Court concluded that the ADAAA was not retroactively applicable and that Britting was unable to establish a disability under the more demanding standard applicable at the time of her termination. The District Court also concluded that there was substantial evidence to support the Merit System Protection Board's decision. This timely appeal                 followed. [2]

The District Court exercised jurisdiction over the Rehabilitation Act claim under *28 U.S.C. § 1331* and over the Merit Systems Protections Board appeal under *5 U.S.C. § 7703(b)(2)*. Appellate [**6] jurisdiction exists under *28 U.S.C. § 1291*. *HN3*[⬆️] "We exercise plenary review over the District Court's grant of summary judgment" and "apply the same standard that the District Court should have applied." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 146 (3d Cir. 2005)* (internal citations omitted).

[*569]
 We agree with the District Court that *HN4*[⬆️] the ADAAA is not retroactively applicable. *HN5*[⬆️] In deciding whether a statute is retroactively applicable, the Supreme Court has instructed that the "first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf v. USI Film Products, 511 U.S. 244, 280, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994)*. If Congress's intent is not clear, "the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* Nothing in the ADAAA's text

expressly prescribes that the statute is retroactively applicable. Furthermore, in expanding the definition of disability, the ADAAA clearly increased the VA's liability for past conduct. As a result, we conclude that [**7] the ADAAA cannot be applied retroactively. [3]
We are not alone in this conclusion. Our sister circuits, which have considered the question, have uniformly concluded that the ADAAA is not retroactively applicable. *See Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x. 85, 87 n.2 (2d Cir. 2010)*; *Nyrop v. Indep. Sch. Dist. No. 11, 616 F.3d 728, 734 n.4 (8th Cir. 2010)*; *Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 34 n.3 (1st Cir. 2009)*; *Becerril v. Pima County Assessor's Office, 587 F.3d 1162, 1164 (9th Cir. 2009)*; *Fredricksen v. United Parcel Serv., 581 F.3d 516, 521 n.1 (7th Cir. 2009)*; *Lytes v. DC Water & Sewer Auth., 572 F.3d 936, 940-42, 387 U.S. App. D.C. 291 (D.C. Cir. 2009)*; *Milholland v. Sumner County Bd. of Educ., 569 F.3d 562, 565-67 (6th Cir. 2009)*; *EEOC v. Agro Distribution, LLC, 555 F.3d 462, 469 n.8 (5th Cir. 2009)*.

Britting argues that the new statute is nevertheless applicable because it effects a waiver of sovereign immunity. As a result, she contends that it is a jurisdictional statute, which (as *Landgraf* acknowledged) is a kind of legislation that is "regularly applied" retroactively. *511 U.S. at 274*. The *Landgraf* Court's acknowledgment, however, was qualified:

> Application of a new [**8]
> jurisdictional rule usually "takes away no substantive right but simply changes the tribunal that is to hear the case." Present law normally governs in such situations because jurisdictional statutes "speak to the power of the court rather than to the rights or obligations of the parties[.]"

*Id.* (citations omitted). By using the term "usually," *Landgraf* signaled that *HN6*[⬆️] there may be instances where a jurisdictional statute may not be applied retroactively. Such an instance may arise where the new jurisdictional statute affects a party's substantive rights or obligations. *Id.* Indeed, the Court concluded in *Hughes Aircraft Co. v. United States, 520 U.S. 939, 117 S. Ct. 1871, 138 L. Ed. 2d 135 (1997)*, that a new statute, which eliminated an affirmative defense in *qui tam* actions, "create[d] jurisdiction where none previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well. Such a statute, even though phrased in 'jurisdictional' terms, is as much subject to our presumption against retroactivity as any other." *Id. at 951*. Thus, we conclude that the ADAAA, even though it may

be jurisdictional in nature with regard to the VA, is not retroactively applicable [**9] because it affects the substantive rights of the parties.

 [*570]
 Having concluded that the ADAAA is not retroactively applicable, we turn to Britting's contention that the District Court erred in its determination that she did not establish a disability under the more demanding pre-ADAAA standard. We conclude that the District Court did not err. Britting confirmed that her IBS was episodic in nature and did not afflict her every day.

Finally, Britting contends that her suspension and termination are not supported by substantial evidence. *HN7*[↑] Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bradley v. Veterans Admin., 900 F.2d 233, 234 (Fed. Cir. 1990)* (quoting *Consol. Edison Co. v. Labor Bd., 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938))*. Our review of the record reveals that there is substantial evidence to support the VA's actions.

For the reasons set forth above, we will affirm the judgment of the District Court.

**End of Document**

**3**

 Caution
As of: June 18, 2020 5:44 PM Z

## *Burke v. Nalco Chem. Co.*

United States District Court for the Northern District of Illinois, Eastern Division

July 17, 1996, Decided ; July 18, 1996, DOCKETED

96 C 981

**Reporter**
1996 U.S. Dist. LEXIS 10190 *

MEREDITH A. BURKE, f/k/a MEREDITH A. JIRKA, Plaintiff, v. NALCO CHEMICAL COMPANY, an Illinois corporation, WILLIAM LINDENBERGER, and ROGER FOWEE, Defendants.
**Disposition:**
 [*1]
 Defendants Nalco, Lindenberger, and Fowee's motions to dismiss plaintiff's amended complaint is granted

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

Civil Procedure > Dismissal > Involuntary Dismissals > Failure to State Claims

Civil Procedure > Judgments > Relief From Judgments > General Overview

*HN1*[📄]  **Motions to Dismiss, Failure to State Claim**

The purpose of a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* is to test the sufficiency of the complaint, not to decide the merits of the case.

Defendants must meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted since, in ruling on a motion to dismiss, the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. The allegations of a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action.

Business & Corporate Compliance > ... > Labor & Employment Law > Leaves of Absence > Family & Medical Leaves

Business & Corporate Compliance > ... > Family & Medical Leaves > Scope & Definitions > Restoration of Benefits & Positions

*HN2*[📄]  **Leaves of Absence, Family & Medical Leaves**

In addition to providing eligible employees with up to 12 weeks of unpaid leave to handle qualified family problems, the Family and Medical Leave Act also ensures that those who take such leave will be restored to their former position or an equivalent one upon returning to work. *29 U.S.C.S. §§ 2612(a)(1)*, *§ 2614(a)(1)*.

Business & Corporate Compliance > ... > Labor & Employment Law > Leaves of Absence > Family & Medical Leaves

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > Covered Employees

Labor & Employment Law > Employment Relationships > At Will Employment > Definition of Employees

Labor & Employment Law > Employment Relationships > At Will Employment > Definition of Employers

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > General Overview

Business & Corporate Compliance > ... > Family & Medical Leaves > Scope & Definitions > Covered Employers

## HN3[⤓] Leaves of Absence, Family & Medical Leaves

In order to state a claim under the Family and Medical Leave Act (FMLA), a complaint must at least contain allegations which establish that, within the meaning of the FMLA, the defendant employer is an "employer" and the plaintiff employee is an "eligible employee." As defined by the FMLA, an employer includes: any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year including any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer. *29 U.S.C.S. § 2611(4)(A)(i), (ii)*. An employer who does not fit within the FMLA's definition is not bound by its terms.

Business & Corporate Compliance > ... > Labor & Employment Law > Leaves of

Absence > Family & Medical Leaves

Governments > Legislation > Statute of Limitations > Extensions & Revivals

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

## HN4[⤓] Leaves of Absence, Family & Medical Leaves

The statute of limitations for actions under the Family and Medical Leave Act is two years after the date of the last event constituting the alleged violation for which the action is brought. *29 U.S.C.S. § 2617(c)(1)*.

Torts > ... > Liability > Claim Presentation > General Overview

Workers' Compensation & SSDI > Administrative Proceedings > Claims > General Overview

Labor & Employment Law > Discrimination > Retaliation > General Overview

Workers' Compensation & SSDI > Coverage > Actions Against Employers > Retaliatory Discharge Actions

## HN5[⤓] Liability, Claim Presentation

The tort of retaliatory discharge is governed by state law.

Labor & Employment Law > Discrimination > Retaliation > General Overview

Labor & Employment Law > Wrongful Termination > Public Policy

## HN6[⬇️]  Discrimination, Retaliation

In order to state a claim for retaliatory discharge in Illinois, an employee must establish that: (1) she was discharged in retaliation for her activities, and (2) that the discharge contravenes a clearly mandated public policy. The mere citation of a constitutional or statutory provision in a complaint will not by itself be sufficient to state a cause of action for retaliatory discharge. Rather, a plaintiff must demonstrate in her complaint that the public policy cited by the plaintiff is violated by the plaintiff's discharge.

Labor & Employment Law > Discrimination > Retaliation > General Overview

## HN7[⬇️]  Discrimination, Retaliation

The Illinois Supreme Court has refused to extend retaliatory discharge to include claims based on employment actions short of discharge.

Business & Corporate Compliance > ... > Disability Discrimination > Scope & Definitions > Covered Entities

Labor & Employment Law > Employment Relationships > At Will Employment > Definition of Employers

Business & Corporate Compliance > ... > Discrimination > Disability Discrimination > Federal & State Interrelationships

## HN8[⬇️]  Scope & Definitions, Covered Entities

The statutory definition of "employer" under the Americans with Disabilities Act does not generally encompass individuals.

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Major Life Activities

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > General Overview

## HN9[⬇️]  Mental & Physical Impairments, Major Life Activities

The Americans with Disabilities Act (ADA) *§ 12102(2)(A)* defines "disability" as a physical or mental impairment that substantially limits one or more of the major life activities of such individual. A plaintiff's failure to allege facts that will support a finding that her disability substantially limited one or more major life activities or that her employer regarded her as having such a disability warrants dismissal of a plaintiff's ADA claim.

Business & Corporate Compliance > ... > Discrimination > Disability Discrimination > Federal & State Interrelationships

Labor & Employment Law > ... > US Equal Employment Opportunity Commission > Civil Actions > General Overview

## HN10[⬇️]  Disability Discrimination, Federal & State Interrelationships

As a predicate to civil action, the Americans with Disabilities Act requires that a charge of discrimination be filed with the Equal Employment Opportunity Commission (EEOC). This requirement is interpreted as precluding the assertion of such claims in a federal complaint where they were not originally included in an EEOC charge. Only those claims that are "like or reasonably related to" the discriminatory conduct identified by the plaintiff in the EEOC charge are permissible. Moreover, when an EEOC charge alleges a particular theory of discrimination allegations of a different type of discrimination in a subsequent complaint are not considered to be

Burke v. Nalco Chem. Co.

reasonably related unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge.

**Counsel:** For MEREDITH A BURKE fka Meredith A Jirka, plaintiff: John Justin Wyeth, Russell John Heitz, John Justin Wyeth & Associates, Naperville, IL.

For NALCO CHEMICAL COMPANY, an Illinois corporation, WILLIAM LINDENBERGER, ROGER FOWEE, defendants: Danuta Bembenista Panich, Janet Lynn Hall, Mayer, Brown & Platt, Chicago, IL.

**Judges:** Charles P. Kocoras, United States District Judge

**Opinion by:** Charles P. Kocoras

## Opinion

***MEMORANDUM OPINION***

CHARLES P. KOCORAS, District Judge:

This matter is before the court on three motions to dismiss pursuant to *Rule 12(b)(b) of the Federal Rules of Civil Procedure*. For the reasons set forth below, all motions are granted.

## BACKGROUND

The plaintiff, Meredith A. Burke, formerly known as Meredith A. Jirka ("Burke") brought this action against her former employer, Nalco Chemical Company ("Nalco") and two former supervisors, William Lindenberger ("Lindenberger") and Roger Fowee ("Fowee"). Burke's first complaint was filed on February 21, 1996, alleging violations of the Family and Medical Leave Act of 1993 ("FMLA"), *29 U.S.C. §§ 2601 et seq.,* [*2] (Count I) and a pendent state law claim for retaliatory discharge (Count II). On April 24, 1996, Burke added a third count, alleging violations of the Americans with Disabilities Act ("ADA"), *42 U.S.C. §§ 12101 et seq.,* (Count III).

As alleged in Count I of the plaintiff's amended complaint, Burke was employed by Nalco from April 22, 1991 to February 22, 1994. On or about November 23, 1992, Defendant Lindenberger, Burke's supervisor in Nalco's "Applied Services" Division, purportedly placed the plaintiff on "verbal probation" for poor work performance. Thereafter, from about December 21, 1992 through January 4, 1993, the plaintiff requested and was granted permission to take a vacation leave from work to care for her terminally ill father. Burke returned to work following the death of her father on or about January 11, 1993. On January 12, 1993, Burke alleges that Lindenberger placed her on written probation for poor work performance. This probationary period ended in March 1993 following the satisfactory completion by Burke of specific goals set by Lindenberger. By the plaintiff's May 11, 1993 performance review, Lindenberger indicated that Burke was satisfying Nalco's legitimate [*3] business expectations.

From July 7, 1993 through August 8, 1993, the plaintiff requested and received permission to take leave from work for an unspecified but "serious health condition." While in the hospital, the plaintiff was allegedly informed that she was being transferred to another division within Nalco, and upon her return to work on August 9, 1993, the plaintiff began working in the "Boiler Research Department" Division under Defendant Fowee, where Burke alleges that she again met all legitimate business expectations of Nalco.

The plaintiff took a second medical leave from work from December 13, 1993 to January 3, 1994. Upon the plaintiff's return to work from this second leave, Burke maintains that she was assigned to "a project of high importance and significance." Burke started experiencing difficulties, however, and Defendant Fowee began documenting her performance problems. On February 22, 1994, Fowee terminated the plaintiff from her position at Nalco.

In Count II of the plaintiff's amended complaint Burke further alleges that on or about November 11, 1992 and again in March 1993, the plaintiff, "reasonably believing Nalco was violating the law,"

Burke v. Nalco Chem. Co.

voiced objections [*4]
 as to Nalco's actions. These objections reportedly culminated in the plaintiff (1) being placed on probation in November 1992 and January 1993, (2) having her job responsibilities changed in August 1993 and January 1994, and (3) being terminated from her position at Nalco on February 22, 1994. Count III of the amended complaint reiterates many of the allegations contained in Count I, adding only that the plaintiff's transfer in August 1993 and her subsequent termination in February 1994 were based upon asserted misperceptions as to the plaintiff's physical and mental condition, purportedly in violation of the ADA. Allegedly based upon these "misperceptions," Fowee and Nalco further failed to offer Burke any other positions at Nalco.

On June 8, 1994, the plaintiff filed her "Charge of Discrimination" with the Equal Employment Opportunity Commission ("EEOC") as to the ADA claim. Burke's Notice of Right to Sue was received on or about March 4, 1996. On April 24, 1996, Burke filed her amended complaint against Defendants Nalco, Lindenberger, and Fowee. All three defendants have moved for dismissal of the complaint in its entirety.

## LEGAL STANDARD

*HN1*[⬆] The purpose of a motion to dismiss [*5]
 pursuant to *Rule 12(b)(6)* is to test the sufficiency of the complaint, not to decide the merits of the case. Defendants must meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted since, in ruling on a motion to dismiss, the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. *Ed Miniat, Inc. v. Globe Life Ins. Group Inc., 805 F.2d 732, 733 (7th Cir. 1986)*, cert. denied, 482 U.S. 915, 96 L. Ed. 2d 676, 107 S. Ct. 3188 (1987). The allegations of a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S.*

*Ct. 99 (1957)*. *See also Hishon v. King & Spalding, 467 U.S. 69, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)*; *Doe on Behalf of Doe v. St. Joseph's Hospital, 788 F.2d 411 (7th Cir. 1986)*. Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts [*6]
 sufficiently setting forth the essential elements of the cause of action. *Gray v. County of Dane, 854 F.2d 179, 182 (7th Cir. 1988)*. We turn to the motion before us with these principles in mind.

## DISCUSSION

## A. Count I - The FMLA

Enacted on February 5, 1993, the FMLA is the embodiment of Congress' attempt to balance the demands of the workplace with the needs of employees to take leave for eligible medical conditions and compelling family reasons. *29 U.S.C. § 2601(b)*. *HN2*[⬆] In addition to providing eligible employees with up to twelve weeks of unpaid leave to handle qualified family problems, the FMLA also ensures that those who take such leave will be restored to their former position or an equivalent one upon returning to work. *29 U.S.C. § 2612(a)(1)*; *29 U.S.C. § 2614(a)(1)*; *Freemon v. Foley, 911 F. Supp. 326, 329-30 (N.D.Ill. 1995)*. The defendants assert that the plaintiff's amended complaint fails to state a claim under the FMLA. For the reasons discussed below, we agree with the defendants.

*HN3*[⬆] In order to state a claim under the FMLA, a complaint must at least contain allegations which establish that, within the meaning of the FMLA, the defendant employer is an [*7]
 "employer" and the plaintiff employee is an "eligible employee." As defined by the FMLA, an employer includes:

> any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year. . . including. . . any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer. . . .

*29 U.S.C. § 2611(4)(A)(i), (ii)*. An employer who

Burke v. Nalco Chem. Co.

does not fit within the FMLA's definition is not bound by its terms. In the present case, the plaintiff's amended complaint is devoid of any allegations which assert that each of the three defendants qualifies as an "employer" under the FMLA or that Burke is an "eligible employee" under the FMLA. Though the plaintiff may believe that such allegations are "obvious" and thus rendered unnecessary, absent such allegations, the complaint is plainly deficient and cannot state a claim under the FMLA.

Even if we were to assume, however, that each of the named parties was subject to the dictates of the FMLA, certain of the plaintiff's allegations would still [*8] falter. For example, the plaintiff alleges violations based on her being placed on probation in January 1993, following the illness of her father. These allegations, however, concern incidents which transpired prior to the effective date of the FMLA. As such, any such allegations are effectively barred.

Statute of limitations problems similarly plague the plaintiff's allegations surrounding her transfer in August 1993 following an extended illness. *HN4*[⬆] The statute of limitations for actions under the FMLA is "2 years after the date of the last event constituting the alleged violation for which the action is brought." *29 U.S.C. § 2617(c)(1)*. The plaintiff's initial complaint was filed on February 21, 1996, more than two years after the plaintiff's transfer on August 9, 1993. Moreover, any attempt by Burke to assert a "continuing violation" which encompasses her transfer in August 1993 and her termination on February 22, 1994 is not factually supported by the amended complaint. The amended complaint does not allege any relationship between the decision to transfer Burke and the decision to terminate her employment with Nalco. Instead, the defendants' alleged conduct in August 1993 and [*9] February 1994 signify two separate incidents about which the plaintiff was fully aware at the time at which they occurred. Indeed, the amended complaint demonstrates that the decision to transfer Burke in 1993 and the decision to terminate Burke in 1994 were two discrete decisions made by two different people. *See Stewart v. County of Brown,*

No. 95 C 2776, 1996 WL 313212 (June 12, 1996) (claim of disability discrimination based on transfer occurring over 300 days prior to plaintiff filing charge is time barred where no relationship between the untimely and the timely acts). The plaintiff's objections notwithstanding, the amended complaint simply does not allege a continuing violation of the FMLA. As such, the plaintiff's allegations regarding her transfer in August 1993 (and hence Burke's allegations against Defendant Lindenberger in this regard) are time-barred under the                          FMLA.                    [1]

The plaintiff's allegations regarding her August 1993 transfer do not find solace in *29 U.S.C. § 2617(c)(2)* which affords a three year limitations period for willful violations of the FMLA. Although the amended complaint does include an allegation that the decision regarding the plaintiff's discharge was willful, it does not include any such allegation with regard to the decision to transfer her in August, 1993. As such, the three-year statute of limitations provision does not apply.

Given the above described shortcomings, Count I of the plaintiff's amended complaint must be dismissed.

[*10]
## B. Count II - Retaliatory Discharge

Governed by state law, *HN5*[⬆] the tort of retaliatory discharge was first recognized in Illinois in *Kelsay v. Motorola, Inc., 74 Ill. 2d 172, 384 N.E.2d 353, 23 Ill. Dec. 559 (Ill. 1978)*, where an employee was discharged in retaliation for filing a worker's compensation claim against her employer. Since that time, however, Illinois courts have repeatedly narrowed the tort of retaliatory discharge. *See, e.g., Barr v. Kelso-Burnett & Co., 106 Ill. 2d 520, 478 N.E.2d 1354, 88 Ill. Dec. 628 (Ill. 1985); Palmateer v. International Harvester Co., 85 Ill. 2d 124, 421 N.E.2d 876, 52 Ill. Dec. 13 (Ill. 1981)*. Acknowledging the state courts' efforts to curtail the expansion of the tort, the Seventh Circuit has similarly declined to increase its scope. *Prince v. Rescorp Realty, 940 F.2d 1104 (7th Cir. 1991)*.

*HN6*[⬆] In order to state a claim for retaliatory discharge in Illinois, an employee must establish that: (1) she was discharged in retaliation for her activities, and (2) that the discharge contravenes a clearly mandated public policy. *Prince, 940 F.2d at 1107*. Elaborating upon this second requirement,

Burke v. Nalco Chem. Co.

the Illinois Supreme Court has held [*11] that "the mere citation of a constitutional or statutory provision in a complaint will not by itself be sufficient to state a cause of action for retaliatory discharge." *Fellhauer v. City of Geneva, 142 Ill. 2d 495, 568 N.E.2d 870, 875, 154 Ill. Dec. 649 (Ill. 1991).* Rather, a plaintiff must demonstrate in her complaint that the public policy cited by the plaintiff is violated by the plaintiff's discharge. *Id.*

The defendants assert that Count II of the plaintiff's amended complaint fails sufficiently to state a claim for retaliatory discharge under Illinois law. We agree. At the outset, we note that to the extent that the plaintiff attempts to assert a claim for retaliatory discharge based on conduct unrelated to her discharge, the plaintiff's claim must fail. *HN7* [⬆] The Illinois Supreme Court has refused to extend retaliatory discharge to include claims based on employment actions short of discharge. *Zimmerman v. Buchheit of Sparta, Inc., 164 Ill. 2d 29, 645 N.E.2d 877, 206 Ill. Dec. 625 (1994).* Hence, to the extent that the plaintiff attempts to state a claim against Lindenberger, Burke's pre-transfer supervisor, the plaintiff's claim for retaliatory discharge cannot survive.

 [*12]
 Count II, however, contains additional fatal deficiencies. The plaintiff alleges in her amended complaint that Burke voiced objections "involving areas of critical public and social importance as demonstrated by Illinois antitrust, environmental safety and workplace safety statutes." Allegedly as a result of these objections, the plaintiff maintains that Nalco took certain retaliatory actions against her. Absent from the plaintiff's amended complaint, however, are allegations which serve to identify the clearly mandated public policy which would have been contravened by such actions. The amended complaint does not, for example, identify statutes or public policy underlying statutes. The amended complaint further does not identify any public policy violated by Burke's discharge, nor does it allege that Burke's discharge violated any public policy. *See Fellhauer, 568 N.E.2d at 875.* Under Illinois law such deficiencies are fatal to the plaintiff's claim for retaliatory discharge. Accordingly, as to all defendants, Count II of the plaintiff's amended complaint is dismissed.

## C. Count III - The ADA

In *EEOC v. AIC Sec. Investigations Ltd.,* the Seventh Circuit pronounced that [*13] *HN8* [⬆] the statutory definition of "employer" under the ADA does not generally encompass individuals. *EEOC v. AIC Security Systems, Ltd., 55 F.3d 1276, 1279-82 (7th Cir. 1995).* Thus, as to the plaintiff's former supervisors, Defendants Lindenberger and Fowee, the plaintiff's claims of liability under the ADA must ultimately fail. For separate reasons recounted below, Count III likewise falters as against Defendant Nalco.

*HN9*[⬆] *Section 12102(2)(A)* of the ADA defines "Disability" as "[a] physical or mental impairment that substantially limits one or more of the major life activities of such individual; . . . ." *42 U.S.C. § 12102(2)(A).* A plaintiff's failure to allege facts that will support a finding that her disability substantially limited one or more major life activities or that her employer regarded her as having such a disability warrants dismissal of a plaintiff's ADA claim. *See Tindle v. Carry Cos. of Illinois,* No. 95 C 5980, 1996 WL 131708 (March 20, 1996) (dismissing plaintiff's ADA claim for failure to allege facts supporting claim that his disability substantially limited one or more major life activities): *Gonzalez v. Perfect Carton Corp. 95 C 5476,* 1996 WL 89058 (February [*14] 28, 1996) (dismissing plaintiff's ADA claim for failure to allege facts supporting claim that defendant regarded plaintiff as disabled).

In the present case, Burke generally alleges that Nalco regarded her as having a disability and, as a result, made certain employment decisions based upon its "misperception" as to her physical and mental condition. Nowhere, however, does the plaintiff indicate what disability or condition Nalco allegedly regarded her as possessing. Nor does the plaintiff allege that Nalco considered her "misperceived" disability to substantially limit one or more major life activities. In short, the plaintiff has failed adequately to allege that she was either disabled as defined by the ADA (the amended complaint does not identify the nature of Burke's illness) or that she was perceived by Nalco to be so

Burke v. Nalco Chem. Co.

disabled. Absent such allegations, the plaintiff simply cannot state a claim under the ADA.

The plaintiff's ADA claim has additional shortcomings. *HN10*[⬆] As a predicate to civil action, the ADA requires that a charge of discrimination be filed with the EEOC. This requirement has been interpreted as precluding the assertion of such claims in a federal complaint where they [*15] were not originally included in an EEOC charge. *Harper v. Godfrey Co., 45 F.3d 143, 147-48 (7th Cir. 1995)*. Only those claims that are "like or reasonably related to" the discriminatory conduct identified by the plaintiff in the EEOC charge are permissible. *Harper, 45 F.3d at 148*. Moreover, "when an EEOC charge alleges a particular theory of discrimination allegations of a different type of discrimination in a subsequent complaint are not [considered to be] reasonably related. . . unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge." 31 F.3d at 503.

The claims which Burke asserts in Count III of her amended complaint clearly fall outside the scope of her EEOC charge. As indicated above, the plaintiff alleges in Count III that Nalco transferred her to a different position in August 1993 and discharged her in February 1994 because Nalco regarded Burke as having a disability and Nalco "misperceived" her physical and mental condition. Such allegations, however, cannot be reasonably inferred from the allegations contained in the plaintiff's EEOC charge.

The plaintiff's EEOC charge states explicitly that she was discriminated [*16] against "on the basis of" specific disabilities diagnosed in "October, July, and December 1993." The EEOC charge further states that Burke informed Nalco of these specific disabilities and requested and was granted a reasonable accommodation for these disabilities. Absent from the plaintiff's EEOC charge are the complaint's assertions that Nalco discriminated against Burke based upon some "misperceived" condition. Absent from the amended complaint are the EEOC charge's allegations that Burke was diagnosed with disabilities and that she requested and received a

reasonable accommodation for those disabilities. Put simply, the discrimination alleged against Nalco in the EEOC charge differs profoundly from the discrimination alleged in the amended complaint. Given that the allegations contained in Count III of the plaintiff's amended complaint cannot reasonably be inferred from the plaintiff's charge as filed with the EEOC, the plaintiff has failed to exhaust required administrative procedures, and Count III of the amended complaint must be dismissed.

**CONCLUSION**

For the reasons set forth above, Defendants Nalco, Lindenberger, and Fowee's motions to dismiss the plaintiff's amended [*17] complaint are granted in their entirety.

Charles P. Kocoras

United States District Judge

Dated: *July 17, 1996*

---

**End of Document**

**4**

 Cited
As of: June 18, 2020 5:44 PM Z

## *Chaussinand v. Guttman Oil Co.*

United States District Court for the Western District of Pennsylvania

July 15, 2009, Decided; July 16, 2009, Filed

Civil Action No. 08-1714

### Reporter

2009 U.S. Dist. LEXIS 60830 *; 2009 WL 2151384

LORI ANN CHAUSSINAND, Plaintiff, v. GUTTMAN OIL COMPANY, LARRY FLANNELLY, and RICHARD GUTTMAN, Defendants.

**Counsel:** [*1]
For LORI ANN CHAUSSINAND, Plaintiff: Jeffrey P. Myers, LEAD ATTORNEY, Jeffrey P. Myers Attorney At Law, Wexford, PA.

For GUTTMAN OIL COMPANY, LARRY FLANNELLY, in official and personal capacity, RICHARD GUTTMAN, in official and personal capacity, Defendants: Gregory A. Miller, LEAD ATTORNEY, Buchanan Ingersoll, Pittsburgh, PA; Ryan W. Colombo, LEAD ATTORNEY, Buchanan Ingersoll & Rooney, Pittsburgh, PA.

**Judges:** Gary L. Lancaster, United States District Judge.

**Opinion by:** Gary L. Lancaster

## Opinion

*MEMORANDUM and ORDER*

Gary L. Lancaster

District Judge.

This is an action in employment discrimination. Plaintiff, Lori Ann Chaussinand, alleges that her employer, Guttman Oil Company, subjected her to discrimination and a hostile work environment because of her gender, and then retaliated against her when she complained, all in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e, et seq.* and the Pennsylvania Human Relations Act, *42 Pa. Cons. Stat. § 951, et seq*. She seeks injunctive and monetary relief.

All defendants (collectively "Guttman") have filed a joint motion to partially dismiss the amended complaint [doc. no. 21]. They ask that the claim for punitive damages under the PHRA be dismissed with prejudice [*2] as the statute does not provide for such relief, that the hostile work environment claim be dismissed as having been insufficiently pled, and that any claim for individual liability under the PHRA against Messrs. Flannelly and Guttman be dismissed because neither individual is an employer. For the reasons set forth below, we grant the motion, without prejudice to Chaussinand's right to amend her complaint in order to plead in conformity with the requirements of the law.

In considering a *Rule 12(b)(6)* motion, we must be mindful that Federal courts require notice pleading, as opposed to the heightened standard of fact pleading. *Rule 8 of the Federal Rules of Civil Procedure* "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)* (citing *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*. However, even under this lower notice pleading standard, a plaintiff must do more than recite the elements of a cause of action, and then make a blanket assertion of an entitlement to [*3] relief under it. Instead, a plaintiff must make a factual showing of his entitlement to relief by alleging sufficient facts that, when taken as true,

Chaussinand v. Guttman Oil Co.

suggest the required elements of a particular legal theory. *Twombly, 127 S.Ct. at 1965*. The amount and type of facts needed to satisfy this requirement will depend on the context of the case and the causes of action alleged. *Phillips v. County of Allegheny, et al., 515 F.3d 224, 232 (3d Cir. 2008)*.

Therefore, when deciding a motion to dismiss under *Rule 12(b)(6)*, we apply the following rules. The facts alleged in the complaint must be taken as true and all reasonable inferences must be drawn in favor of plaintiffs. *Twombly, 127 S.Ct. at 1965*; *Phillips, 515 F.3d at 231*; *Rowinski v. Salomon Smith Barney Inc., 398 F.3d 294 (3d Cir. 2005)*. We may not dismiss a complaint merely because it appears unlikely or improbable that plaintiffs can prove the facts alleged or will ultimately prevail on the merits. *Twombly, 127 S.Ct. at 1965, 1969 n.8*. Instead, we must ask whether the facts alleged raise a reasonable expectation that discovery will reveal evidence of the necessary elements. *Id. at 1965*. In the end, if, in view of the facts alleged, it [*4] can be reasonably conceived that the plaintiffs could, upon a trial, establish a case that would entitle them to relief, the motion to dismiss should not be granted. *Id. at 1969 n.8*.

It is on this standard that the court has reviewed Guttman's motion to dismiss. Based on the pleadings of record and the briefs filed in support of and opposition to the motion, the court will grant the motion for the reasons set forth below.

Guttman has moved to dismiss Chaussinand's prayer for punitive damages on the ground that such relief is unavailable as a matter of law under the PHRA. Chaussinand has filed no response in her opposition brief. We could therefore consider the issue waived and grant the motion on those grounds. In any case, the Pennsylvania Supreme Court has stated clearly that "punitive damages are not available under the [Pennsylvania Human Relations] Act." *Hoy v. Angelone, 554 Pa. 134, 720 A.2d 745, 749-51 (Pa. 1998)*. As such, we grant Guttman's motion on this point, with prejudice.

Next, Guttman moves to dismiss Chaussinand's hostile work environment claim on the ground that she has insufficiently pled facts suggestive of illegal harassment. Chaussinand contends that she

has set forth the necessary [*5] factual averments to support her claim. We agree with Guttman and will dismiss Chaussinand's hostile work environment claim(s) [1]

Chaussinand includes a reference to an alleged hostile work environment in every count of her amended complaint. As such, we cannot simply dismiss one particular count in order to excise the hostile work environment claims from the case. Rather, we must dismiss all counts to the extent that they purportedly assert a claim based on an alleged hostile work environment.

, without prejudice to her right to amend her complaint to include the necessary allegations, if they exist.

Although Chaussinand refers cryptically to "inappropriate behavior" and "a hostile work environment…includ[ing] the working relationship between her Outside Sales Position and the Inside Sales Division" in her amended complaint, she does not give substance to these allegations. Nor does she ever allege that the problematic behavior or relationship was related to her gender. Rather, these unidentified problems could have been related to personality conflicts, differences in socioeconomic backgrounds, or even rival sports affiliations. Looked at another way, even if Chaussinand could prove [*6] all of the facts she alleges in her amended complaint, we could not find that a hostile work environment related to gender existed. Without the element of harassment based on gender, there is no hostile work environment claim under Title VII or the PHRA. As such, we dismiss all counts of the complaint to the extent they seek relief, whether against the company or either individual defendant, based on a hostile work environment.

Finally, Guttman seeks dismissal of Counts IV and V to the extent that they assert claims for individual liability against defendants Flannelly and Guttman under the PHRA on the ground that neither qualify as employers under the statute. [2]

Chaussinand has voluntarily withdrawn her claims for individual liability under Title VII against Messrs. Flannelly and Guttman in response to Guttman's motion to dismiss [doc. no. 30].

Chaussinand claims that she has sufficiently alleged aiding and abetting liability against each individual. We again agree with Guttman and dismiss Counts IV and V to the extent that they seek to impose individual liability against Messrs.

Flannelly and Guttman under the PHRA.

As an initial matter, neither Count IV nor Count V references Mr. [*7]
Guttman by name. Although the heading indicates that both counts are asserted against "Larry Flannelly, Richard Guttman and Guttman Oil Company" and refer to "Defendants" collectively in the numbered allegations, Flannelly is the only individual specifically referred to. [doc. no. 20 at PP 46, 50 ("Defendants Company and Flannelly are employers within the scope of the PHRA")]. Regardless of this deficiency, even were Mr. Guttman also mentioned specifically in the body of these counts, the allegations made in Counts IV and V are insufficient to impose liability against either individual under the PHRA. Neither Messrs. Guttman nor Flannelly are employers and Chaussinand makes no allegations in these two counts that either individual aided or abetted gender discrimination or harassment. Therefore, we dismiss these two counts, without prejudice, to the extent that they seek to impose liability against either individual defendant under the PHRA.

However, this ruling does not remove any possibility that Messrs. Flannely or Guttman may be held individually liable under that statute. Although we have found that Chaussinand has failed to sufficiently plead claims for individual liability in [*8]
Counts IV and V, we find that she has sufficiently pled such a claim in Count II. In addition, she has pled elsewhere in the amended complaint that both individuals held supervisory positions. *Dici v. Comm. of Pa., 91 F.3d 542, 552 (3d Cir. 1996)*. As such, for those legal causes of action that have been sufficiently pled in Count II, Chaussinand has made appropriate allegations on which to base a finding of individual liability against Messrs. Flannelly and/or Guttman under the PHRA.

For the reasons set forth above, Guttman's motion to dismiss is granted. An appropriate order follows.

*ORDER*

AND NOW, this 15th day of July, 2009, IT IS HEREBY ORDERED THAT defendants' motion to partially dismiss the amended complaint [doc. no. 21] is GRANTED.

Any claim for punitive damages under the PHRA is dismissed, with prejudice.

All counts of the amended complaint, to the extent they assert a hostile work environment claim, are dismissed without prejudice to plaintiff's right to file an amended to complaint within ten (10) days from the entry of this order on the court's docket.

Counts IV and V of the amended complaint, to the extent they assert individual liability against Mr. Flannelly or Mr. Guttman, [*9]
are dismissed without prejudice to plaintiff's right to file an amended to complaint within ten (10) days from the entry of this order on the court's docket.

BY THE COURT:

/s/ Gary L. Lancaster

_____

**End of Document**

**5**

 Neutral
As of: June 18, 2020 5:44 PM Z

## *ESI/Employee Sols., L.P. v. City of Dallas*

United States District Court for the Eastern District of Texas, Sherman Division

March 30, 2020, Decided; March 30, 2020, Filed

CIVIL ACTION NO. 4:19-CV-570-SDJ

**Reporter**

2020 U.S. Dist. LEXIS 55099 *

ESI/EMPLOYEE SOLUTIONS, L.P.; HAGAN LAW GROUP L.L.C.; and STATE OF TEXAS v. CITY OF DALLAS; T.C. BROADNAX, in his official capacity as City Manager of the City of Dallas; and BEVERLY DAVIS, in her official capacity as Director of the City of Dallas Office of Equity and Human Rights

**Prior History:** *ESI/Employee Sols., L.P. v. City of Dallas, 2019 U.S. Dist. LEXIS 189538 (E.D. Tex., Oct. 31, 2019)*

**Counsel:** [*1]

For ESI/Employee Solutions, LP, Hagan Law Group LLC, Plaintiffs: Ryan Daniel Walters, Robert Earl Henneke, Texas Public Policy Foundation, Austin, TX.

For State Of Texas, Plaintiff: Anne Marie Mackin, LEAD ATTORNEY, Office of The Attorney General of Texas, Austin, TX; William Thomas Thompson, Office of The Attorney General of Texas, Capitol Station, Austin, TX.

For Dallas City of, T.C. Broadnax, in his official capacity as City Manager of the City of Dallas, Beverly Davis, in her official capacity as Director of the City of Dallas Office of Equity and Human Rights, Defendants: Kathleen MacInnes Fones, LEAD ATTORNEY, Charles Steven Estee, Stacy Jordan Rodriguez, Dallas City Attorney's Office, Dallas, TX.

For Associated Builders & Contractors of South Texas, Inc., American Staffing Association, BBM-Online, LLC d/b/a BBM Staffing, The Burnett Companies Consolidated, Inc. d/b/a Burnett Specialists, Cardinal Senior Care, LLC d/b/a Cardinal Med Staffing, Choice Staffing, LLC, eEmployers Solutions, Inc., Hawkins Associates, Inc. d/b/a Hawkins Personnel Group, LeadingEdge Personnel, Ltd., Staff Force, Inc. d/b/a Staff-Force Personnel Services, San Antonio Manufacturers Association, San Antonio [*2] Restaurant Association, Amicus: Courtney Renea Potter-Gaines, Davis Cedillo & Mendoza Inc, San Antonio, TX.

**Judges:** SEAN D. JORDAN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** SEAN D. JORDAN

## Opinion

### MEMORANDUM OPINION & ORDER

Like several other Texas cities, the City of Dallas has enacted an ordinance requiring employers to provide paid sick leave to most employees working within the Dallas city limits. Plaintiffs, the State of Texas and two Collin County headquartered employers with employees who work in Dallas, ESI/Employee Solutions, L.P. ("ESI") and Hagan Law Group, L.L.C. ("Hagan"), assert that the Dallas paid sick leave ordinance runs afoul of both the federal and state constitutions and is therefore unenforceable.[1]

ESI and Hagan will sometimes be collectively referenced herein as the "Employer-Plaintiffs."

Before the Court is a Motion to Dismiss filed by Defendants City of Dallas, T.C. Broadnax, and Beverly Davis (collectively, "the City"), (Dkt. #36), and Employer-Plaintiffs' Motion for Preliminary Injunction, (Dkt. #3), joined by the State of Texas, (Dkt. #21). The City has moved to dismiss Plaintiffs' claims under *Federal Rule of Civil*

ESI/Employee Sols., L.P. v. City of Dallas

*Procedure 12(b)(1)* and *Rule 12(b)(6)*. (Dkt. #36). The State of Texas and the Employer-Plaintiffs' motion for preliminary injunction requests that the Court issue an injunction to halt the enforcement of the City's Paid [*3]

Sick Leave Ordinance until an ultimate ruling on the merits is made.

The Court, having considered the motion to dismiss, response, reply, and applicable law, **GRANTS in part** and **DENIES in part** the motion. (Dkt. #36).[2]

The Employer-Plaintiffs have made hearsay and relevance objections to Defendants' Exhibit 2 under *Federal Rules of Evidence 802*, *401*, and *403*. (Dkt. #48 at 27). Defendants' Exhibit 2 consists of the Dallas City Council agenda and minutes from the meeting at which the Ordinance was passed. As this evidence does not support the *Rule 12(b)(1)* portion of the City's motion to dismiss, and the Court does not consider matters beyond the complaint in reviewing a 12(b)(6) motion to dismiss, the Court did not consider Exhibit 2. *See Baker v. Putnal, 75 F.3d 190, 196 (5th Cir. 1996)* ("[T]he court may not look beyond the pleadings in ruling on [a *Rule 12(b)(6)*] motion."). The Employer-Plaintiffs' objections to Exhibit 2 are, therefore, overruled as moot.

The Court further **GRANTS** the Plaintiffs' motion for preliminary injunction. (Dkt. #3, #21).[3] The Employer-Plaintiffs make several objections in their reply to evidence Defendants offer in support of their response, including that such evidence is hearsay, unauthenticated, and irrelevant. (Dkt. #24). These objections are overruled. *See Sierra Club, Lone Star Chapter v. F.D.I.C., 992 F.2d 545, 551 (5th Cir. 1993)* ("[A]t the preliminary injunction stage, . . . the district court may rely on otherwise inadmissible evidence, including hearsay evidence."); *Fed. Sav. & Loan Ins. Corp. v. Dixon, 835 F.2d 554, 558 (5th Cir. 1987)* (citing *Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981))* ("[A] preliminary injunction proceeding is not subject to jury trial procedures."). In any event, the Court did not rely on the objected-to materials in reaching its decision.

# I. BACKGROUND

## A. The City's Paid Sick Leave Ordinance

On April 24, 2019, the City enacted the Paid Sick Leave Ordinance (the "Ordinance"). Dallas, Texas, Ordinance No. 31181; Municipal Code § 20-1-20-12. The Ordinance, which became effective for "medium or large employers" on August 1, 2019, and will become effective for "small employers" on August 1, 2021, requires employers to grant one hour of paid sick leave for every thirty hours worked by an employee within Dallas, regardless of

the employer's location.[4]

The Ordinance defines a "medium or large employer" as "an employer with more than 15 employees at any time in the preceding 12 months, excluding the employer's family members." Dall. City Code § 20-2(8). A "small employer" is "any employer that is not a medium or large employer." *Id.* § 20-2(11).

Dall. City Code § 20-4(a)-(b).

The Ordinance allows employees working in Dallas to earn up to sixty-four hours of sick leave time per year for medium or large employers and forty-eight hours of sick leave time per year for small employers. *Id.* § 20-4(c)(1)-(2). Employees under a collective bargaining agreement, however, may bargain to modify the yearly cap. *Id.* § 20-4(e). When an employee uses accrued paid sick leave [*4]

time, employers are directed to pay employees their normal rate, exclusive of overtime premiums, tips, and commissions, for each hour the employee is absent from work for reasons that are authorized under the Ordinance. *Id.* § 20-5(a). Authorized reasons include absence arising from mental or physical illness and preventative care for the employee or their family members. *Id.* § 20-5(c).

In addition to granting sick leave time, the Ordinance also contains reporting and notice requirements for employers. *Id.* § 20-7. Among those requirements are physical notices of rights and remedies under the Ordinance on signage and in an employee handbook, where one exists. *Id.* § 20-7(b), (e). The employer must also track and report the number of sick leave hours available to each employee in writing on no less than a monthly basis, *id.* § 20-7(a), as well as maintain logs of the hours accrued, used, and available for each employee, *id.* § 20-7(d).

The Ordinance authorizes the City to conduct investigations, triggered by employee complaints, to assess employer compliance. Such investigations may include the use of administrative subpoenas to compel witness attendance or material and document production. *Id.* § 20-10(a)-(b). Violations of any portion of the Ordinance will [*5]

result in a fine. *Id.* § 20-11(a). However, aside from claims of retaliation under section 20-8, the City will not begin to assess penalties for Ordinance violations against medium or large

employers until April 1, 2020, and will not assess any penalties, including retaliation claims, against small employers until April 1, 2021. *Id.* § 20-11(c).

## B. The Employer-Plaintiffs and the State of Texas Challenge the Enforceability of the Ordinance

Shortly before the Ordinance became effective, Employer-Plaintiffs ESI and Hagan filed this lawsuit, arguing that the Ordinance violates both the United States Constitution and the Texas Constitution and is, therefore, unenforceable. ESI is a Texas corporation, headquartered in Plano, Texas, that provides temporary staffing in various industries. ESI employs over 300 temporary employees within the City of Dallas at any given time. Hagan is a Texas corporation, based in Allen, Texas, that provides legal counseling and representation to employers and executives in various industries located in Texas. Hagan currently employs one attorney who works full time from home within the City of Dallas.

The Employer-Plaintiffs claim that the Ordinance violates their *Fourth Amendment* right to be free from unreasonable [*6] searches and seizures, their *Fourteenth Amendment* right to equal protection under the laws, and both their own and their employees' *First Amendment* right to freedom of association. The Employer-Plaintiffs further allege that the Ordinance is preempted by the *Texas Minimum Wage Act ("TMWA")* and, therefore, violates the Texas Constitution. The Employer-Plaintiffs have requested declaratory and injunctive relief, including a preliminary injunction barring the enforcement of the Ordinance pending a final ruling on the merits. The State of Texas has joined the suit, but it seeks declaratory and injunctive relief only on the claim that the Ordinance is preempted by the TMWA and therefore contravenes the Texas Constitution. The Employer-Plaintiffs filed a preliminary injunction motion, which was later joined by the State.

The City has filed a motion to dismiss all claims made by Plaintiffs under *Federal Rule of Civil Procedure 12(b)(1)* (lack of subject matter jurisdiction) and *Rule 12(b)(6)* (failure to state a claim). The City contends that the Employer-Plaintiffs do not have standing to challenge the Ordinance on *First Amendment* grounds either on their own behalf or on behalf of their employees. Further, the City claims that Plaintiff Hagan does not have standing to bring any claim because [*7] enforcement of the Ordinance as to Hagan is too remote in time. The City also claims that all Plaintiffs have failed to state a claim as to each of the federal and state constitutional challenges, and that they have likewise failed to adequately plead municipal liability under *Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)*. Lastly, the City asks the Court, in the alternative, to decline supplemental jurisdiction over Plaintiffs' claim that the Ordinance is preempted by the TMWA under state law.

## II. MOTION TO DISMISS UNDER *RULE 12(b)(1)*

The City's *Rule 12(b)(1)* motion challenges (1) the Employer-Plaintiffs' standing to bring a claim under the *First Amendment* on their own behalf and on behalf of their employees, and (2) Hagan's standing to bring any claim with respect to the Ordinance. Because courts must generally address jurisdiction before reaching the merits, the Court will address these questions of standing first. *See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)* (quoting *Ex parte McCardle, 74 U.S. 506, 7 Wall. 506, 514, 19 L.Ed. 264 (1868))* ("Without jurisdiction, the court cannot proceed at all in any cause." (internal quotation marks omitted)).

## A. *Rule 12(b)(1)* Legal Standards

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton, 568 U.S. 251, 256, 133 S.Ct. 1059, 185 L.Ed.2d 72 (2013)* (quoting *Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994))*. A federal court has original jurisdiction to hear a suit when it is asked to

adjudicate [*8] a case or controversy that arises under federal question or diversity jurisdiction. *U.S. CONST., art. III, § 2, cl.1*; *28 U.S.C. §§ 1331-32*. Courts have "an independent obligation to determine whether subject-matter jurisdiction exists . . . ." *Arbaugh v. Y&H Corp., 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006)*. However, a defendant may also challenge the court's subject matter jurisdiction by filing a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(1)*.

A *Rule 12(b)(1)* challenge to the court's subject matter jurisdiction to hear a claim may address the sufficiency of the facts pleaded in the complaint (a "facial" attack) or may challenge the accuracy of the facts underpinning the claimed federal jurisdiction (a "factual" attack). *See King v. U.S. Dep't of Veteran's Affairs, 728 F.3d 410, 413 (5th Cir. 2013)* (quoting *Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001))* (noting that subject matter jurisdiction is amenable to a facial or factual attack). "An attack is 'factual' rather than 'facial' if the defendant 'submits affidavits, testimony, or other evidentiary materials'" to controvert subject matter jurisdiction. *Superior MRI Servs., Inc. v. Alliance Healthcare Servs., Inc., 778 F.3d 502, 504 (5th Cir. 2015)* (quoting *Paterson v. Weinberger, 644 F.2d 521, 523 (5th Cir. 1981))*.

When, as here, a defendant contests the facial sufficiency of the facts pleaded in the complaint to confer jurisdiction, those facts are entitled to a presumption of truth. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd., 627 F.3d 547, 553 (5th Cir. 2010)* (accepting material allegations in the complaint as true when subject matter jurisdiction was challenged on the basis of the pleadings); *Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981)* (noting that the court [*9] "must consider the allegations in the plaintiff's complaint as true" if a *Rule 12(b)(1)* motion is based on the face of the complaint). However, a legal conclusion "couched as a factual allegation" is not entitled to the same presumption of truth. *Alfred v. Harris Cty. Hosp. Dist., 666 F. App'x 349, 352 (5th Cir. 2016)* (quoting *Machete Prods., L.L.C. v. Page, 809 F.3d 281, 287 (5th Cir. 2015))* (per curiam) (unpublished). If the facts as pleaded are sufficient to confer jurisdiction, then a *Rule 12(b)(1)* motion will not succeed. *Paterson, 644 F.2d at 523*.

## B. Discussion

## 1. Hagan's standing to bring a claim

The City has moved to dismiss Employer-Plaintiff Hagan's claims for lack of subject matter jurisdiction. Because the Ordinance does not go into effect as to Hagan until August 2021, the City asserts that any injury Hagan alleges based on the Ordinance's enactment is too remote and speculative to appropriately adjudicate at this time. The City, therefore, asks the Court to find that Hagan does not have standing to bring a claim under the Ordinance and to dismiss Hagan's claims for lack of subject matter jurisdiction. The Employer-Plaintiffs argue in response that Hagan's injuries are not remote or speculative because Hagan is indisputably an object of the Ordinance's regulation and will have to take action and expend money to comply with the Ordinance's mandates before it [*10] goes into effect.

To allege facts sufficient to establish standing, a plaintiff must show "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likel[ihood] that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157-58, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014)* (quoting *Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992))* (internal quotation marks omitted) (alteration in original). An injury satisfies Article III requirements when it is concrete, particularized, and actual or imminent. *Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408, 133 S.Ct 1138, 185 L.Ed.2d 264 (2013)*.

In an action brought under the *Declaratory Judgment Act*, as here, the standing requirement can be met by establishing "actual present harm or a significant possibility of future harm," *Bauer v. Texas, 341 F.3d 352, 357-58 (5th Cir. 2003)* (quoting *Peoples Rights Org. v. City of Columbus, 152 F.3d 522, 527 (6th Cir. 1998))*, "even though

the injury-in-fact has not yet been completed," *id.* (quoting *Nat'l Rifle Ass'n of Am. v. Magaw, 132 F.3d 272, 280 (6th Cir. 1997)).* The Supreme Court has stated that "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List, 573 U.S. at 157-58* (quoting *Clapper, 568 U.S. at 414 n.5*). Further, a plaintiff can "bring a preenforcement suit when he 'has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" [*11]

*Id. at 160* (quoting *Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)).*

Here, Hagan asserts that it will imminently suffer harm by being forced to act in a financially detrimental way to become compliant with the Ordinance. While the Ordinance states that employees of small employers like Hagan will not begin accruing sick leave time and the City will not begin assessing penalties until August 1, 2021, Hagan must act prior to that time to become compliant. For example, Hagan must procure new software to accommodate tracking requirements, among other things, in preparation for the day the Ordinance becomes enforceable against it.

The City argues that, prior to the Ordinance becoming enforceable, circumstances may change so that Hagan may no longer be subject to the Ordinance. Such speculation fails to address the substance of Hagan's contention: under current circumstances the Ordinance requires Hagan to take action in order to become compliant. Thus, Hagan's injury is "certainly impending" and it has standing to challenge the Ordinance.[5]

For the same reasons, Hagan's claims are also ripe for review. Unlike standing, the doctrine of ripeness does not speak to who may sue, but instead *when* a claim may be brought. *Thomas v. Union Carbide Agr. Prods. Co., 473 U.S. 568, 580, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)* (quoting *Blanchette v. Conn. Gen. Ins. Corps., 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974)).* "Ripeness 'requir[es] us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Texas v. United States, 523 U.S. 296, 300-01, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998)* (quoting *Abbott Labs. v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)*) (alteration in original).

The City argues that Hagan will not suffer hardship if the issues are

not adjudicated at this time because the Ordinance is not yet enforceable as to small employers. *See* Dall. City Code § 20-4(b). But "[t]he Supreme Court has found hardship to inhere in legal harms," specifically, in the "harm of being 'force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences.'" *Texas v. United States, 497 F.3d 491, 499 (5th Cir. 2007)* (quoting *Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 734, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998)*) (alteration in original). Because Hagan has shown that it will imminently suffer harm by being forced to act in a financially detrimental way to become compliant with the Ordinance now, its claims are ripe for adjudication.

For these reasons, the City's *Rule 12(b)(1)* motion to dismiss Hagan's claims for lack of subject matter jurisdiction is DENIED.

## 2. The Employer-Plaintiffs' standing to bring a claim under the *First Amendment* on their own behalf

The City [*12]
 claims that the Employer-Plaintiffs do not have standing to bring a *First Amendment* claim on their own behalf. The Employer-Plaintiffs allege that section 20-4(e) of the Ordinance infringes on their *First Amendment* right to freedom of association. Section 20-4(e) allows employers operating under a collective bargaining agreement to modify the yearly cap on sick leave time. It is undisputed that section 20-4(e) effectively exempts "unionized" employers from the Ordinance because the cap can be bargained down to zero. The Employer-Plaintiffs contend that affording this potential exemption only to unionized employers impermissibly coerces non-unionized employers to give up their constitutionally protected right to refrain from associating with a union. In response, the City argues that the Employer-Plaintiffs have no right or ability to be unionized and, therefore, do not have standing to bring a *First Amendment* claim on that ground. Accordingly, the City asks the Court to dismiss the Employer-Plaintiffs' *First Amendment* claim for lack of standing under *Rule 12(b)(1)*. Because this question properly goes to the merits of the Employer-Plaintiffs' claim rather than to their standing to bring it, the Court DENIES the City's *Rule 12(b)(1)* motion as to the Employer-Plaintiffs' *First Amendment* claim brought on their own behalf.

It is well [*13]

ESI/Employee Sols., L.P. v. City of Dallas

established that an attack on the validity of a claim does not call into question the court's authority to decide it. *See Steel Co., 523 U.S. at 89* ("[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case."(emphasis in original)). Instead, a court has jurisdiction where "the right of the petitioners to recover under their complaint will be sustained if [the laws] are given one construction and will be defeated if they are given another[.]" *Bell v. Hood, 327 U.S. 678, 685, 66 S.Ct. 773, 90 L.Ed. 939 (1946)*. Only when a claim is "immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous" is it appropriate to dismiss for lack of subject matter jurisdiction. *Steel Co., 523 U.S. at 89* (quoting *Bell, 327 U.S. at 682-83*).

The City claims that the Employer-Plaintiffs have no right to unionize and, therefore, lack standing to bring a *First Amendment* claim against the City for infringing upon that right. Not so. Such an argument makes the precise error *Steel Co.* cautions against. Although a business's right to unionize or refrain from unionizing has not been explicitly recognized, the contention that it exists is by no means a frivolous claim [*14] nor is it patently foreclosed. *See Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31, U.S. _ , 138 S.Ct. 2448, 2463, 201 L.Ed.2d 924 (2018)* ("The right to eschew association for expressive purposes is likewise protected."); *Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 342, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010)* (recognizing that "*First Amendment* protection extends to corporations"); *Mote v. Walthall, 902 F.3d 500, 507 (5th Cir. 2018)* (quoting *Prof'l Ass'n of Coll. Educators, 730 F.2d 258, 262 (5th Cir. 1984))* ("[P]rotected *First Amendment* rights flow to unions as well as to their members and organizers." (internal quotation marks omitted)). Accordingly, an argument centered on whether a business holds a right to unionize in the context of this challenge is properly made on the merits and is not so "insubstantial and frivolous" that it implicates standing.

The Employer-Plaintiffs have sufficiently alleged Article III standing. Their pleadings allege an injury in fact by asserting that the Employer-Plaintiffs' right to freedom of association has been infringed by the enactment of the Ordinance. Specifically, the Employer-Plaintiffs claim that section 20-4(e) impermissibly coerces them to give up their right to refrain from associating with a union. This alleged harm will be redressed if the Ordinance is enjoined. As the Employer-Plaintiffs have made sufficient allegations to justify Article III standing to bring a *First Amendment* claim on their own behalf, the City's *Rule 12(b)(1)* motion to dismiss this claim is DENIED.

## 3. The Employer-Plaintiffs' third-party standing [*15]

 to bring a *First Amendment* claim on behalf of their employees

The Employer-Plaintiffs also seek to vindicate their employees' *First Amendment* right to freedom of association, again challenging section 20-4(e) of the Ordinance. The Employer-Plaintiffs maintain that their employees are harmed by the inability of the Employer-Plaintiffs to have the same flexibility as a unionized workplace to modify the yearly cap on sick leave time imposed by the Ordinance. According to the Employer-Plaintiffs, this lack of flexibility will result in the reduction of other benefits currently enjoyed by their employees.

The City contends that the Employer-Plaintiffs have failed to plead any basis for third-party standing to raise *First Amendment* claims on behalf of their employees. The City further asserts that, even if the Employer-Plaintiffs had pleaded third-party standing, there is no basis for allowing the Employer-Plaintiffs to bring claims on behalf of their employees in this case. Specifically, the City argues that the Employer-Plaintiffs and their employees do not have the type of relationship that would allow for third-party standing because, in the context of unionization issues, the nature of the employer-employee relationship is necessarily adverse. [*16] The City further argues that non-unionized employees are not injured by the Ordinance. Although the Court disagrees with the City's

reasoning, it concludes that the Employer-Plaintiffs lack third-party standing to assert their employees' *First Amendment* rights. The City's *Rule 12(b)(1)* motion to dismiss the Employer-Plaintiffs' *First Amendment* claim purportedly brought on behalf of their employees is therefore GRANTED.

In addition to constitutional standing requirements under Article III, the Supreme Court has established prudential constraints that are "judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004)*. These prudential constraints require the court to refrain from adjudicating claims that allege generalized grievances or assert the rights of third parties, even if Article III requirements are otherwise met. *Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)* (noting that prudential restrictions on standing are in place to avoid courts being "called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights"). However, the prohibition against bringing claims on behalf of third [*17] parties is not categorical. The Supreme Court has recognized a limited number of situations in which it is appropriate to allow a party to bring claims on behalf of another. *See Powers v. Ohio, 499 U.S. 400, 410-11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)* (third-party standing); *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp., 207 F.3d 789, 792 (5th Cir. 2000)* (associational standing).

As here, one of the situations in which a litigant may assert the rights of a third party is when, in addition to his or her own Article III standing to bring the claim, the litigant also has a close relationship to the third party such that the parties' interests are aligned and some "hindrance to the third party's ability to protect his or her own interests" exists. *Powers, 499 U.S. at 411*. When any of the three components are missing, courts should dismiss the claim for lack of standing. *Id.*

As discussed above, a motion to dismiss for lack of

standing may be either "facial" or "factual." *Superior MRI Servs., Inc., 778 F.3d at 504*. Here, because the City has offered no evidence to contest the Employer-Plaintiffs' third-party standing, the City has made a "facial" attack on standing. "A facial attack on the complaint requires the court merely to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." [*18]

*Cell Sci. Sys. Corp. v. La. Health Serv. Eyeglasses, No. 18-31034, 2020 U.S. App. LEXIS 8349, 2020 WL 1285033, at *3 (5th Cir. Mar. 17, 2020)* (per curiam) (unpublished). Liberally construing the Employer-Plaintiffs' Amended Complaint, there are allegations that both ESI and Hagan's employees have chosen not to be unionized, thus suggesting that they do not wish to associate with a union. (Dkt. #9 PP 7-8, 41). The Court notes that the fact that the Employer-Plaintiffs' employees have not unionized does not, standing alone, mean that all, some, or none of those employees affirmatively do not wish to unionize. However, the Court recognizes that it is possible that the interests of the Employer-Plaintiffs and their employees could plausibly align in rejecting a unionized workplace. And because the City has made a facial attack on the Employer-Plaintiffs' standing, at this stage of the proceedings the Court assumes the truth of the Employer-Plaintiffs' assertion that their interests align with their employees on this issue. The relationship prong of the third-party standing requirement is therefore sufficiently pleaded.[6]

The City additionally argues that "non-unionized employees suffer no loss of benefits and potentially have access to greater benefits under the Ordinance than employees subject to a collective bargaining agreement" to demonstrate a lack of alignment with the Employer-Plaintiffs. (Dkt. #36 at 13). This argument misses the mark at the outset because the Employer-Plaintiffs' allegation—that their employees are harmed because the benefit of bargaining below the cap is denied to them unless they unionize—is entitled to a presumption of truth in the context of the City's facial attack on standing. The City's assertion may also be inaccurate. Although many employees will likely receive a benefit under the Ordinance that they would not have received otherwise, other employees may be losing a better or less restrictive benefit because their employer must provide sick leave time.

In addition to a close relationship and alignment of interests, to establish third-party standing the Employer-Plaintiffs must also plead that their employees are hindered in bringing a *First*

ESI/Employee Sols., L.P. v. City of Dallas

*Amendment* claim themselves. In their [\*19] Amended Complaint, the Employer-Plaintiffs suggest that, because the Ordinance only regulates employers, employees would not have standing to bring a claim on their own. Because this is a legal conclusion rather than a factual allegation, it is not entitled to a presumption of truth. *See Williamson, 645 F.2d at 412* (noting that "the plaintiff is left with safeguards similar to those retained when a *Rule 12(b)(6)* motion to dismiss for failure to state a claim is raised" when a *Rule 12(b)(1)* motion is based on the face of the complaint). Therefore, the Court must determine whether the employees would be hindered in bringing their own *First Amendment* claim under the Ordinance.

When a plaintiff is the object of the regulation he challenges, establishing standing is generally not difficult. *Lujan, 504 U.S. at 561*. However, when a challenge is brought by a litigant who is not the object of the regulation at issue, standing to challenge the law "is ordinarily 'substantially more difficult' to establish." *Id. at 562* (quoting *Allen v. Wright, 468 U.S. 737, 758, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984))*. This is because the causation and redressability aspects of standing may become functions of "the unfettered choices made by independent actors not before the court." *Id.* (quoting *ASARCO, Inc. v. Kadish, 490 U.S. 605, 615, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989))* (internal quotation marks omitted).

Here, however, Employer-Plaintiffs' employees would [\*20] not have difficulty establishing their standing to assert a *First Amendment* claim challenging the Ordinance. The injury in fact and redressability elements of standing clearly would be met. First, non-unionized employees subject to the Ordinance could claim that the Ordinance coerces them to give up their *First Amendment* right to refrain from associating with a union in order to enable them to bargain to modify the Ordinance's yearly sick leave cap. In so doing, the employees would state a plausible injury in fact. Second, the plausible injury to the employees' *First Amendment* rights could be redressed through declaratory and injunctive relief like that requested by the Employer-Plaintiffs in this case.

Third, although they are not expressly regulated by the Ordinance, employees are directly impacted as the other half of a regulated dyad. By design, the Ordinance alters the terms of the employer-employee relationship, imposing sick leave requirements that immediately affect both employers and employees, including the Ordinance's provision allowing only unionized workplaces to modify the Ordinance's yearly sick leave cap. For purposes of standing analysis, there is a critical distinction between would-be litigants who are directly [\*21] impacted by the regulation of a third party, and those who are not. *Compare id. at 558* (finding no standing when environmental advocates brought a declaratory action challenging the geographic scope of a statute that regulated federal agencies in funding projects that impacted endangered species), with *Craig v. Boren, 429 U.S. 190, 192-96, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976)* (finding standing for a 20-year-old man to challenge a statute that forbade vendors from selling 3.2% beer to men between the ages of 18 and 21). Courts have repeatedly concluded that unregulated parties have standing when their rights are necessarily impacted by the regulation of a third party. *See, e.g., MD II Entm't v. City of Dallas, 28 F.3d 492, 497 (5th Cir. 1994)* (declining to allow third-party standing where there "was no practical obstacle" to dancers raising their own equal protection claim against a zoning statute regulating their employer); *cf. Mainstreet Org. of Realtors v. Calumet City, 505 F.3d 742 (7th Cir. 2007)* (refusing to allow realtors to challenge a point-of-sale inspection ordinance because homeowners would be better advocates for their property rights despite homeowners not being directly regulated by the ordinance). Here, the Ordinance applies differently to employers when their employees have chosen to unionize, allowing the sick leave cap to be altered only for unionized workplaces. Thus, although employees [\*22] are not expressly regulated by the Ordinance, their ability to bargain to reduce the yearly cap is directly conditioned on their own decision to unionize. Because the Ordinance directly impacts employees as well as their employers, the Court concludes that there is no reason to believe that the Employer-Plaintiffs' employees would lack standing to challenge the Ordinance.

For these reasons, the Employer-Plaintiffs have not sufficiently pleaded a hindrance to their employees bringing a claim challenging the Ordinance, leaving no basis on which the Employer-Plaintiffs can properly assert third-party standing. The City's motion to dismiss the Employer-Plaintiffs' *First Amendment* claim brought on behalf of their employees is therefore GRANTED.

## III. MOTION TO DISMISS UNDER *RULE 12(b)(6)*

The City also moves for dismissal of all of the Plaintiffs' claims for failure to state a claim under *Rule 12(b)(6)*, as well as all of the Employer-Plaintiffs' constitutional claims for failure to plead municipal liability under *Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)*.

### A. *Rule 12(b)(6)* Legal Standards

Under the relaxed pleading standards of *Federal Rule of Civil Procedure 8(a)(2)*, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." When a defendant contends that a plaintiff [*23] has failed to meet this standard, *Rule 12(b)(6)* provides a mechanism to challenge the legal sufficiency of a claim early in litigation. Such motions are, however, "viewed with disfavor and rarely granted." *Test Masters Educ. Servs., Inc. v. Singh, 428 F.3d 559, 570 (5th Cir. 2005)*.

To survive a motion to dismiss brought under *Rule 12(b)(6)*, a plaintiff must plead in its complaint only "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)*. "The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010)* (citing *Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000))*.

Although a probability that the defendant is liable is not required, the plausibility standard demands "more than a sheer possibility." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)*. In assessing a motion to dismiss under *Rule 12(b)(6)*, the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not entitled to the same presumption. *Id.* To determine whether the plaintiff has pleaded enough to "nudge[] their claims across the line from conceivable to plausible," a court draws on its own "judicial experience and common sense." *Id. at 679-80* (first quoting *Twombly, 550 U.S. at 570*, then citing *Iqbal v. Hasty, 490 F.3d 143, 157-58 (2nd Cir. 2007))* (internal quotation marks omitted). This threshold is surpassed when [*24] "a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. at 678* (citing *Twombly, 550 U.S. at 556*).

### B. Municipal Liability under *Monell*

The City moves for dismissal of the Employer-Plaintiffs' constitutional claims based on the assertion that the Employer-Plaintiffs have not sufficiently pleaded the *Monell* requirements necessary to impose liability for deprivation of constitutional rights under *42 U.S.C. § 1983*. *436 U.S. at 694*. Under *Monell*, a municipality cannot be sued under *section 1983* unless it can be established that the constitutional violation was the result of an official policy. *Id.* An official policy is:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.

*Bennett v. City of Slidell, 735 F.2d 861, 861 (5th Cir. 1984)* (en banc) (per curiam).

The alleged pleading deficiency complained of by

the City is that the Employer-Plaintiffs [*25] did not specifically identify the *Monell* elements of municipal liability in their complaint. This argument fails. Because the Dallas City Council is the "final policy maker of the [C]ity of Dallas," the Employer-Plaintiffs must only plead that the city council officially adopted and promulgated an unconstitutional ordinance. *See Groden v. City of Dall., 826 F.3d 280, 284 (5th Cir. 2016)* (finding that because "the policymaker is a legal question that need not be pled," a complaint "need only allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable" to survive a motion to dismiss). The Employer-Plaintiffs have clearly stated in their amended complaint that "the City enacted the Paid Sick Leave Ordinance," (Dkt. #9 ¶ 13), and that the Ordinance is unconstitutional under various legal theories, (Dkt. #9 ¶¶ 58, 62, 66). The City, in its motion to dismiss, acknowledges that the city council adopted the Ordinance. (Dkt. #36 at 2). The Employer-Plaintiffs have met the pleading requirements necessary to show municipal liability under *section 1983*. The City's motion to dismiss on this theory is therefore DENIED.

## C. *Rule 12(b)(6)* Challenge to the Employer-Plaintiffs' *First Amendment* Claim

The Employer-Plaintiffs [*26] assert that the Ordinance violates their right to associate under the *First Amendment*, pointing to section 20-4(e) of the Ordinance, which permits unionized employers operating with a collective bargaining agreement to "modify the yearly cap" of paid sick leave. The Employer-Plaintiffs contend that, through section 20-4(e), the Ordinance impermissibly conditions the benefit of bargaining to modify the Ordinance's yearly sick leave cap on employers giving up their right to refrain from unionizing, without the justification of being narrowly tailored to a compelling governmental interest. The Employer-Plaintiffs further allege that, because their employees have not unionized of their own accord, and because as employers they have not voluntarily recognized a union to represent the employees, they are not and do not wish to be "unionized employers." The City argues that the

Employer-Plaintiffs have failed to state a claim because they have no unilateral right to unionize.

The *First Amendment's* freedom of association "provides both public and private employees the right to organize . . . and belong[s] to labor unions." *Vicksburg Firefighters Ass'n, Local 1686 Int'l Ass'n of Firefighters v. City of Vicksburg, 761 F.2d 1036, 1039 (5th Cir. 1985)* (citing *Smith v. Ark. State Highway Emples., Local 1315, 441 U.S. 463, 464-66, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979)*). The government infringes on that right when it "tak[es] steps to discourage or prohibit [*27] union membership or association." *Smith, 441 U.S. at 466*. Similarly, the existence of the right to associate "plainly presupposes a freedom not to associate." *Boy Scouts of Am. v. Dale, 530 U.S. 640, 648, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000)* (quoting *Roberts v. U.S. Jaycees, 468 U.S. 609, 623, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)*) (internal quotation marks omitted).

The unconstitutional conditions doctrine prevents the government from making some benefit contingent on relinquishing a constitutional right. *See Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595, 604, 133 S.Ct. 2586, 186 L.Ed.2d 697 (2013)* (quoting *Regan v. Taxation With Representation of Wash., 461 U.S. 540, 545, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983)*) ("We have said in a variety of contexts that 'the government may not deny a benefit to a person because he exercises a constitutional right.'"). In other words, where government action compelling or prohibiting some sort of association would be unconstitutional, so too is government action coercing the same. *See Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)* (holding that it is unconstitutional "to condition the availability of benefits" on a person's "willingness to violate a cardinal principle of her religious faith" because doing so "effectively penalizes the free exercise of her constitutional liberties").

At the outset, the Court must determine whether the Employer-Plaintiffs possess the right to unionize. It is undisputed, as the Employer-Plaintiffs correctly state, that individuals, corporations, and other associations generally possess rights under the *First Amendment* that are of the same nature and

quality. [*28]

See *Citizens United, 558 U.S. at 342-43* (noting that *First Amendment* rights extend to corporations and other associations and are not treated differently than rights afforded to natural persons). However, *First Amendment* rights can be infringed only when those claiming the right have the ability to engage in the activity they contend is improperly coerced. That is to say, there can be no infringement under the *First Amendment* where it is impossible for the regulated entity to associate in the manner it claims the regulation is coercing.

The Employer-Plaintiffs claim that the Ordinance conditions the benefit of being able to bargain to modify the yearly cap on giving up their right not to associate—that is, their right to refrain from associating with a union.[7]

Although the Employer-Plaintiffs cite to *Citizens United* and *Southwire Co. v. N.L.R.B., 383 F.2d 235, 240 (5th Cir. 1967),* for the proposition that they possess a *First Amendment* right to refrain from operating as a unionized business, neither case specifically addresses an employer's right to unionize. See *Citizens United, 558 U.S. at 342* (recognizing that "*First Amendment* protections extend to corporations" in a discussion of corporate political speech); *Southwire Co., 383 F.2d at 240 (5th Cir. 1967)* (discussing an employer's right to express an opinion regarding unionization rather than its right to unionize).

But a union is a special type of association whose creation begins with the actions of *employees*. There is no mechanism for an employer to unilaterally unionize on the employees' behalf without the employees' impetus. Employees alone have the right to seek unionization under the *National Labor Relations Act ("NLRA")* by either asking the National Labor Relations Board ("NLRB") to conduct an election ("election provision") or by requesting that their employer voluntarily recognize the union ("voluntary recognition [*29]

provision"). *29 U.S.C. § 159(a)*; *id. § 159(c)(1)*; *see also Pac. Molasses Co. v. N.L.R.B., 577 F.2d 1172, 1177 (5th Cir. 1978)* (noting the method by which a union establishes the authority to bargain on behalf of employees).

The Employer-Plaintiffs maintain that their ability to "unionize" or, more accurately, to associate with a union, is derived from the voluntary recognition provision of the NLRA. They argue that they "have not elected to invite a union to represent their

employees" and, therefore, are exercising their right to refrain from associating with a union. This assertion misunderstands the nature of unions and the authority granted to employers by the voluntary recognition provision. An employer cannot simply elect to recognize a union—they may do so *only* upon a sufficient showing of support from employees. *See 29 U.S.C. § 159(c)(1)* ("Whenever a petition shall have been filed . . . by an employer, alleging that one or more individuals or labor organization have presented to him a claim to be recognized. . . ."). Similarly, employers cannot choose to refrain from becoming a "unionized" employer when faced with sufficient support from employees. *See id.* ("Whenever a petition shall have been filed . . . by an employee or group of employees. . . alleging that a substantial number of employees [*30]

wish to be represented. . . ."). Thus, the Employer-Plaintiffs cannot of their own accord decide whether their employees will unionize. Because the Employer-Plaintiffs themselves have no ability to decide whether their employees will unionize, they certainly cannot be coerced into doing so. Therefore, the Employer-Plaintiffs have not stated a legally cognizable claim under the *First Amendment*. Accordingly, the City's *Rule 12(b)(6)* motion to dismiss the Employer-Plaintiffs' *First Amendment* claim brought on their own behalf is GRANTED.

## D. *Rule 12(b)(6)* Challenge to the Employer-Plaintiffs' Equal Protection Claim

The City also seeks dismissal under *Rule 12(b)(6)* of the Employer-Plaintiffs' *Fourteenth Amendment* claim that the Ordinance violates their right to equal protection under the laws. Like the Employer-Plaintiffs' *First Amendment* claim, this claim also concerns the provisions of section 20-4(e) of the Ordinance permitting only unionized employers to modify the yearly cap of paid sick leave. The Employer-Plaintiffs allege that, by including section 20-4(e), the Ordinance intentionally and impermissibly distinguishes between employers operating under a collective bargaining agreement and those that are not.

"The *Fourteenth Amendment*[] promise[s] that no

ESI/Employee Sols., L.P. v. City of Dallas

person shall be denied equal protection of the laws." *Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)* (citations omitted). However, [*31]

laws often classify and disadvantage some group. *Id.* Whether a particular type of classification is lawful depends both on the group being classified and the activity being regulated. Laws that draw lines distinguishing a suspect class—like those based on immutable characteristics such as race, alienage, and national origin—or those that affect a fundamental right will be analyzed under strict scrutiny. *Frontiero v. Richardson, 411 U.S. 677, 682, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973)*. With some exceptions,[8]

Sex or illegitimacy classifications are analyzed under intermediate scrutiny. *See Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988)* (discrimination based on illegitimacy); *Craig, 429 U.S. at 197* (discrimination based on sex).

all others will be reviewed under rational basis scrutiny. *Heller v. Doe, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)*.

Because the Employer-Plaintiffs do not have a fundamental right to unionize, as discussed *supra* Section III(C), and are not a protected class, their equal protection claim is subject to rational basis scrutiny. *See Lyng v. Int'l Union, UAW, 485 U.S. 360, 370, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988)* (determining that a statute refusing food stamps to striking union members did not implicate a protected class or fundamental right). Under rational basis review, the question before the Court is whether the Ordinance's classification of employers operating under a collective bargaining agreement and those who are not is rationally related to some legitimate governmental interest. The Court finds that it is.

Legislation will survive rational basis scrutiny "if there is any reasonably conceivable [*32] state of facts that could provide a rational basis for the classification"—even if the legislature does not provide one. *Heller, 509 U.S. at 320* (quoting *F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993))* (internal quotation marks omitted). Accordingly, a law is presumed constitutional unless the challenger can "negative every conceivable basis which might support it." *Id.* (quoting *Lehnhausen v. Lake Shore*

*Auto Parts Co., 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973))*.

Although the rational basis standard is quite deferential, it is not "toothless." *Schweiker v. Wilson, 450 U.S. 221, 234, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981)* (quoting *Mathews v. Lucas, 427 U.S. 495, 510, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976))* (internal quotation marks omitted). "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)* (citations omitted). Where the plaintiff pleads facts that sufficiently negate any rational basis for the legislation, the equal protection claim will survive a motion to dismiss. But where it does not, the claim will fail. *See Crook v. El Paso Indep. Sch. Dist., 277 F. App'x 477, 481 (5th Cir. 2008)* (per curiam) (unpublished) (upholding the district court's dismissal of plaintiff's equal protection claim where the defendant identified a rational purpose for a classifying policy that the plaintiff did not negate).

In support of its motion to dismiss, the City points to "compliance" with federal labor laws as its legitimate governmental interest. According to the City, [*33]

because the federal labor laws preempt claims brought under state and local laws that are "substantially dependent upon analysis of the terms of a collective bargaining agreement," the Ordinance carved out employers operating under a collective bargaining agreement to avoid preemption—thereby, as the argument goes, avoiding conflict with federal law and its interests. (Dkt. #36 at 14) (citing *Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985))*. Put differently, the City argues that it had to include the collective bargaining agreement classification or risk preemption. The City further defends the distinction by pointing to other state laws which distinguish employers with a collective bargaining agreement from those without one. *Id.* (citing *TEX. LAB. CODE ANN. § 413.022(a)*) ("Nothing in this section supersedes the provisions of a collective bargaining agreement. . . .").

Jeffrey Shooman

The Employer-Plaintiffs seize on the City's use of the phrase "complying with federal labor laws" in their attempt to rebut the City's justification. They argue that the City cannot have a legitimate interest in complying with federal labor laws through the collective bargaining agreement distinction because the laws themselves prohibit discrimination based on union status.

While the Employer-Plaintiffs' [*34] understanding of the general policy thrust of federal labor law is correct, these arguments are unhelpful to their cause because they do not confront the reason the City claims it created the distinction—to avoid preemption. This rationale has been found to sufficiently justify a regulation subject to rational basis review. *See Boston Taxi Owners Ass'n, Inc. v. City of Boston, 180 F. Supp. 3d 108, 118-19 (D. Mass. 2016)* (acknowledging that drafting a regulation that will not be preempted is a legitimate government objective for a city). Further, courts have dismissed similar equal protection claims despite the NLRA's interest in the equitable treatment of union and non-union workers. *See Babler Bros., Inc. v. Roberts, 761 F. Supp. 97, 101 (D. Or. 1991), aff'd, 995 F.2d 911 (9th Cir. 1993)* (finding that an overtime pay statute that exempted contractors that were a party to a collective bargaining agreement did not violate equal protection).

Because treating employers without a collective bargaining agreement differently than those with one is rationally related to the City's interest in crafting legislation that avoids federal preemption, the Employer-Plaintiffs have not rebutted "every conceivable basis" that supports the Ordinance's classification. Accordingly, the City's motion to dismiss the Employer-Plaintiffs' equal protection claim is GRANTED.

**E. *Rule 12(b)(6)* Challenge to [*35]**

**the Employer-Plaintiffs' *Fourth Amendment* Claim**

The Employer-Plaintiffs claim that the Ordinance is unconstitutional on its face under the *Fourth Amendment*. Specifically, the Employer-Plaintiffs contend that, because the Ordinance authorizes city officials to issue administrative subpoenas to employers compelling attendance of witnesses or production of documents without precompliance review, it runs afoul of the *Fourth Amendment*. The City moves to dismiss this claim, arguing that the Dallas City Code does, in fact, provide a sufficient opportunity for subpoenaed employers to obtain precompliance review.

Facial challenges to a statute or ordinance are "the most difficult . . . to mount successfully." *United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)*. But as the Supreme Court has recently explained, it "has never held that these claims cannot be brought under any otherwise enforceable provision of the Constitution." *City of Los Angeles v. Patel, 576 U.S. 409, 135 S.Ct. 2443, 2449, 192 L.Ed.2d 435 (2015)*. To the contrary, and in the specific context of a *Fourth Amendment* facial challenge to a municipal ordinance, the Supreme Court has made clear that "facial challenges under the *Fourth Amendment* are not categorically barred or especially disfavored." *Patel, 135 S.Ct. at 2449; see also id.* (observing that the Supreme Court has "allowed [facial] challenges to proceed under a diverse array of constitutional provisions" and that [*36] "*Fourth Amendment*" challenges to statutes authorizing warrantless searches are no exception").

The *Fourth Amendment* protects "[t]he right of the people to be secure in their persons, houses, papers, and effects," to be free from "unreasonable searches and seizures," and requires that warrants must be based on probable cause. *U.S. CONST. amend. IV*. The rights secured by the *Fourth Amendment* extend not only to physical searches, but also include compulsory inspection of documents in a commercial establishment. *See v. City of Seattle, 387 U.S. 541, 543-44, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967)*. Generally, warrantless searches conducted without judicial review are "*per se* unreasonable." *Patel, 135 S.Ct. at 2452; see also Arizona v. Gant, 556 U.S. 332, 338, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009)* (explaining that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the *Fourth Amendment*—

subject only to a few specifically established and well-delineated exceptions") (quoting *Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967))*.

One of the exceptions to the warrant requirement is the administrative search, which is at issue here. *See Cotropia v. Chapman, 721 F. App'x 354, 357 (5th Cir. 2018)* (per curiam) (unpublished). Administrative subpoenas ordering the production of a business's records do not offend the Constitution if they are "sufficiently limited in scope, relevant in purpose, and specific in directive." *See*, *387 U.S. at 544*. Although an administrative subpoena may issue without a warrant, [*37]

"[a]bsent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Patel, 135 S.Ct. at 2452*; *see also Donovan v. Lone Steer, Inc., 464 U.S. 408, 414-15, 104 S.Ct. 769, 78 L.Ed.2d 567 (1984)* (citing *Okla. Press Publ'g Co. v. Walling, 327 U.S. 186, 195, 66 S.Ct. 494, 90 L.Ed 614 (1946))* (rejecting a *Fourth Amendment* claim where the government sought only to enforce a court order for the production of documents "made after adequate opportunity to present objections"). Without this opportunity, a search conducted by means of an administrative subpoena violates the *Fourth Amendment*. *Patel, 135 S.Ct. at 2452* (noting that searches of hotel records would have been constitutional had they been performed under an administrative subpoena because the parties in that case stipulated that the searched party could have moved to quash, thus meeting any *Fourth Amendment* concerns).[9]

As the Fifth Circuit has explained, consistent with Supreme Court precedent, "Texas law contemplates the opportunity for precompliance review of an administrative subpoena before a neutral decisionmaker." *Cotropia, 721 F. App'x at 358 n.2*. "For example, *Texas Occupations Code § 153.007(e)* states that if 'a person fails to comply with a [Texas Medical Board] subpoena,' then [the Medical Board] 'may file suit to enforce the subpoena.'" *Id.* (quoting *TEX. OCC. CODE ANN. § 153.007(e)*). As the *Cotropia* court observed, "[i]n this scenario, a court can, prior to compliance, determine whether the subpoena is valid." *Id.*

The Employer-Plaintiffs allege that the Ordinance ignores these constitutional limitations on administrative searches, pointing to a portion of Article III of the Ordinance, entitled "Enforcement." Article III consists of three provisions, sections 20-9 through 20-11. Section 20-9, entitled "Procedures for Filing Complaints," provides that any employee may file a complaint with the City that the Ordinance is being violated by an employer. *See* [*38]
Dall. City Code § 20-9. Section 20-10, entitled "Investigation," provides procedures for the investigation of such employee complaints, directing that, upon the filing of a complaint, the City "shall commence a prompt and full investigation" to determine "whether there is sufficient cause to believe that a violation of [the Ordinance]" has occurred. *Id.* § 20-10(a). Section 20-10(b) empowers the City, in conducting its investigation of employee complaints, to "issue subpoenas to compel the attendance of a witness or the production of materials or documents in order to obtain relevant information and testimony."[10] Before issuing a subpoena, the City must "seek the voluntary cooperation of any employer to timely obtain relevant information and testimony in connection with any investigation of a complaint filed under [the Ordinance]." Dall. City Code § 20-10(b).

Section 20-10(b) goes on to state that, "[r]efusal to appear or to produce any document or other evidence after receiving a subpoena pursuant to this section is a violation of this chapter and subject to sanctions as described in section 2-9 of the Dallas City Code."[11] Section 2-9 provides little guidance on the nature of sanctions that may be imposed for, among other things, "refus[ing] to be sworn," "refus[ing] to appear to testify," or "fail[ing] or refus[ing] to produce any book, paper, document or instrument touching any matter under examination" by the City. Dall. City Code § 2-9. According to section 2-9, a person who runs afoul of its provisions is simply "guilty of an offense." *Id.*

Finally, section 20-11, entitled "Voluntary Compliance; Violations; Penalties; Appeals," provides that, after seeking voluntary compliance from the employer to remedy a violation of the Ordinance, a civil fine not to exceed $ 500 may be imposed. Section 20-11 also allows employers to appeal any civil penalty imposed for a violation of the Ordinance.

The Employer-Plaintiffs allege that, because the Ordinance [*39] fails to include a procedure for obtaining precompliance review of subpoenas issued in

ESI/Employee Sols., L.P. v. City of Dallas

conjunction with investigations of employee complaints under section 20-10(b), it violates the *Fourth Amendment* on its face. The City counters by referencing another portion of the Dallas City Code, section 2-8. Section 2-8 states that, "[i]n all hearings and investigations" conducted by the city council, the city manager, or any person or committee authorized to conduct investigations as to city affairs, the City may "subpoena witnesses and compel the production of books, papers and other evidence material to such inquiry in the same manner as is now prescribed by the laws of this state for compelling the attendance of witnesses and production of evidence in the corporation court."[12]

[12] Corporation court is the municipal court. *TEX. GOV'T CODE ANN. § 29.002.*

According to the City, section 2-8's subpoena provision "addresses the procedures applicable to *any* subpoena issued by the City." (Dkt. #36 at 17). Based on its contention that section 2-8 provides for precompliance review of *any* subpoena the City issues, including subpoenas specifically authorized by section 20-10(b) of the Ordinance, the City maintains that the Employer-Plaintiffs' *Fourth Amendment* claim is not viable.

The City's interpretation of section 20-10(b) cannot be reconciled with the text and structure of the Ordinance. Section 20-10(b)'s text [*40] makes no reference to section 2-8. Instead, section 20-10(b) describes, in language differing from that of section 2-8, a subpoena process unique to the investigation of employee complaints concerning alleged employer violations of the Ordinance. The omission of any reference to section 2-8 is particularly telling because section 20-10(b) expressly incorporates section 2-9 of the City Code concerning sanctions. *See id.* § 20-10(b). In drafting and enacting the Ordinance, the City therefore demonstrated that it knew how to incorporate other parts of the City Code into the provisions of the Ordinance. Courts "presume the words in a statute are selected with care" and should "interpret them in a manner that gives meaning to all of them without disregarding some as surplusage." *Plains Capital Bank v. Martin, 459 S.W.3d 550, 556 (Tex. 2015).* Section 20-10(b)'s explicit incorporation of section 2-9, taken together with the absence of any

reference to section 2-8, confirms that section 2-8 is not incorporated into the Ordinance.

To the extent the City contends that, regardless of incorporation into section 20-10(b), the general provisions of section 2-8 concerning administrative subpoenas control over the specific provisions of section 20-10(b), this argument also fails. As the Supreme Court has explained, "[i]t is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645, 132 S.Ct. 2065, 182 L.Ed.2d 967 (2012)* (quoting *Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992))* (internal quotation marks [*41] omitted); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: INTERPRETATION OF LEGAL TEXTS 183-87 (2012) (explaining that a later enacted, more specific statute generally governs over an earlier, more general one).[13]

[13] Section 2-8 was made part of the Dallas City Code in 1941, while the Ordinance was passed in 2019.

Moreover, even if section 2-8 applied to the Ordinance, the City overreads its provisions, which fail to direct the subject of an administrative subpoena to a neutral forum in which it could obtain review. *See Airbnb, Inc. v. City of New York, 373 F. Supp. 3d 467, 493 (S.D.N.Y. 2019)* (noting that an ordinance that failed to provide procedures or a forum to challenge a demand for production was unconstitutional on its face). Nothing in section 2-8 makes clear that the City will provide constitutionally adequate procedures for precompliance review of its administrative subpoenas. Section 2-8 merely states that any person authorized by the city council or city manager may subpoena witnesses or compel the production of evidentiary materials "in the same manner as now prescribed by the laws of this state for compelling the attendance of witness and production of evidence in the corporation court." Dall. City Code § 2-8. On its face, section 2-8 describes how a subpoena may issue, not a procedure for precompliance review.

The City's reading of section 2-8 effectively

concedes that this city code provision [*42] does not operate to provide constitutionally adequate precompliance review of administrative subpoenas. As explained by the City, sections 2-8 and 2-9 work in conjunction to allow an employer to "question the reasonableness of the subpoena" only *after* being subject to citation for failing to comply with an administrative subpoena. (Dkt. #36 at 17) ("[A]n employer who refused to comply with a subpoena could be subject to citation and *then* would have an opportunity to appear before the Dallas Municipal Court at which time it would have the 'opportunity to question the reasonableness of the subpoena . . . .'" (quoting *Donovan, 464 U.S. at 415*) (emphasis added)). This is not the order of events contemplated by the *Fourth Amendment*. *See Patel, 135 S.Ct. at 2452* (explaining that the government cannot reasonably force business owners to risk a criminal penalty to invoke statutory safeguards against suspicionless searches). Providing for review only after a citation for noncompliance has issued creates an unconstitutional Hobson's choice for the recipient of an administrative subpoena under section 2-8: comply with a potentially overbroad subpoena in contravention of *Fourth Amendment* protections or risk a citation that may or may not withstand review for reasonableness.

In sum, the Employer-Plaintiffs' [*43] claim that the Ordinance does not provide for precompliance review sufficiently states a claim under the *Fourth Amendment* to survive scrutiny under *Rule 12(b)(6)*. Section 20-10(b) of the Ordinance, the operative provision for the issuance of administrative subpoenas to employers during the investigation of employee complaints regarding paid sick leave, provides no mechanism whatsoever for precompliance review, does not incorporate section 2-8 of the city code, and controls over section 2-8's general provisions concerning administrative subpoenas. And, even if section 2-8 applied to administrative subpoenas issued under the Ordinance, section 2-8 does not appear to provide constitutionally adequate precompliance review. The City's motion to dismiss the Employer-Plaintiffs' claim under the *Fourth Amendment* is therefore DENIED.

### F. Preemption under the Texas Constitution

The City also seeks dismissal under *Rule 12(b)(6)* of the preemption claim asserted by all Plaintiffs under the Texas Constitution. For reasons that are fully explained below, *see infra* Part V(B), the Court holds that Plaintiffs have sufficiently stated a preemption claim. The City's motion to dismiss the preemption claim is therefore DENIED.

## IV. SUPPLEMENTAL JURISDICTION

The parties do not dispute that the Court has supplemental jurisdiction [*44] over Plaintiffs' preemption claim. *See 28 U.S.C. § 1367(a)*. The Court agrees. Generally, a district court has original jurisdiction over claims that arise under federal law, *id. § 1331*, as well as cases that arise under state law and meet certain diversity of citizenship and amount in controversy requirements, *id. § 1332*. A court may also exercise supplemental jurisdiction over state law claims that it would not have original jurisdiction over if those claims are "part of the same case or controversy" as the federal claims. *Id. § 1367(a)*.

The Court has original jurisdiction over the constitutional claims made in this case under the *First Amendment*, *Fourth Amendment*, and the *Fourteenth Amendment*, all challenging the enforceability of the Ordinance. The Court has determined that the Employer-Plaintiffs' *First Amendment* and *Fourteenth Amendment* claims should be dismissed. However, the City's motion to dismiss the Employer-Plaintiffs' *Fourth Amendment* claim has been denied, and this claim will be permitted to proceed. Plaintiffs' state law preemption claim, alleging that the Ordinance is also unenforceable because it is preempted by the TMWA, is part of the same case or controversy as the *Fourth Amendment* claim. The Court therefore has supplemental jurisdiction over the preemption claim under *28 U.S.C. § 1367(a)*.

In its motion to dismiss, the City does not raise [*45] a question of subject matter jurisdiction as to the preemption claim. Instead, the City asks the Court to exercise its discretion to decline supplemental

jurisdiction over the preemption claim. *See id. § 1367(c)*. Under *section 1367(c)*, the Court may decline to exercise supplemental jurisdiction over the state law preemption claim if:

> (1) the claim raises a novel or complex issue of state law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*Id.* Courts should also consider the common law factors of "judicial economy, convenience, fairness, and comity" when determining whether to retain supplemental jurisdiction over a state law claim. *Enochs v. Lampasas Cty., 641 F.3d. 155, 159 (5th Cir. 2011)* (citing *Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988))*. Weighing all factors together, with no single factor dispositive, courts should determine whether the overall balance favors declining jurisdiction while "guard[ing] against improper forum manipulation." *Id.* "[I]n the usual case in which all federal law claims are eliminated before trial" the common law factors [*46] "will point toward declining to exercise [supplemental] jurisdiction." *Carnegie-Mellon, 484 U.S. at 350 n.7*.

The City argues that both the predominance of the state law claim and its novelty require the Court to decline supplemental jurisdiction and dismiss the claim. (Dkt. #36 at 18.) The State urges that the City has waived the other factors by failing to raise them, but that misstates the law. A defendant waives a challenge to supplemental jurisdiction if it is not raised in the district court, but once the issue is raised, the defendant's failure to discuss all of the factors bearing on supplemental jurisdiction does not preclude their consideration by the Court. *See Powers v. United States, 783 F.3d 570, 576-77 (5th Cir. 2015)* (noting that the failure to challenge supplemental jurisdiction in the district court rendered the issue waived on appeal). Accordingly, because the City has appropriately raised the issue, the Court must assess each of the statutory and common law factors to determine whether it should decline supplemental jurisdiction.

As to the first factor described in *section 1367(c)(1)*, this case does not present a novel or complex issue of state law. To the contrary, Texas preemption law is well delineated. *See, e.g., Tex. Manufactured Hous. Ass'n, Inc. v. City of Nederland, 101 F.3d 1095, 1101 (5th Cir. 1996)* (analyzing whether a state statute preempted a local ordinance); [*47] *BCCA Appeal Grp., Inc. v. City of Houston, 496 S.W.3d 1, 7-8 (Tex. 2016)* (outlining municipal ordinance preemption and statutory construction). Not only is the applicable Texas preemption law clear, as will be explained further herein, *see infra* Part V(B), Texas's Third Court of Appeals has already held that the TMWA preempts a city ordinance requiring private employers to provide paid sick leave. *See Tex. Ass'n of Bus. v. City of Austin, 565 S.W.3d 425, 440 (Tex. App.—Austin 2018, pet. filed)*. Thus, the Court has the benefit of state court precedent specifically addressing TMWA preemption of a materially similar municipal paid sick leave ordinance. *See Mem'l Hermann Healthcare Sys., Inc. v. Eurocopter Deutschland, GMBH, 524 F.3d 676, 678 (5th Cir. 2008)* ("In making an *Erie* guess, [federal courts] defer to intermediate state appellate court decisions, 'unless convinced by other persuasive data that the highest court of the state would decide otherwise.'") (quoting *Herrmann Holdings Ltd. v. Lucent Techs. Inc., 302 F.3d 552, 558 (5th Cir. 2002))*.[14]

A Texas state district court has also issued an order granting a motion temporarily enjoining the enforcement of a similar paid sick leave ordinance enacted in the City of San Antonio. (Dkt. #61-1) (Order on Temporary Injunction of the 408th Judicial District of Bexar County, Texas, in *Associated Builders & Contractors of S. Tex., et al. v. City of San Antonio, et al.*, No. 2019CI13921). Texas's Fourth Court of Appeals has abated the appeal of that order pending the resolution of a petition for review before the Texas Supreme Court in the *City of Austin* case, suggesting that the Fourth Court of Appeals considers San Antonio's paid sick leave ordinance to be materially similar to the Austin paid sick leave ordinance enjoined in the *City of Austin* case. *City of San Antonio v. Associated Builders & Contractors of S. Tex., No. 04-20-00004-CV, slip op., 2020 Tex. App. LEXIS 1972 (Tex. App.—San Antonio Mar. 4, 2020 no pet. h.)* (mem op., not designated for publication).

By contrast, cases that have identified novel issues of state law include those that ask the Court to apply the law for the first time. *See, e.g., In re*

ESI/Employee Sols., L.P. v. City of Dallas

*Abbott Labs., 51 F.3d 524, 529 (5th Cir. 1995)* (noting that whether indirect purchasers could state a claim under Louisiana antitrust law was a novel and complex issue); *Brim v. ExxonMobil Pipeline Co., 213 F. App'x 303, 305 (5th Cir. 2007)* (per curiam) (unpublished) (finding that [*48]

the question of whether a state statute provided a private cause of action was a novel issue when no state court had decided the issue).

The City claims that, because there is a petition for review of the *Austin* court's order pending before the Texas Supreme Court, this case presents a novel issue of law. But as the State has correctly noted, such a reading of "novel" under *28 U.S.C. § 1367(c)* would mean that, even where a state's highest court had established a legal standard, any new set of facts involving the application of that standard in federal court would present a "novel" issue. The Court is unaware of any precedent supporting the City's unusual interpretation and rejects such a strained and unworkable construction of the statute.

As to the second factor described in *section 1367(c)(2)*, the City argues that the Court should decline supplemental jurisdiction because the state law claim substantially predominates over the federal claim. When considering whether a claim substantially predominates over others, courts consider the proof required, scope of issues, and "comprehensiveness of the remedy sought." *United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)*. The questions before the Court in this case are predominantly legal in nature. It is, therefore, unlikely that [*49]

any one claim will require substantially more evidentiary proof than another. As the Court has previously observed in the context of venue, the parties have already agreed that "the subject matter [of this case] lends itself to having little evidence to present" and the parties have likewise "point[ed] to no physical evidence that may be required to resolve the case." (Dkt. #49). Nor does the state law claim's scope predominate. Whether the Ordinance is preempted by the Texas Constitution is not a claim that is dependent on the resolution of multiple questions of Texas law. It requires the Court to decide only whether the Texas legislature

intended to preempt municipalities from regulating the minimum wage and, if so, whether the paid sick leave mandated by the Ordinance falls within the meaning of the word "wage." Lastly, the remedy sought for the federal *Fourth Amendment* claim and the state law claim is the same—an order enjoining the entire Ordinance. Although the remedy for the federal claim may be narrowed later, this factor asks about the remedy *sought*. Because the remedy sought for the remaining federal claim and the state law claim is the same, the state law claim does not substantially predominate [*50]

over the federal claim. This factor is therefore neutral.

The final two statutory factors, described in *section 1367(c)(3)-(4)*, both weigh in favor of retaining jurisdiction, as a viable federal claim remains and there is no other compelling reason to decline jurisdiction.

Turning to the common law factors, both the convenience and fairness factors are neutral. This Court and a court in Dallas County are roughly equivalent in their convenience to the parties. *See* (Dkt. #49 at 8) (determining that neither the Northern District of Texas nor the Eastern District of Texas was inconvenient for any party associated with the case). And any discovery, research, or briefing that has already been completed by the parties concerning the state law issue will be largely, if not completely, applicable in state court. Thus, neither party would be prejudiced by dismissing the case.

The judicial economy factor, on the other hand, weighs slightly in favor of retaining the case. Although the Court has not yet invested a substantial amount of judicial resources into the case, declining supplemental jurisdiction on the state law claim would require the involvement and attention of an additional court, thereby doubling the effort [*51]

required to resolve it. *See PPG Indus., Inc. v. Cont'l Oil Co., 478 F.2d 674, 680 (5th Cir. 1973)* (noting a "disinclination to encourage duplication of effort"). It is not economical to require a case that could be resolved in one court to proceed in two courts. Because a federal claim remains in this case and will proceed, it is a more efficient use of

ESI/Employee Sols., L.P. v. City of Dallas

judicial resources to have all challenges to the Ordinance resolved in one court.

As to the comity factor, the State argues that comity weighs in favor of retaining the state law claim because the State of Texas itself has indicated its desire to proceed in a federal forum. In support, the State analogizes decisions in which federal courts have declined to dismiss cases on the basis of international comity when the United States has brought a claim. The international comity doctrine instructs courts to refuse jurisdiction when adjudicating the case may upset foreign relations. *See Derr v. Swarek, 766 F.3d 430, 442 (5th Cir. 2014)* (noting that the purpose of international comity is to defer to foreign judgments that are the result of a "fully and fairly" litigated case). In the cases cited by the State, courts have retained jurisdiction because "declining jurisdiction out of deference to the interest of a foreign nation would be inappropriate" as the [*52] executive branch has already weighed international policy interests. *See United States v. All Assets Held in Account Number XXXXXXXX, 83 F. Supp. 3d. 360, 372, 314 F.R.D. 12 (D.D.C. 2015)* (refusing to decline jurisdiction over a case brought by the United States which had been previously settled in Nigeria). The State argues that, consistent with the international comity doctrine, Texas's executive branch has already weighed the state and local interests at stake in this case, and has affirmatively decided to proceed in federal court.

Notwithstanding the State executive branch's decision to proceed in federal court, its reliance on the international comity doctrine is unpersuasive. Comity is a factor in determining whether a federal court should retain supplemental jurisdiction over state law claims because of a desire to avoid "needless decisions of state law" and to "promote justice between the parties by procuring for them a surer-footed reading of applicable law." *Gibbs, 383 U.S. at 726*. The Supreme Court has explained that comity, in the federalism context, supports the idea that "the National Government will fare best if the States *and their institutions* are left free perform their separate functions in their separate ways." *Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 10, 107 S.Ct 1519, 95 L.Ed.2d 1 (1987)* (quoting *Younger v. Harris, 401 U.S. 37, 44, 91 S.Ct 746, 27 L.Ed.2d 669 (1971)*) (emphasis added). Comity as a common law factor in determining supplemental [*53] jurisdiction must, as both *Pennzoil* and *Gibbs* suggest, refer to a more global deference that includes the interests of the parties, courts, and citizens of the state in having state issues decided by state courts. The Court, therefore, concludes that comity, as it normally does in this context, weighs in favor of declining supplemental jurisdiction in this case.

Taken together, the statutory and common law factors weigh in favor of retaining supplemental jurisdiction over the state law claim. That a federal claim remains viable, and that the state law issue is neither novel, complex, nor predominant, weigh in favor of retaining supplemental jurisdiction over the state law claim. And there are no other compelling reasons to decline jurisdiction. Even if one of the statutory factors was invoked, the common law factors do not counsel strongly in favor of declining jurisdiction, with only comity concerns weighing in favor of dismissing the state law claim. Thus, having weighed the statutory and common law factors, the Court will exercise supplemental jurisdiction over the state law claim. The City's motion to dismiss the claim is therefore DENIED.

## V. PRELIMINARY INJUNCTION

Having determined [*54] that the Plaintiffs have sufficiently stated a claim under the *Fourth Amendment* and under state law to survive the City's dismissal motion, and that the Court should retain supplemental jurisdiction over the state law preemption claim, the Court now turns to the Plaintiffs' motions for preliminary injunction. Because the Court concludes that the Plaintiffs' request for a preliminary injunction on the state law preemption claim is substantially likely to succeed on the merits and otherwise meets the requirements for a preliminary injunction, it will not reach the *Fourth Amendment* claim seeking the same relief.

## A. Preliminary Injunction Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)*. To issue such relief, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* It does so by requiring the plaintiff to establish:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and [*55]
>
> (4) that the grant of an injunction will not disserve the public interest.

*Janvey v. Alguire, 647 F.3d 585, 595 (5th Cir. 2011)*. While a plaintiff "is not required to prove his case in full," *Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)*, he must "clearly carr[y] the burden of persuasion on all four requirements[,]" *Lake Charles Diesel, Inc. v. Gen. Motors Corp., 328 F.3d 192, 196 (5th Cir. 2003)*.

## B. Substantial Likelihood of Success on the Merits

At the outset, a plaintiff requesting a preliminary injunction must first demonstrate that he is likely to succeed on the merits of his claim. *Canal Auth. v. Callaway, 489 F.2d 567, 576 (5th Cir. 1974)* ("[I]t is important to consider this requirement, since, regardless of the balance of relative hardships threatened to the parties, the granting of a preliminary injunction would be inequitable if the plaintiff has no chance of success on the merits.").

The Employer-Plaintiffs and the State allege that the Ordinance is preempted by the TMWA and therefore violates the Texas Constitution. This issue is a matter of state law. "A federal court exercising [supplemental] jurisdiction over state law claims, must apply the substantive law of the state in which it sits." *Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan, 883 F.2d 345, 353 (5th Cir. 1989)* (citing *Gibbs, 383 U.S. at 726*). That law is enunciated by the state's highest court. *Troice v. Greenberg Traurig, L.L.P., 921 F.3d 501, 505 (5th Cir. 2019)*. When a state's highest court has yet to speak on an issue, a federal court "must follow the decisions of intermediate state courts in the absence of convincing [*56] evidence that the highest court of the state would decide differently." *Stoner v. N.Y. Life Ins. Co., 311 U.S. 464, 467, 61 S.Ct. 336, 85 L.Ed. 284 (1940)* (citations omitted).

The Texas Supreme Court has explained the standard for evaluating the type of preemption claim asserted by Plaintiffs: the preemption of a municipal ordinance by state legislation. Home-rule cities,[15]

Home-rule cities are those operating under a municipal charter as provided for in the Texas Constitution. *Barnett v. City of Plainview, 848 S.W.2d 334, 337 (Tex. App.—Amarillo 1993, no pet.)*; *TEX. CONST. art. XI, § 5*.

like the City of Dallas, "have broad discretionary powers, provided that no ordinance 'shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State.'" *Dall. Merch.'s & Concessionaire's Ass'n v. City of Dallas, 852 S.W.2d 489, 490 (Tex. 1993)* (quoting *TEX. CONST. art. XI, § 5*). Accordingly, home-rule cities have full power of self-governance, limited only by what the Texas legislature withholds. *Id.* Regardless of whether a statutory limit on local laws is implicit or explicit, it "must appear with unmistakable clarity" to foreclose coregulation of a matter. *City of Laredo v. Laredo Merchs. Ass'n, 550 S.W.3d 586, 593 (Tex. 2018)* (quoting *Lower Colo. River Auth. v. City of San Marcos, 523 S.W.2d 641, 645 (Tex. 1975))* (internal quotation marks omitted).

Although home-rule cities can regulate broadly, when a municipal ordinance purports to regulate subject matter that is already regulated by a state statute, it is unenforceable "to the extent it conflicts with the state statute." *Dall. Merch's & Concessionaire's Ass'n, 852 S.W.2d at 491* (citing *City of Brookside Vill. v. Comeau, 633 S.W.2d 790, 796 (Tex. 1982))*. Mere coexistence in the same statutory ambit as state legislation does not preempt a municipal [*57] ordinance *per se* where it can operate "in harmony with the general scope and purpose of the state enactment." *City of Laredo, 550 S.W.3d at 593*

ESI/Employee Sols., L.P. v. City of Dallas

(quoting *Comeau, 633 S.W.2d at 796*) (internal quotation marks omitted). But where the purpose of the state legislation is frustrated by concurrent operation of a municipal ordinance, the ordinance will be unenforceable—even if the laws do not regulate the same subject. *See S. Crushed Concrete, L.L.C. v. City of Houston, 398 S.W.3d 676, 679 (Tex. 2013)* (finding a municipal ordinance that ostensibly regulated land use was preempted by a state statute regulating air quality in part because the ordinance rendered the state statute ineffective); *BCCA Appeal Grp., 496 S.W.3d at 7* (explaining that, "a home-rule city's ordinance is unenforceable to the extent that it is inconsistent with [a] state statute preempting that particular subject matter").

The Texas Supreme Court has not yet addressed the specific preemption issue in this case: whether a city ordinance requiring private employers to provide paid sick leave to their employees is preempted by the TMWA. However, the issue has been decided by Texas's Third Court of Appeals. *See Tex. Ass'n of Bus. v. City of Austin, 565 S.W.3d 425 (Tex. App.—Austin 2018, pet. filed)*. The *Austin* court considered a paid sick leave ordinance enacted by the City of Austin that included substantive provisions virtually identical to the Dallas Ordinance at issue here. *[*58]* *Id.*[16]

The *Austin* court ruled on the matter as part of an appeal of a temporary injunction, which ordinarily would not include a ruling on the merits. *See City of Austin, 565 S.W.3d at 438*. However, the court stated that it "must address the merits of the statutory-preemption claim to determine whether the district court abused its discretion in denying the temporary injunction," as "[t]hat is a legal question that the district court has no discretion to get wrong." *Id.*

In both ordinances, employees are granted one hour of paid sick leave for every thirty hours worked, and in both, employers must pay employees what they would have made if they had been working during hours taken as sick leave. *Compare City of Austin, 565 S.W.3d at 440* (quoting Austin, Tex. Code of Ordinances *§§ 4-19-2(A), (J)*) ("[E]mployers must 'grant an employee one hour of earned sick time for every 30 hours worked' . . . [and] must pay the 'earned sick leave in an amount equal to what the employee would have earned if the employee had worked.'"), *with* Dall. City Code §§ 20-4(a), 20-5(a) (same). The plaintiffs in *City of Austin* brought a preemption claim that required the Texas intermediate appellate court to determine whether the Austin ordinance established a "wage" in contravention of the TMWA and the Texas Constitution. Absent "convincing evidence" that the Texas Supreme Court would rule differently on this issue, the Court must follow the *Austin* court's interpretation of Texas law. *Stoner, 311 U.S. at 467*.[17] As noted herein, *see supra* note 14, a state district court in San Antonio has also temporarily enjoined a substantially similar San Antonio city ordinance on the same preemption grounds. *See Associated Builders & Contractors of S. Tex. v. City of San Antonio*, No. 2019CI13921 (Bexar Cty. Dist. Ct.). However, that opinion does not provide reasoned grounds for the decision and is of limited usefulness in the analysis here.

The *Austin* court concluded that the "legislative intent in the TMWA to preempt local law is clear." *565 S.W.3d at 439*. The court explained that the TMWA "expressly prohibits municipalities [*59] from regulating the wages of employers that are subject to the federal minimum-wage requirements of the *Fair Labor Standards Act (FLSA)*." *Id.*[18] Generally, the FLSA applies to employers whose "annual gross volume of sales made or business done" is greater than $ 500,000. *See 29 U.S.C. § 206(a)* (setting minimum wage for enterprises "engage[d] in commerce"); *§ 203(s)(1)(A)(ii)* (stating that an enterprise is "engaged in commerce" if its "annual gross volume of sales made or business done" is greater than $ 500,000).

In support of this conclusion, the court cited and quoted *section 62.151 of the TMWA*, which states that any municipal ordinance "governing wages in private employment . . . [does] not apply to a person covered by the [FLSA]." *Id.* (quoting *TEX. LAB. CODE ANN. § 62.151*) (internal quotation marks omitted). The *Austin* court further explained that, "the TMWA explicitly provides that 'the minimum wage provided by [the TMWA] *supersedes* a wage established in an ordinance . . . governing wages in private employment.'" *Id.* (quoting *TEX. LAB. CODE ANN. § 62.0515(a)*) (emphasis in original).

The Court has no reason to believe that the Texas Supreme Court would reach different conclusions than Texas's Third Court of Appeals concerning the operation and preemptive effect of the TMWA. The Texas legislature's intent to limit local government regulation of wages is perspicuous. The TMWA's plain text states that municipal ordinances governing wages in private employment are

inapplicable to employers subject to the FLSA and *section 62.151 of the Texas Labor Code*, and that the minimum wage provided by the TMWA "supersedes" a wage established in, among other things, a municipal ordinance. [*60]

*TEX. LAB. CODE ANN. § 62.0515(a)*. Working in concert, these TMWA provisions unequivocally yoke the minimum wage in Texas to the TMWA itself and the federal minimum wage, explicitly preempting upward departures imposed by municipalities. Therefore, as the *Austin* court concluded, if the paid sick leave required by the Ordinance establishes a wage, it is preempted by the TMWA and unenforceable.

Because the TMWA does not define the term "wage," the *Austin* court gave that word its ordinary meaning. *City of Austin, 565 S.W.3d at 439*; *see also City of Laredo, 550 S.W.3d at 594* ("To decide [the preemption issue] we look, as usual, to the statutory text and the ordinary meaning of words."). The court noted that the word "wage" "refers to a 'payment to a person for service rendered. . . . The amount paid periodically, esp. by the day or week or month, for the labour or service of an employee, worker, or servant.'" *City of Austin, 565 S.W.3d at 439* (quoting COMPACT OXFORD ENGLISH DICTIONARY 693 (2d. ed. 1989), and then citing WEBSTER'S THIRD NEW INT'L DICTIONARY 2568 (2002) (defining "wage" as "a pledge or payment of usu. monetary remuneration by an employer esp. for labor or services")).

In light of the ordinary meaning of "wage," and under the TMWA's plain language, the *Austin* court concluded that the Austin ordinance was [*61] preempted because it "establishes the payment that a person receives for services rendered to an employer." *Id.* In this regard, like the Dallas Ordinance, the Austin ordinance mandates that employers provide one hour of sick leave for "every 30 hours worked." *Id.* (quoting Austin, Tex. Code of Ordinances *§ 4-19-2(A)* (internal quotation marks omitted). Under this paid sick leave mandate, "an employer . . . must pay employees who use sick leave for hours that they did not actually work." *Id.* The *Austin* court held that the "effective result" of such provisions "is that employees who take sick leave are paid the same wage for fewer hours worked, or, stated differently, that employees who take sick leave are paid more

per hour for the hours actually worked." *Id. at 439-40*.

In short, the *Austin* court concluded that the paid sick leave provisions of the Austin ordinance "increase[] the pay of those employees who use paid sick leave." *Id. at 440*. Based on these conclusions, the *Austin* court determined that (1) the TMWA preempts local regulations that establish a wage, (2) the Austin paid sick leave ordinance establishes a wage, and that, accordingly, (3) the TMWA preempts the Austin ordinance as a matter of law, thus making [*62] the ordinance unconstitutional. *Id. at 440-41* (citing *TEX. CONST. art. XI, § 5*) (mandating that no city ordinance "shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State").

Again, there is no reason to believe the Texas Supreme Court would reach a different conclusion than the *Austin* court on the question of whether the Austin paid sick leave ordinance establishes a wage and is therefore preempted by the TMWA and unenforceable. To the contrary, in construing the relevant provisions of the TMWA and the Austin ordinance, the *Austin* court employed statutory construction tools consistently endorsed and applied by the Texas Supreme Court. The *Austin* court focused on the statutory text to determine legislative intent, adhering to the oft-repeated admonitions of the Texas Supreme Court. *See, e.g., In re Office of Attorney Gen., 422 S.W.3d 623, 629 (Tex. 2013)* ("Legislative intent is best revealed in legislative language."). Likewise, the *Austin* court followed the Texas Supreme Court's guidance that, "[w]here statutory text is clear, that text is determinative of legislative intent unless the plain meaning of the statute's words would produce an absurd result." *Tex. Mut. Ins. Co. v. Ruttiger, 381 S.W.3d 430, 452 (Tex. 2012)*; *see also, e.g., State v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006)* ("[W]hen possible, we discern [*63] [legislative intent] from the plain meaning of the words chosen.").

Applying these tools to interpret the TMWA and the Austin ordinance, the *Austin* court reached the unremarkable conclusion that, when the text of a

municipal ordinance mandates that employees be paid their regular wage for hours *not* actually worked based on taking sick leave, the result is an increased wage for hours that *are* worked. Because such an ordinance has the inevitable effect of increasing the pay of employees who use paid sick leave, it is preempted by the plain language of the TMWA and unenforceable under the Texas Constitution. Finally, the *Austin* court's preemption ruling also comports with the Texas Supreme Court's guidance that "a home-rule city's ordinance is unenforceable to the extent that it is inconsistent with [a] state statute preempting that particular subject matter." *BCCA Appeal Grp., 496 S.W.3d at 7*.

The Court concludes that it is bound to follow the *Austin* court's well-reasoned preemption ruling, which applies equally to the Dallas paid sick leave ordinance because its substantive provisions mirror those of the Austin ordinance held to be unenforceable. *Compare* Austin, Tex. Ordinance No. 20180215-049, *§ 4-19-2(A)* (stating that Austin [*64]
employers must "grant an employee one hour of earned sick time for every 30 hours worked"), *with* Dall. City Code § 20-4(a) (stating that Dallas employers "shall grant [employees] one hour of earned, paid sick time for every 30 hours worked"). For these reasons, the Court holds that the Employer-Plaintiffs and the State of Texas have established a substantial likelihood of success on the merits of their preemption claim.

## C. Substantial Threat of Irreparable Injury

The Court must next consider whether there is a substantial threat of irreparable injury if a preliminary injunction is not granted. *Janvey, 647 F.3d at 595*. The Court concludes that there is. "Federal courts have long recognized that, when the 'threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.'" *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana, 762 F.2d 464, 472 (5th Cir. 1985)* (quoting *Canal Auth., 489 F.2d at 574*). Irreparability, in this context, refers to the plaintiff's ability to recover monetary remedies. *Dennis*

*Melancon, Inc. v. City of New Orleans, 703 F.3d 262, 279 (5th Cir. 2012)*. Where the plaintiff can be compensated for their harm later through normal litigation mechanisms, a court will not issue a preliminary injunction, even when the threatened harm is substantial. *Id.* (citing *Morgan v. Fletcher, 518 F.2d 236, 240 (5th Cir. 1975))*.

Here, neither the State of Texas nor the Employer-Plaintiffs [*65]
will be able to recover for the harm they will suffer if they are subjected to an unconstitutional municipal ordinance. The state invariably suffers irreparable harm when it cannot enforce its laws. *Abbott v. Perez,     U.S.    , 138 S.Ct. 2305, 2324 n.17, 201 L.Ed.2d 714 (2018)* (citing *Maryland v. King, 567 U.S. 1301, 133 S.Ct. 1, 183 L.Ed.2d 667 (2012)* (Roberts, C.J., in chambers)) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State."); *see also New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 434 U.S.1345, 1352, 98 S.Ct. 359, 54 L.Ed.2d 439 (1977)* (Rehnquist, J., in chambers) (holding that a state was irreparably harmed when a court enjoined the enforcement of its laws). The State of Texas has enacted the TMWA, which governs the minimum wage in Texas. *TEX. LAB. CODE ANN. §§ 62.151*, *62.155*. The Texas Constitution states that no municipal law shall conflict with laws enacted by the legislature. *Tex. Const. art. XI, § 5*. Because the enactment of the Ordinance creates a different minimum wage for employers of people who work in Dallas by superimposing additional requirements on top of the TMWA, the State's law has been effectively nullified as to those workers, despite the State's clear intent to normalize the minimum wage statewide. This type of harm supports a preliminary injunction.

Likewise, the Employer-Plaintiffs will suffer irreparable harm resulting from compliance costs and increased regulatory burden. Specifically, the Employer-Plaintiffs [*66]
have shown that, in addition to paying employees when they take accrued sick leave time, they will also need to hire additional personnel to oversee compliance, update training materials, rearrange the mix of pay and benefits offered to employees, raise client rates, and change acquisition and benefit priorities. Although these injuries are economic in

nature, which normally counsels against irreparable harm, *Janvey, 647 F.3d at 600*, they are not compensable because the City of Dallas enjoys governmental immunity as a home-rule city under Texas law. *See, e.g., City of Galveston v. Texas, 217 S.W.3d 466, 469 (Tex. 2007)* (stating that home-rule cities are immune from suit for government functions unless a state statute limits immunity). Thus, even if the Employer-Plaintiffs are eventually successful on the merits of their claim, they will not be able to recover their damages and, as such, are irreparably harmed by the Ordinance. *See Harris v. Cantu, 81 F. Supp. 3d 566, 580 (S.D. Tex. 2015), rev'd on other grounds sub nom., Harris v. Hahn, 827 F.3d 359 (5th Cir. 2016)* (finding that economic loss unrecoverable due to immunity constitutes irreparable harm); *Teladoc, Inc. v. Tex. Med. Bd., 112 F. Supp. 3d 529, 543 (W.D. Tex. 2015)* (same); *see also Chamber of Commerce v. Edmondson, 594 F.3d 742, 770-71 (10th Cir. 2010)* (same).

The City's arguments against irreparable harm to the Employer-Plaintiffs are two-fold: it questions the accuracy of ESI's alleged compliance costs and whether Hagan's alleged harm is sufficiently [*67] imminent to justify a preliminary injunction. ESI has provided proof that it will incur damages that are "approximately $ 269,000.00 annually if each of its Dallas employees take the full amount of paid leave," and that it will have to hire another employee to "track where employees are placed, track their hours, calculate leave earned and send monthly reports." (Dkt. #3-1, Ex. 1 PP 10-11). The City takes issue with these estimates and suggests that ESI already tracks employees. The City also argues that as a staffing agency, ESI will not bear the sole responsibility for complying with the Ordinance. Neither of these arguments detract from ESI's demonstration of irreparable harm.

The City is correct that the Plaintiffs carry a heavy burden to establish irreparable injury. *See White v. Carlucci, 862 F.2d 1209, 1211 (5th Cir. 1989)* (citing *Enter. Int'l, 762 F.2d at 472*) ("Without question, the irreparable harm element must be satisfied by independent proof, or no injunction may issue."). But after that harm has been established, the element is satisfied; the degree of harm is irrelevant. It is beyond dispute that there

are greater than de minimis compliance costs associated with the Ordinance—ESI must spend money on employees that do not work because they are taking [*68] sick leave, must track sick leave accrual, and must amend its handbook and training materials. *See Dennis Melancon, 703 F.3d at 279* (finding that $ 2,000 in damages is more than de minimis). Because governmental immunity will preclude recovery against the City regardless of the amount of damage, the irreparable harm element is met.

As to Hagan, the City rests on its standing argument to rebut a claim of irreparable harm, arguing that enforcement for small employers is too remote to justify a preliminary injunction. But Hagan has shown that it will suffer harm for which it cannot recover as it becomes compliant with portions of the Ordinance whose enforcement is delayed. The additional time afforded to small employers before the Ordinance is enforced against them suggests that the City anticipates it will require more time for such employers to become compliant. Thus, these threatened injuries are likely to occur sooner than the date Hagan's employees begin accruing sick leave and are sufficiently imminent to justify considering them in the preliminary injunction context. Because Hagan has or will suffer damages that are more than de minimis and are not recoverable against the City, Hagan has also established that [*69] it will suffer irreparable harm if the Ordinance remains in force.

## D. Balance of Equities and Public Interest

The balance of equities and public interest also favor granting the requested preliminary injunction. Because the Court has already determined that the Plaintiffs are likely to succeed on their preemption claim, the balance of equities and public interest factors weigh in favor of granting the preliminary injunction. *See Tex. Midstream Gas Servs., L.L.C. v. City of Grand Prairie, No. 3:08-CV-1724, 2008 U.S. Dist. LEXIS 95991, 2008 WL 5000038, at *20 (N.D. Tex. Nov. 25, 2008)* ("Because [the plaintiff] has demonstrated a substantial likelihood of success on the merits of part of its express preemption claim, this suggests that the balance of hardship and

public interest factors weigh in favor of granting the preliminary injunction."), *aff'd*, *608 F.3d 200 (5th Cir. 2010)*.

The City argues that the harm it will suffer if it is unable to effectuate its laws, and the potential loss or suspension of benefits to the public, counsel against granting a preliminary injunction. Neither concern alters the balance of equities or ultimate weight of the public interest in preliminarily enjoining the Ordinance. The City's interest in the continued operation of an Ordinance that is most likely preempted by the [*70] TMWA, and therefore unenforceable under the Texas Constitution, cannot outweigh the State's interest in enforcing its constitution and laws. The State of Texas is "inviolably sovereign," *Wasson Interests, Ltd. v. City of Jacksonville, 489 S.W.3d 427, 429 (Tex. 2016)*, and its legislature stands above local governments, *see TEX. CONST. art XI, § 5(a)*. As the State has correctly noted, each day the Ordinance operates against the express mandate of the Texas legislature to preempt local laws governing wages, the State's sovereignty is violated and the relationship between the legislature and local governments, guaranteed by the Texas Constitution, is turned on its head. Further, allowing the continued accrual of benefits under an Ordinance that is most likely unenforceable, as well as the continued imposition of unrecoverable expenses on regulated businesses, also is not consistent with the public interest.

For all of the foregoing reasons, the Plaintiffs' request for a preliminary injunction is GRANTED. Under *Federal Rule of Civil Procedure 65(c)*, a court granting a preliminary injunction has discretion to require a bond "in an amount that the court considers proper." Because the City is unlikely to accrue any damages if it is wrongly enjoined, nor has it argued for an appropriate bond amount, no security bond will be required. [*71] See *A.T.N. Indus., Inc. v. Gross, 632 F. App'x 185, 192 (5th Cir. 2015)* (per curiam) (unpublished) (quoting *Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 628 (5th Cir.1996)* ("[U]nder *Rule 65(c)*, 'a court may elect to require no security at all.'").

* * *

The Court notes that this decision issues at a time when the American public and federal, state, and local authorities are confronted with the unprecedented public health crisis and economic upheaval caused by the Coronavirus Disease 2019 ("COVID-19"). The President has declared a national emergency under the *National Emergencies Act, 50 U.S.C. § 1601, et seq.*, with respect to COVID-19. Businesses large and small, and workers across the country, face tremendous challenges during this national emergency. Likewise, policymakers at all levels of government are developing and implementing strategies to meet and balance the public health and economic concerns of their constituents.[19] For example, in response to the rapid proliferation of COVID-19 in the United States, on March 18, 2020, Congress enacted, and the President signed into law, the Families First Coronavirus Response Act ("FFCRA"). Families First Coronavirus Response Act, **Pub. L. No. 116-127, 134 Stat. 178 (2020)**. The FFCRA, which applies to private sector employers that employ fewer than 500 employees and some public sector employers, provides up to 80 hours of paid sick leave to workers who are ill, quarantined, or seeking treatment as a result of COVID-19, or caring for those who are sick or quarantined as a result of COVID-19. These provisions will be in effect until December 31, 2020. *Id.* §§ 5102(a)-(b), 5108-09, 5110(2)(B).

Federal courts, on the other hand, although vested with the authority to interpret the law, "possess neither the expertise nor the prerogative to make policy judgments." *Nat'l Fed. of Indep. Bus. v. Sebelius, 567 U.S. 519, 538, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012)*. As the Supreme Court has explained, "[t]hose decisions are entrusted to our Nation's elected leaders." *Id.*

Courts' deference in matters of policy, however, "cannot become abdication in matters of law." *Id.* "The peculiar circumstances of the moment may render [*72] a measure more or less wise, but cannot render it more or less constitutional." Chief Justice John Marshall, *A Friend of the Constitution No. V*, Alexandria Gazette, July 5, 1819, *reprinted in* JOHN MARSHALL'S DEFENSE OF *MCCULLOCH V. MARYLAND* 190-191 (G. Gunther ed. 1969). Whether or not paid sick leave requirements should be imposed by government on private employers is an important public policy issue, made even more significant under the challenging circumstances faced by our Nation at this moment. The State of Texas, through its constitutional structure and statutory law, has

committed that public policy decision to the Texas legislature. The Court's decision to grant a preliminary injunction upholds the state constitution and statutory provisions preempting and rendering unenforceable the City's paid sick leave ordinance.

## VI. CONCLUSION

For the reasons stated above, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss. (Dkt. #36). Defendants' *Rule 12(b)(1)* motion is **GRANTED** as to the Employer-Plaintiffs' purported third-party *First Amendment* claim on behalf of their employees and **DENIED** as to Plaintiff Hagan's claims and the Employer-Plaintiffs' *First Amendment* claim brought on their own behalf. Defendants' [*73] *Rule 12(b)(6)* motion is **GRANTED** as to the Employer-Plaintiffs' *First Amendment* claim brought on their own behalf, as well as the Employer-Plaintiffs' *Fourteenth Amendment* claim. Defendants' Rule1 2(b)(6) motion is **DENIED** as to the Employer-Plaintiffs' *Fourth Amendment* claim, Plaintiffs' state law preemption claim, and Defendants' request that the Court decline to exercise supplemental jurisdiction.

It is therefore **ORDERED, ADJUDGED, AND DECREED** that the Employer-Plaintiffs' claims brought under the *First Amendment* and *Fourteenth Amendment* are hereby **DISMISSED**.

It is further **ORDERED** that the Plaintiffs' Motion for Preliminary Injunction (Dkt. #3, #21) is hereby **GRANTED**. The City of Dallas's Paid Sick Leave Ordinance, Dallas, Texas, Ordinance No. 31181; Municipal Code § 20-1-20-12, is **ENJOINED** and unenforceable. No officer, agent, servant, employee, attorney, or other person in active concert with the City of Dallas may enforce the Paid Sick Leave Ordinance against any business or entity pending the resolution of this case.

**So ORDERED and SIGNED this 30th day of March, 2020**.

/s/ Sean D. Jordan

SEAN D. JORDAN

UNITED STATES DISTRICT JUDGE.

_____

**6**



Neutral

As of: June 18, 2020 5:44 PM Z

# *Matthews v. Freedman*

United States District Court for the Eastern District of Pennsylvania

June 8, 1993, Decided ; June 8, 1993, Filed; June 9, 1993, Entered

Civil Action No. 88-3127

**Reporter**

1993 U.S. Dist. LEXIS 7662 *; 1993 WL 204164

DORENDA MATTHEWS, Plaintiff v. DARYL FREEDMAN & McCORMICK, TAYLOR & CO., INC., Defendants

## LexisNexis® Headnotes

Civil Rights Law > Protection of Rights > Contractual Relations & Housing > General Overview

Labor & Employment Law > ... > Racial Harassment > Employment Practices > General Overview

Labor & Employment Law > Discrimination > Reconstruction Statutes

**HN1**[⬇] **Protection of Rights, Contractual Relations & Housing**

The applicability of *42 U.S.C.S. § 1981* is limited to discrimination claims that relate to contract formation only, not to conduct occurring in the course of contract performance.

Civil Procedure > ... > Relief From Judgments > Excusable Mistakes & Neglect > Excusable Neglect

Civil Procedure > Pleading & Practice > Motion Practice > General Overview

Civil Procedure > Pleading &

Practice > Motion Practice > Time Limitations

Civil Procedure > Judgments > General Overview

Civil Procedure > Judgments > Relief From Judgments > General Overview

Civil Procedure > ... > Relief From Judgments > Excusable Mistakes & Neglect > Inadvertence

Civil Procedure > ... > Relief From Judgments > Excusable Mistakes & Neglect > Mistake

Civil Procedure > Judgments > Relief From Judgments > Extraordinary Circumstances

Civil Procedure > Judgments > Relief From Judgments > Fraud, Misconduct & Misrepresentation

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

Civil Procedure > Judgments > Relief From Judgments > Newly Discovered Evidence

Civil Procedure > Judgments > Relief From Judgments > Reversal of Prior Judgments

Civil Procedure > Judgments > Relief From Judgments > Void Judgments

**HN2**[⬇] **Excusable Mistakes & Neglect, Excusable Neglect**

*Fed. R. Civ. P. 60(b)* provides that on motion and

upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect, (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b), (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party, (4) the judgment is void, (5) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application, or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under *Rule 60(b)* does not affect the finality of a judgment or suspend its operation.

Civil Procedure > Judgments > Relief From Judgments > Extraordinary Circumstances

Labor & Employment Law > Discrimination > Title VII Discrimination > Amendments

*HN3*[⤓] **Relief From Judgments, Extraordinary Circumstances**

A *Fed. R. Civ. P. 60(b)(6)* motion must be brought within "a reasonable time."

Civil Procedure > Judgments > Relief From Judgments > Extraordinary Circumstances

Governments > Courts > Judicial Precedent

Civil Procedure > Judgments > Relief From Judgments > General Overview

*HN4*[⤓] **Relief From Judgments, Extraordinary**

Circumstances

A change in decisional law alone is not grounds for *Fed. R. Civ. P. 60(b)* relief. While judgments are subject to being opened and retroactively modified in certain extraordinary situations where justice demands, a change in precedent is not one of those extraordinary circumstances. A judgment at law for damages for past wrongs is "inherently final" and remains unaffected by a subsequent change in the law.

Governments > Legislation > Effect & Operation > Prospective Operation

Labor & Employment Law > Discrimination > Title VII Discrimination > Amendments

*HN5*[⤓] **Effect & Operation, Prospective Operation**

The United States District Court for the Eastern District of Pennsylvania holds that the Civil Rights Act of 1991 does not apply to pre-enactment conduct, let alone to finally determined claims. Section 402(a) of the Act provides that, except as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment. There are no "otherwise specifically provided" provisions relating to the effective date.

**Counsel:** Steven M. Kramer, Esq., STEVEN M. KRAMER & ASSOCIATES, The Academy House, Penthouse Suite 37, 1420 Locust Street, Philadelphia, PA 19102 & 1822 Spruce St., Phila., PA 19103, 124 West 60th Street, Suite 28 N, New York NY 10023.

For FREEDMAN, DARRYL ET AL, by: Richard C. Biedrzycki, Esq., PHILLIPS AND PHELAN, 121 South Broad St., Suite 1600, Philadelphia, PA 19107.

**Judges:** [*1]
McGLYNN, JR.

**Opinion by:** BY THE COURT; JOSEPH L. McGLYNN, JR.

# Opinion

*MEMORANDUM OF DECISION*

McGlynn, J.

June 8, 1993

Before the court is plaintiff's motion under *Federal Rule of Civil Procedure 60(b)(6)* to vacate an adverse judgment entered by this court and affirmed by the court of appeals.

On April 14, 1988 plaintiff filed a complaint alleging that, in the course of her employment, she was the subject of racial and sexual harassment by one of defendants' employees. Plaintiff further alleged that ultimately she was forced to resign due to the difficulty of working under these conditions. The complaint contains allegations of race and gender discrimination set forth in seven counts, none of which, however, identified the claim as being grounded on *42 U.S.C. § 1981*.

Defendants filed a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)* or alternatively for summary judgment. Plaintiff opposed the dismissal of only one of the seven counts.

Judge Gawthrop entered an order granting defendants' motion and dismissed plaintiff's complaint in its entirety. Plaintiff appealed and for the first time, asserted a *42 U.S.C. § 1981* [*2] cause of action. Defendants contended, however, that plaintiff waived her right to assert a *§ 1981* claim by failing to raise it in the court below. Plaintiff responded that her intent to rely on *section 1981* was evident from her argument in the district court.

While plaintiff's appeal was pending, the United States Supreme Court decided *Patterson v. McLean Credit Union, 491 U.S. 164, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989)*. The ruling in that case limited *HN1*[⬆] the applicability of *42 U.S.C. § 1981* to discrimination claims that related to contract

formation only, not to conduct occurring in the course of contract performance. ( *Patterson, 491 U.S. at 176-77*.) Accordingly, the Third Circuit affirmed Judge Gawthrop's dismissal stating that *Patterson* barred "the use of *section 1981* in suits alleging on-the-job racial harassment." ( *Matthews v. Freedman, 882 F.2d 83, 85 (3d Cir. 1989)* ("*Matthews I*").) Consequently, the Third Circuit did not resolve whether plaintiff "should have been allowed to proceed under *42 U.S.C § 1981*, a theory of relief which was  [*3] not put in her complaint nor raised in her brief before the district court." ( *Id. at 84*.) The court denied plaintiff's subsequent motion for rehearing on September 15, 1989.

Plaintiff attempted to revive her *section 1981* claim in a second complaint filed on November 4, 1991. The court granted defendants' *Rule 12(b)(6)* motion to dismiss reasoning that the second action was precluded by the Third Circuit's final disposition of plaintiff's first action. (*Matthews v. Freedman*, No. 91-6888 (E.D.Pa. March 30, 1992) (Ditter, J.).

On appeal plaintiff argued that the passage of the Civil Rights Act of 1991 breathed new life into her *section 1981* cause of action. The Third Circuit rejected this argument, at least insofar as the case under review was concerned and affirmed the dismissal by the court below on *res judicata* grounds. (*See Matthews v. Freedman*, No. 92-1280, slip op. at 4 (3d Cir. Oct. 16, 1992) ("*Matthews II*").) The court of appeals did not rule on the retroactivity of the Civil Rights Act of 1991 but suggested that even if the Act were retroactive, the plaintiff would have to proceed by a *Rule 60(b)(6)* motion to vacate the judgment [*4] entered in the first action. This is precisely the motion that is now before the court. The motion will be denied.

*HN2*[⬆] *Fed. R. Civ. P. 60(b)* provides as follows:

**Relief From Judgment or Order**

**\* \* \***

**(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.**

Matthews v. Freedman

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or *(6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time*, and for reasons [*5] (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation.

* * *

(emphasis added.)

The only ground for *Rule 60(b)(6)* relief stated by the plaintiff in her motion is that "it would be extremely unfair to deprive plaintiff of her day in court when the dismissal was entered by the Third Circuit on the basis of a now-void decision…". She does not present any legal analysis of the issues or cite any authority in support of her position. The reason is obvious. Her motion is totally without substance.

First of all, *HN3*[⬆] a *Rule 60(b)(6)* motion must be brought within "a reasonable time." The motion was filed on October 26, 1992, more than three years and seven months after the judgment complained of was entered, and more than eleven months elapsed between the effective date of the Civil Rights Act of 1991 (Nov. 21, 1991) and the filing of the motion. There is absolutely no excuse for the delay nor is one offered. Moreover, the underlying claim is stale. The last significant act relating to her claim dates back to December 1986, almost six [*6] years, on a claim for which the statute of limitation is two years. *See, Goodman v. Lukens Steel Co., 777 F.2d 113 (3rd Cir. 1985) aff'd 482 U.S. 656, 96 L. Ed. 2d 572, 107 S. Ct. 2617 (1987).*

Furthermore, even if the 1991 Act could be construed to apply to cases pending on its effective date, this case was not pending on November 21, 1991. Judgment had been entered on February 28, 1989. The Court of Appeals affirmed on August 15, 1989 and denied a rehearing on September 15, 1989.

Secondly, there is no authority for the proposition that a post-judgment statutory amendment can invalidate a judgment based on pre-amendment law. Indeed, the precedents point in the opposite direction. In this circuit, at least, *HN4*[⬆] a change in decisional law alone is not grounds for *Rule 60(b)* relief. *Harris v. Martin, 834 F.2d 361 (3rd Cir. 1987)* ("The finality of judgments is a cornerstone of our judicial system. While judgments are subject to being opened and retroactively modified in certain extraordinary situations where justice demands, a change in precedent is not one of those extraordinary circumstances.") Cf. *Bailey v. Ryan Stevedoring Co., Inc., 894 F.2d 157 (5th Cir. 1990)*, [*7] *Precision Air Parts, Inc. v. Avco Corp., 736 F.2d 1499 (11th Cir. 1984)*. In *Marshall v. Board of Education, 575 F.2d 417 (3rd Cir. 1978)*, the court stated

[A] judgment at law for damages for past wrongs is "inherently final" and remains unaffected by a subsequent change in the law.

*575 F.2d at 425*.

Moreover, the plaintiff has not shown nor even attempted to show extraordinary circumstances justifying relief under *Rule 60(b)(6)*. *See. Mayberry v. Maroney, 558 F.2d 1159 (3rd Cir. 1977)*.

Finally, *HN5*[⬆] the Civil Rights Act of 1991 does not apply to pre-enactment conduct, let alone to finally determined claims.

Section 402(a) of the Act entitled "Effective Date" provides:

IN GENERAL -- Except as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment.

There are no "otherwise specifically provided"

provisions relating to the effective date.

Given this clear direction, there is no need to resort to rules of construction or legislative history to determine whether Congress might have had a contrary intent. [*8] *Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. 827, 108 L. Ed. 2d 842, 110 S. Ct. 1570 (1990)* (finding that the "plain language" of both the original and amended versions of the federal post-judgment interest statute, *28 U.S.C. § 1961*, evidenced a "clear congressional intent" that the amended *§ 1961* was not to be applied to a judgment entered before its effective date).

Even without the clear direction of non-retroactivity such as that provided in the 1991 Act, courts have held that in the absence of a clear expression to the contrary, a newly enacted statute is deemed to be prospective only. *See, Brown v. Georgetown University Hospital, 488 U.S. 204, 102 L. Ed. 2d 493, 109 S. Ct. 468 (1988)* ("retroactivity is not favored in the law. Thus Congressional Enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.")

Concurring in *Bonjorno supra*, Justice Scalia concluded that "a statute is deemed to be effective only for the future unless contrary intent appears." *Bonjorno, 494 U.S. at 858*.

In *Davis v. Omitowoju, 883 F.2d 1155 (3rd Cir. 1989)*, [*9] the court relying on *United States v. Security Industrial Bank, 459 U.S. 70, 74 L. Ed. 2d 235, 103 S. Ct. 407 (1982)* held that an amendment to a statute lowering the cap on medical malpractice awards is not to be applied retrospectively.

The Third Circuit has not addressed the retroactivity of the Civil Rights Act of 1991 (*but see, Thompson v. Prudential Life Ins. Co. of America, 795 F. Supp. 1337 aff'd* by Judgment Order 3/15/93 3rd Cir. No. 92-5407). The overwhelming weight of authority of those circuits that have addressed the issue have held that the Civil Rights Act of 1991 does not apply retroactively. *Butts v. City of New York Dept. of Housing Preservation & Development*, 1993 WL

85026 (2d Cir. 1993). *Harvis v. Roadway Exp., Inc., 973 F.2d 490 (6th Cir. 1992)*, *cert. granted, Landgraf v. USI Film Products, 122 L. Ed. 2d 649, 61 U.S.L.W. 3580, 61 U.S.L.W. 3580, 61 U.S.L.W. 3580, 113 S. Ct. 1250* (Feb. 22, 1993) (Nos. 92-757, 92-938). *Banas v. American Airlines, 969 F.2d 477 (7th Cir. 1992)*. *Fray v. Omaha World Herald Co., 960 F.2d 1370 (8th Cir. 1992)*. [*10] *Baynes v. AT & T Technologies, Inc., 976 F.2d 1370 (11th Cir. 1992)*. *Gersman v. Group Health Ass'n., Inc., 975 F.2d 886 (D.C. Cir. 1992)*, *petition for cert. filed, 61 U.S.L.W. 3523* (Jan. 13, 1993) (No. 92-1190). *Contra, Davis v. City & County of San Francisco, 976 F.2d 1536 (9th Cir. 1992)*, *vacated* in part on denial for rehearing, *984 F.2d 345 (9th Cir. 1993)*.

I am persuaded that the conclusion reached by the majority is the correct one and, thus, I join a growing number of my colleagues in this District who have ruled that the Civil Rights Act of 1991 applies prospectively only. *See*, *Byerly v. Herr Foods, Inc.*, No. CIV.A. 92-7382, 1993 WL 101196, (E.D.Pa. Apr. 6, 1993) (Newcomer, J.).

*Jones v. Arbor, Inc.*, No. CIV.A. 92-6824, 1993 WL 67257, (E.D.Pa. Mar 8, 1993) (Waldman, J.). *Dade v. Woolworth Corp., No. CIV.A. 92-4337, 1993 WL 64613*, (E.D.Pa. Mar 3, 1993) (Broderick, J.). *Bertels v. Merck & Co., Inc., No. CIV.A. 91-6281, 1993 WL 29123*, (E.D.Pa. Feb. 4, 1993) (R.F. Kelly, J.). *Rabinowitz v. Thomas Jefferson [*11] Univ. Hosp., No. CIV.A. 92-3088, 1993 WL 21009*, (E.D.Pa. Jan. 20, 1993) (Newcomer, J.). *Jones v. Montgomery Hosp., No. CIV.A. 92-6809, 1993 WL 12836*, (E.D.Pa. Jan. 15, 1993) (VanArtsdalen, J.). *Blanding v. Pennsylvania State Police, 811 F. Supp. 1084 (E.D.Pa. 1992)* (Reed, J.). *Linsalata v. Tri-State General Ins., Ltd., No. CIV.A. 92-0596, 1992 WL 392586*, (E.D.Pa. Dec. 17, 1992) (Brody, J.). *Davis v. Greater Philadelphia Chamber of Commerce, No. CIV.A. 92-3432, 1992 WL 396712*, (E.D.Pa. Dec. 15, 1992) (Ludwig, J.). *Graham v. State Farm Mut. Auto. Ins. Co., No. CIV.A. 92-2864, 1992 WL 334024*, (E.D.Pa. Nov. 2, 1992) (Newcomer, J.). *Heist v. Frank, No. CIV.A. 91-3583, 1992 WL 189394*, (E.D.Pa. Aug. 3, 1992) (Troutman, J.). *Core v. Guest Quarters Hotel/Beacon Hotel Corp., No.*

Matthews v. Freedman

*CIV.A. 92-2033, 1992 WL 189405*, (E.D.Pa. July 30, 1992) (Bartle, J.). *Aiken v. Bucks Ass'n for Retarded Citizens, Inc., (B.A.R.C.), 799 F. Supp. 522 (E.D.Pa. 1992)* (Reed, J.). *Neibuer v. Philadelphia College of Pharmacy and Science*, No. CIV.A. 92-1993, 1992 WL 151321, (E.D.Pa. June 19, 1992) (Weiner, J.). *Haynes v. Glen Mills* [*12]

 *Schools*, No. CIV.A. 91-6905, 1992 WL 97904, (E.D.Pa. May 6, 1992) (J.M. Kelly, J.). *Kimble v. DPCE, Inc., 784 F. Supp. 250 (1992)* (R.F. Kelly, J.). *Contra*, *Clark v. Sears Roebuck & Co.*, No. CIV.A. 92-6438, 1993 WL 96934, (E.D.Pa. Mar. 29, 1993) (Joyner, J.).

For all of the above reasons, the plaintiff's *Rule 60(b)(6)* motion will be denied.

*ORDER* - June 8, 1993

AND NOW, this 8th day of JUNE, 1993, upon consideration of the plaintiff's motion pursuant to *Fed.R.Civ.P. 60(b)(6)* to vacate the judgment entered on February 23, 1989 dismissing this action, and upon consideration of the defendants' answer thereto and supporting and opposing memoranda of law, it is hereby

ORDERED

that plaintiff's motion is DENIED.

BY THE COURT

JOSEPH L. McGLYNN, JR. J.

**End of Document**

**7**

 Positive
As of: June 18, 2020 5:44 PM Z

## *Schrader v. Gulf Oil*

United States District Court for the Eastern District of Pennsylvania

November 28, 1994, Decided ; November 28, 1994, Filed; November 29, 1994, Entered

CIVIL ACTION NO. 93-6794

**Reporter**

1994 U.S. Dist. LEXIS 17129 *; 4 Am. Disabilities Cas. (BNA) 523

JOHN SCHRADER and MARY SCHRADER v. GULF OIL AND/OR ITS SUCCESSSOR IN INTEREST, CHEVRON, U.S.A., INC.

## LexisNexis® Headnotes

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

*HN1*[⬇] **Discovery, Methods of Discovery**

When a motion for summary judgment under *Fed. R. Civ. P. 56* is properly made, the non-moving party cannot rest on the mere allegations of the pleadings. Rather, in order to defeat the motion for summary judgment, the non-moving party, by its own affidavits, or by depositions, answers to interrogatories or admissions on file, as stated in *Rule 56(e)*, must set forth specific facts showing that there is a genuine issue for trial.

Civil Procedure > ... > Summary

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN2*[⬇] **Summary Judgment, Motions for Summary Judgment**

The plain language of *Fed. R. Civ. P. 56(c)* mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where the non-moving party fails to make such a showing with respect to an essential element of his case, there can be no genuine issue of material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. Therefore, the moving party is entitled to summary judgment as a matter of law because the non-moving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the

burden of proof.

> Business & Corporate
> Compliance > ... > Discrimination > Disability
> Discrimination > Rehabilitation Act
>
> Civil Procedure > ... > Federal & State
> Interrelationships > Federal Common
> Law > General Overview
>
> Labor & Employment Law > ... > Employment
> Contracts > Conditions & Terms > General
> Overview

### *HN3*[⬇] **Disability Discrimination, Rehabilitation Act**

Section 503 of the Rehabilitation Act provides that if any individual with a disability believes any contractor has failed or refused to comply with the provisions of a contract with the United States, relating to employment of individuals with a disability, such individual may file a complaint with the Department of Labor (department). The department shall promptly investigate such complaint and shall take such action thereon as the facts and circumstances warrant, consistent with the terms of such contract and the laws and regulations applicable thereto.

> Business & Corporate
> Compliance > ... > Discrimination > Disability
> Discrimination > Rehabilitation Act

### *HN4*[⬇] **Disability Discrimination, Rehabilitation Act**

There is no private right of action under § 503 of the Rehabilitation Act.

> Business & Corporate Compliance > ... > Sole
> Proprietorships > Business & Corporate
> Law > Sole Proprietorships
>
> Governments > Federal Government > US

Postal Service

> Public Health & Welfare Law > ... > Advocacy
> & Protection > Discrimination > Rehabilitation
> Act
>
> Business & Corporate
> Compliance > ... > Discrimination > Disability
> Discrimination > Rehabilitation Act
>
> Public Health & Welfare Law > ... > Disabled
> & Elderly Persons > Advocacy &
> Protection > General Overview
>
> Public Health & Welfare Law > ... > Advocacy
> & Protection > Discrimination > General
> Overview

### *HN5*[⬇] **Businesses & Corporations, Sole Proprietorships**

Section 504(b) of the Rehabilitation Act provides that no otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity conducted by any executive agency or by the United States Postal Service. For the purposes of this section, the term "program or activity" means all of the operations of an entire corporation, partnership, or other private organization, or sole proprietorship -- if assistance is extended to such corporation, partnership, private organization or sole proprietorship as a whole; or the entire plant or other comparable, geographically separate facility to which federal financial assistance is extended, in the case of any corporation, partnership, private organization, or sole proprietorship.

> Business & Corporate
> Compliance > ... > Discrimination > Disability
> Discrimination > Rehabilitation Act
>
> Public Health & Welfare Law > ... > Advocacy
> & Protection > Discrimination > General

Schrader v. Gulf Oil

Overview

Public Health & Welfare Law > ... > Disabled & Elderly Persons > Advocacy & Protection > General Overview

*HN6*[⬇] **Disability Discrimination, Rehabilitation Act**

In order to establish a violation of § 504 of the Rehabilitation Act, a plaintiff must meet four requirements: (1) he is an individual with a disability; (2) he is otherwise qualified for participation in the program; 3) the program receives federal financial assistance; and (4) he was denied the benefits of or subject to discrimination under the program.

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Labor & Employment Law > Affirmative Action > General Overview

*HN7*[⬇] **Discrimination, Title VII Discrimination**

Title VII prohibits employment discrimination on the basis of an individual's race, color, religion, sex, or national origin. *42 U.S.C.S. § 2000e-2(a)*.

Business & Corporate Compliance > ... > Discrimination > Disability Discrimination > Federal & State Interrelationships

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

*HN8*[⬇] **Disability Discrimination, Federal & State Interrelationships**

The language of Title VII does not prohibit

discrimination on the basis of handicap or disability.

Civil Procedure > ... > Summary Judgment > Supporting Materials > Affidavits

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

Civil Procedure > ... > Methods of Discovery > Interrogatories > General Overview

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

*HN9*[⬇] **Supporting Materials, Affidavits**

*Fed. R. Civ. P. 56* requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.

Business & Corporate Compliance > ... > Consolidated Omnibus Budget Reconciliation Act > Continuation Coverage > Coverage Types

Family Law > Marital Duties & Rights > Causes of Action > Loss of Consortium

Pensions & Benefits Law > Consolidated Omnibus Budget Reconciliation Act > General Overview

*HN10*[⬇] **Continuation Coverage, Coverage Types**

The Consolidated Omnibus Budget Reconciliation Act of 1986 provides for a period of 18 months of benefits following a qualifying event, such as a discharge. *29 U.S.C.S. § 1162*.

**Counsel:** [*1]

For JOHN SCHRADER, MARY SCHRADER, H/W, PLAINTIFFS: THOMAS M. HOLLAND, MC CALLUM & HOLLAND, PHILA, PA.

For GULF OIL, AND/OR ITS SUCCESSOR AN INTEREST, CHEVRON USA, DEFENDANT: DORETTA MASSARDO MC GINNIS, PEPPER, HAMILTON & SCHEETZ, PHILA, PA. JESSAMYNE M. SIMON, PHILA, PA.

**Judges:** JUDGE RAYMOND J. BRODERICK

**Opinion by:** RAYMOND J. BRODERICK

# Opinion

---

### *MEMORANDUM*

Broderick, J.

November 28, 1994

Plaintiff John Schrader ("Mr. Schrader") and Mary Schrader ("Ms. Schrader") have brought this action against Defendant Gulf Oil and its successor in interest, Chevron, U.S.A., Inc. ("Chevron") alleging that the Defendant discriminated against Mr. Schrader by unlawfully terminating his employment and health care coverage because of his disability.

In Count I of their complaint, Plaintiffs assert that Chevron's termination of Mr. Schrader's employment violated the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101 et seg;* the Rehabilitation Act of 1973 ("Rehabilitation Act"), *29 U.S.C. 701 et seg;* and Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e et seg.* In Count [*2] II, the Plaintiffs allege that the Defendant's termination of Mr. Schrader's health insurance was improper under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), *29 U.S.C. § 1161 et seg.* In Count III, Ms. Schrader seeks damages for loss of consortium based on her husband John Schrader's alleged injuries.

Defendant Chevron has filed a motion for summary

judgment under *F.R.C.P. 56*, claiming that the Plaintiffs have failed to demonstrate the existence of a genuine issue of material fact on any of their federal claims and that Chevron is entitled to judgment as a matter of law. Plaintiffs have responded to Defendant's motion for summary judgment, and also submitted a motion for partial summary judgment arguing that no genuine dispute exists as to the fact that Mr. Schrader is disabled, that Mr. Schrader was qualified for various employment opportunities at Chevron, and that Chevron failed to take affirmative steps to make reasonable accommodations for Mr. Schrader.

For reasons set forth below, the Court will grant summary judgment under *F.R.C.P. 56* to Chevron on all federal claims on the grounds that Plaintiffs John and Mary [*3] Schrader have failed to demonstrate the existence of a genuine issue of material fact and that Chevron is entitled to judgment as a matter of law.

# I. Background

Although the parties dispute the exact date of Mr. Schrader's initial application for employment with Gulf Oil, both parties acknowledge that Mr. Schrader began work as a Warehouse Helper on or about June 20, 1977. Gulf Oil had offered Mr. Schrader this position as a result of a settlement agreement between Gulf Oil, Mr. Schrader, and the Department of Labor, which resolved charges filed by Mr. Schrader alleging violations of the Rehabilitation Act of 1973. In addition to a promise by Gulf Oil to offer employment to Mr. Schrader, the settlement agreement included provisions stating that the parties agreed that Mr. Schrader was certified to be a handicapped person pursuant to the Rehabilitation Act, and that he would not apply for or be forced to work in positions that would be contrary to such a certification. The settlement agreement also provided that the settlement could not be considered an admission of liability or responsibility on the part of any of the parties.

On July 1, 1985, Chevron U.S.A., Inc. was merged into [*4] Gulf Oil Corporation, and the name of the resulting corporation was changed to Chevron U.S.A., Inc.

The surviving company assumed all of the obligations and liabilities of Gulf Oil.

In an affidavit filed with Plaintiffs' motion for partial summary judgment, Mr. Schrader claims that he was laid off in September 1981 and "was so anxious to return to work" that he took an offered position of shiftworker. On or about February 22, 1989, Mr. Schrader sustained a work-related injury to his shoulder. He went on disability leave in August, 1989, and was subsequently terminated by Chevron in January 1992.

Mr. Schrader contends that his termination of employment was a result of Chevron's unlawful discrimination against him as a disabled person. Mr. Schrader states that he suffers from both the shoulder injury, which renders him unable to lift and push more than 50 pounds or climb ladders, and from diabetes, which he alleges was the basis on which Gulf Oil discriminated against him before the 1977 settlement agreement. In his affidavit, Mr. Schrader maintains that he was terminated in January 1992 without notice or opportunity to apply for other positions, despite the existence of numerous jobs [*5] which he believes he could have performed given his current physical condition and his prior experience. Mr. Schrader also asserts in his Complaint that Chevron improperly terminated his health care benefits in July 1993, despite his election to continue his health coverage following notification in January 1992 of his entitlement to health care benefits pursuant to COBRA.

Chevron claims that its termination of Mr. Schrader's employment and health care benefits was lawful. According to the affidavit of Mr. Fred Bates, Human Resources Manager at Chevron's Philadelphia Refinery, Mr. Schrader received short-term disability benefits beginning in August 1989 and began to receive long-term disability benefits beginning in August 1990. Bates states that Mr. Schrader was provided with long-term disability benefits for a period of eighteen months, until January 31, 1992. After eighteen months, such benefits could continue pursuant to Chevron's policies only if Mr. Schrader was totally disabled. Bates asserts that Mr. Schrader was not totally disabled at the end of the eighteen month period,

and Chevron attempted to find a suitable position for Mr. Schrader in accordance with its policies. [*6] According to Bates, no appropriate position was available, and Mr. Schrader was terminated effective February 1, 1992.

In his affidavit, Bates also states that Schrader was provided with notice of his right to elect eighteen months of continuing health coverage at the time of his termination in accordance with the requirements of COBRA. Mr. Schrader elected such coverage, and Bates asserts that the coverage was terminated in July 1993 consistent with the requirements of COBRA.

In its motion for partial summary judgment, Plaintiffs argue that no material dispute exists as to the fact that Mr. Schrader is disabled, that other suitable employment opportunities at Chevron existed for Mr. Schrader, and that Chevron failed to take affirmative steps to make reasonable accommodations for Mr. Schrader. In its responses to Defendant's motion for summary judgment, Plaintiffs also claim that an additional genuine issue of material fact exists as to whether Chevron is a recipient of federal financial assistance, which is a requirement for claims under Section § 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794.

As will hereinafter be discussed, the Court [*7] finds that there is no genuine issue of *material* fact, and that judgment will be entered on behalf of Defendant Chevron as a matter of law in connection with its motion for summary judgment.

## II. Discussion

### A. Standard for Summary Judgment

The law is clear that *HN1*[⬆] when a motion for summary judgment under *Rule 56 of the Federal Rules of Civil Procedure* is properly made, the non-moving party cannot rest on the mere allegations of the pleadings. *Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Rather, in order to defeat the motion for summary judgment,

Schrader v. Gulf Oil

the non-moving party, by its own affidavits, or by depositions, answers to interrogatories or admissions on file, as stated in *F.R.C.P. 56(e)*, "must set forth specific facts showing that there is a genuine issue for trial."

As *Celotex* teaches, *HN2*[⬆] "the plain language of *Rule 56(c)* mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party  [*8]
 who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex at 322, 106 S. Ct. at 2552*. Where the non-moving party fails to make such a showing with respect to an essential element of his case, "there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id. at 323, 106 S. Ct. at 2552*. Therefore, "the moving party is 'entitled to summary judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of (his) case with respect to which [he] has the burden of proof." *Id.*.

## B. The Rehabilitation Act Claims

Plaintiffs' claim in Count I is based in part on both § 503 of the Rehabilitation Act,' *29 U.S.C. § 793*, providing for enforcement of discrimination claims against federal contractors, and § 504, *29 U.S.C. § 794*, [*9]
 encompassing claims against programs or activities which are recipients of federal financial assistance.

### 1. The § 503 Claim in Count I

*HN3*[⬆] Section 503 provides in relevant part:

> If any individual with a disability believes any contractor has failed or refused to comply with the provisions of a contract with the United States, relating to employment of individuals with a disability, such individual may file a complaint with the Department of Labor. The Department shall promptly investigate such complaint and shall take such action thereon as the facts and circumstances warrant, consistent with the terms of such contract and the laws and regulations applicable thereto.

The Third Circuit, analyzing this section in light of *Cort v. Ash, 422 U.S. 66, 95 S. Ct. 2080, 45 L. Ed. 2d 26 (1975)*, concluded that *HN4*[⬆] there is no private right of action under section 503. *See Beam v. Sun Shipbuilding & Dry Dock Co., 679 F.2d 1077 (3d. Cir. 1982)*; *see also Barron v. Nightingale Roofing, Inc., 842 F.2d 20, 22 (1st Cir. 1988)* (noting that nine Courts of Appeal have concluded [*10]
 that § 503 does not permit a private right of action).

As there appears to be no question that the Third Circuit has determined that there is no private right of action under Section 503, Chevron is entitled to summary judgment as a matter of law on Count I insofar as it is based on Section 503 of the Rehabilitation Act.

### 2. The § 504 Claim in Count I

Plaintiffs also contend that they may bring suit under § 504 of the Rehabilitation Act, *29 U.S.C. § 794*. § 504 (a) and *HN5*[⬆] § 504(b) provide in relevant part:

> (a) No otherwise qualified individual with a disability. . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. . .

> (b) For the purposes of this section, the term "program or activity" means all of the operations of. . .

>> (3) (A) an entire corporation, partnership, or other private organization, or sole proprietorship--

>> (i) if assistance is extended to such corporation,  [*11]
 partnership, private organization or sole proprietorship as a whole; or. . .

>> (B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any corporation, partnership, private organization, or sole proprietorship. . .

The Third Circuit has stated that *HN6*[⬆] in order to establish a violation of Section 504, a plaintiff

must meet four requirements: (1) he is an individual with a disability; (2) he is otherwise qualified for participation in the program; 3) the program receives Federal financial assistance; and (4) he was denied the benefits of or subject to discrimination under the program. *Nathanson v. Medical College of Pennsylvania, 926 F.2d. 1368, 1380 (3d. Cir. 1991)* (citing *Strathie v. Department of Transp., 716 F.2d 227, 230 (3d. Cir. 1983)*.

In its motion for summary judgment, Chevron contends that it is not subject to suit under § 504 because it has not received Federal financial assistance. Chevron presented the affidavit of Mr. Fred Bates, Human Resources Manager of the Philadelphia Refinery, in which he states that the Refinery [*12]
 has received no such assistance at any time. The Plaintiffs, however, have failed to provide any deposition, answer to interrogatories, admission, or affidavit showing that Federal financial assistance has been extended to Chevron "as a whole" or to "the entire plant or other comparable, geographically separate facility." *29 U.S.C. § 794(b)(3)*. As heretofore stated, "the plain language of *Rule 56(c)* mandates the entry of summary judgment, after adequate time and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322, 106 S. Ct. at 2552*. Therefore, the Court will enter summary judgment in favor of Defendant Chevron on Count I insofar as it is based on Section 504 of the Rehabilitation Act.

### C. The Title VII Claim in Count I

*HN7*[⬆] Title VII prohibits employment discrimination on the basis of an individual's "race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)*. [*13]
 Plaintiffs have made no allegation in the Complaint, nor have they filed an affidavit, a deposition, or an answer to an interrogatory showing that Chevron discriminated against Mr. Schrader on the basis of race, color, religion, sex, or national origin.

*HN8*[⬆] The language of Title VII does not prohibit discrimination on the basis of handicap or disability. *See* Arthur Larson and Lex K. Larson, 3A *Employment Discrimination* 22-4 (1990) ("In particular, the handicapped are *not* protected against employment discrimination by the provisions of Title VII of the Civil Rights Act of 1964.").

Because Plaintiffs have failed to raise a genuine issue of material fact showing that Chevron discriminated against Mr. Schrader on the basis of race, color, religion, sex, or national origin, the Court will enter summary judgment in favor of Defendant Chevron on Count I insofar as it is based on Title VII.

### D. The Americans with Disabilities Act (ADA) Claim in Count I

The Americans with Disabilities Act (ADA) became effective July 26, 1992 for employers with 25 or more employees. *See 42 U.S.C § 12111*. In its motion for summary judgment, Chevron contends [*14]
 that Plaintiffs have no claim under the ADA because Mr. Schrader's termination occurred in January 1992, six months before the ADA became effective. Courts which have analyzed the issue of the ADA retroactivity have concluded that the ADA is not retroactive. *See, e.g., O'Bryant v. City of Midland, 9 F.3d 421 (5th Cir. 1993)*; *see also Landgraf v. USI Film Products, 128 L. Ed. 2d 229, 114 S. Ct. 1483, 1499 (1994)* (noting long tradition of declining to "give retroactive effect to statutes burdening private rights unless Congress had made clear its intent").

As Plaintiffs now concede that they "have no direct cause of action" under the ADA, the Court will enter summary judgment in favor of Defendant Chevron on Count I to the extent that it is based on the ADA.

### E. The COBRA Claim in Count II

In Count II of the Complaint, Plaintiffs assert that Chevron improperly terminated Mr. Schrader's

health care coverage, causing him to spend a significant amount of money to maintain a health care plan for his family. Plaintiffs allege that these expenses include the additional cost of health care following Mr. Schrader's [*15] discharge and election of coverage under COBRA in January 1992, as well as the cost of a new health care plan following the termination of COBRA benefits in July 1993. Plaintiffs contend in their pleadings that Mr. Schrader received no notice that his COBRA benefits would expire, and that savings of health care costs were a motivation for Chevron in the termination of Mr. Schrader, particularly in light of "unique medical needs of Plaintiffs' minor son."

Fred Bates, Chevron's Human Resources manager, asserts in his affidavit in support of Chevron's motion for summary judgment that Mr. Schrader received continuing health insurance coverage after electing COBRA benefits upon his discharge. Bates states that these benefits were terminated in July 1993 after eighteen months, consistent with COBRA's requirements.

The affidavit of Mr. Schrader, submitted by Plaintiffs, does not discuss health care benefits. Plaintiffs have failed to provide any other sworn affidavits showing the existence of a genuine issue of material fact on this claim. Plaintiffs have apparently relied on their pleadings and, as *Celotex* provides, *HN9*[↑] *Rule 56* "requires the nonmoving party to go beyond the pleadings and [*16] by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex, 477 U.S. at 324, 106 S. Ct. at 2553*.

As *HN10*[↑] COBRA provides for a period of eighteen months of benefits following a qualifying event, such as a discharge, *see* *29 U.S.C. § 1162*, and there is no dispute between the parties as to the fact that eighteen months of COBRA coverage was provided to Mr. Schrader, Chevron is entitled to summary judgment on Count II.

*F. Loss of Consortium*

Count III of Plaintiffs' complaint sets forth solely a claim for loss of consortium by Ms. Schrader based on the alleged discriminatory acts against her husband set forth in Counts I and II. In view of the fact that the Court will grant summary judgment to Defendant Chevron on Counts I and II, Ms. Schrader's damage claim will be dismissed.

### III. Conclusion

For the reasons stated above, the Court will grant Defendant's motion for summary judgment on Counts I and II and dismiss Count III.

### *ORDER*

AND NOW, this 28th day [*17] of November, 1994; Defendant Chevron, U.S.A., Inc. having filed a motion for summary judgment; for the reasons set forth in this Court's memorandum of November 28, 1994;

IT IS ORDERED: the motion for summary judgment of Defendant Chevron, U.S.A., Inc. is GRANTED AND JUDGMENT IS ENTERED in favor of Chevron, U.S.A., Inc. and against Plaintiffs John and Mary Schrader.

IT IS FURTHER ORDERED: the loss of consortium claim by Ms. Schrader is DISMISSED.

RAYMOND J. BRODERICK, J.

---

**End of Document**

**8**


Neutral
As of: June 18, 2020 5:44 PM Z

## *Thankachen v. Cardone Indus.*

United States District Court for the Eastern District of Pennsylvania

September 28, 1995, Decided

CIVIL ACTION NO. 95-181

**Reporter**

1995 U.S. Dist. LEXIS 14476 *; 150 L.R.R.M. 2735; 67 Empl. Prac. Dec. (CCH) P43,805; 3 Wage & Hour Cas. 2d (BNA) 216

MARY THANKACHEN, Plaintiff, v. CARDONE INDUSTRIES, et al., Defendants.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN1*[⬇] **Motions to Dismiss, Failure to State Claim**

When ruling on a motion to dismiss for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*, all facts alleged in the complaint and all reasonable inferences that can be drawn from them must be accepted as true.

Labor & Employment Law > Leaves of Absence > Family & Medical Leaves > General Overview

*HN2*[⬇] **Leaves of Absence, Family & Medical Leaves**

The Family and Medical Leave Act (FMLA) was enacted on February 5, 1993. *29 U.S.C.S. § 2601 et seq.* Congress provided two alternatives for the effective date of the FMLA's provisions. For most employers, the FMLA's provisions became effective six months from the date of its enactment -- August 5, 1993. For an employer operating under a CBA, the earlier of the following dates apply: (A) the date of termination of such CBA; or (B) the date that occurs 12 months after the date of enactment of the act, February 5, 1994. *29 U.S.C.S. § 2601*, note.

Labor & Employment Law > Leaves of Absence > Family & Medical Leaves > General Overview

*HN3*[⬇] **Leaves of Absence, Family & Medical Leaves**

See *29 C.F.R. § 825.700(c)*.

Labor & Employment Law > Leaves of Absence > Family & Medical Leaves > General Overview

*HN4*[⬇] **Leaves of Absence, Family & Medical Leaves**

The exception to the effective date of the Family and Medical Leave Act in which a CBA may be reopened at specified times only applies to agreements without a general expiration date. A reopener clause is a contractual agreement to renegotiate certain items at a later date.

Labor & Employment Law > ... > Family & Medical Leaves > Scope & Definitions > General Overview

*HN5*[⤓] **Family & Medical Leaves, Scope & Definitions**

A plaintiff cannot allege conduct violative of the Family and Medical Leave Act (FMLA) such as retaliatory conduct -- when the conduct which spawned the retaliation did not fall within the FMLA. Permitting such retroactive effect of the FMLA would circumvent the purpose of a delayed effective date for the FMLA.

> Governments > Legislation > Statute of Limitations > Time Limitations

> Labor & Employment Law > Employment Relationships > Employment Contracts > Breaches

> Labor & Employment Law > Collective Bargaining & Labor Relations > Enforcement of Bargaining Agreements

> Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

*HN6*[⤓] **Statute of Limitations, Time Limitations**

The applicable statute of limitations period in a hybrid action brought under the Labor Management Relations Act is six months and typically applies to both defendants. The six-month period begins when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation. Thus, in a suit for breach of duty of fair representation, the limitations period begins when a union notifies an employee that it will proceed no further with a grievance.

> Labor & Employment Law > Collective Bargaining & Labor Relations > Enforcement of Bargaining Agreements > Exhaustion of Remedies

*HN7*[⤓] **Enforcement of Bargaining Agreements, Exhaustion of Remedies**

When a CBA contains a grievance procedure, the employee-plaintiff is required to at least attempt to exhaust his or her remedies under that procedure before a *§ 301* suit can be filed against the employer.

> Torts > ... > Commercial Interference > Employment Relationships > Elements

> Torts > ... > Contracts > Intentional Interference > Elements

*HN8*[⤓] **Employment Relationships, Elements**

Under Pennsylvania law intentional interference with contract is defined as: One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for pecuniary loss resulting to the other from the failure of the third person to perform the contract.

> Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption

*HN9*[⤓] **Collective Bargaining & Labor Relations, Federal Preemption**

A claim of intentional interference with contract claim is preempted by *§ 301* of the Labor Management Relations Act if the claim requires the interpretation of a CBA. Section 310 preemption is invoked when the resolution of a state-law claim is substantially dependent upon analysis of the terms of the agreement made between the parties in a labor contract.

Thankachen v. Cardone Indus.

Civil Procedure > Pleading & Practice > Pleadings > General Overview

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

*HN10*[🔻]  **Pleading & Practice, Pleadings**

"Notice pleading" under the Federal Rules requires that a complaint include only a short and plain statement of the claim showing that the pleader is entitled to relief. *Fed. R. Civ. P. 8(a)(2)*. The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

**Counsel:**  [*1]
For MARY THANKACHEN, PLAINTIFF: LINDA A. CARPENTER, MC CANN, MAILEY & GESCHKE, PHILA, PA.

For CARDONE INDUSTRIES, SAM THEVANAYANAM, DEFENDANTS: ALAN D. BERKOWITZ, CAROL B. TRASK, DECHERT, PRICE & RHOADS, PHILA, PA. For SERVICE EMP. INTERNATIONAL UNION LOCAL 252, AFL-CIO, DEFENDANT: RICHARD H. MARKOWITZ, MARKOWITZ & RICHMAN, PHILA, PA. ANDREW BRENNER, MARKOWITZ & RICHMAN, PHILADELPHIA, PA.

**Judges:** Joseph L. McGlynn, Jr., J.

**Opinion by:** Joseph L. McGlynn, Jr.

## Opinion

***Memorandum***

McGlynn, J.

September 28, 1995

Before the court are the Motions of Defendants, Cardone Industries and Sam Thevanayanam, to Dismiss Counts VII, VIII and XI (misnumbered as Count VII), and of Defendant, Service Employees International Union, Local 252, AFL-CIO, to Dismiss Counts II, III, IV, VI, IX and X. For the following reasons Defendants' Motions will be GRANTED.

**Facts**

Plaintiff, an Asian Indian woman, took a scheduled vacation and leave of absence from her employment at Cardone Industries ("Cardone") to care for her mother in India for the period beginning July 21, 1993 to August 5, 1993. On August 2, 1993, Plaintiff called her employer and was informed that she was laid-off. Plaintiff alleges [*2]
that she was replaced by a less qualified male, Pentecostal Christian, and claims that since 1993, white, male, Pentecostal Christian employees took extended leaves of absence without adverse action taken against them.

Thereafter on August 23, 1993, Plaintiff claims that she attempted to file a grievance with the Service Employees International Union ("Union") [1]
Cardone and the Union are operating under a collective bargaining agreement ("CBA") with the effective dates of December 9, 1992 to December 9, 1995.

, but Cardone and her supervisor, Sam Thevanayanam, directed the Union to refuse to process the grievance because she was not a Pentecostal Christian.

Plaintiff's position reopened in August 1994, at which time she requested re-instatement. She contends that Defendants refused to re-instate her because she filed discrimination claims against Cardone and the Union on the basis of religion, national origin, sexual discrimination and harassment, and retaliation. [2]
These claims were filed with the Pennsylvania Human Relations Commission and with the Equal Employment Opportunity Commission.

[*3]
## Discussion

*HN1*[↑] When ruling on a Motion to Dismiss for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*, "all facts alleged in the complaint and all reasonable inferences that can be drawn from them must be accepted as true." *Malia v. General Electric Co., 23 F.3d 828, 830 (3d Cir. 1994)*, cert. denied, 130 L. Ed. 2d 328,    U.S.   , 115 S. Ct. 377 (1994).

## I. The Family and Medical Leave Act claim (Count VII).

*HN2*[↑] The Family and Medical Leave Act ("FMLA") was enacted on February 5, 1993. *See 29 U.S.C.A. § 2601 et seq.* Congress provided two alternatives for the effective date of the FMLA's provisions. For most employers, the FMLA's provisions became effective six months from the date of its enactment -- August 5, 1993. For an employer operating under a CBA, the earlier of the following dates apply: "(A) the date of termination of such [CBA]; or (B) the date that occurs 12 months after the date of enactment of this act [February 5, 1994]." *29 U.S.C.A. § 2601*, note.

Here, Cardone and the Union are operating under a CBA with the effective dates of December 9, 1992 to December 9, 1995. The FMLA became effective as of the earlier of the termination [*4] of the CBA -- December 9, 1995 -- or the date occurring 12 months from the enactment of the FMLA -- February 5, 1994. Thus, Cardone and its employees within the bargaining unit became bound by the provisions of the FMLA on February 5, 1994.

Plaintiff learned on August 5, 1993 that she was laid-off. On August 23, 1993, she tried to file a grievance with the Union, but the shop steward refused to process it. In addition, Plaintiff claims that she was not re-instated to her position when that position re-opened in August 1994.

Plaintiff argues that: (1) the FMLA became effective as of August 5, 1993; and (2) regardless of the effective dates of the FMLA, Plaintiff has

alleged conduct violative of the FMLA through August 1994.

Plaintiff argues that the FMLA may have become effective as early as August 5, 1993, citing a Department of Labor regulation, which provides in pertinent part:

> *HN3*[↑] For CBAs subject to the Railway Labor Act and other CBAs which do not have an expiration date for the general terms, but which may be reopened at specified times, e.g., to amend wages and benefits, the first time the agreement is amended after August 5, 1993, time the agreement is amended after [*5] August 5, 1993, shall be considered the termination date of the CBAs, and the effective date for FMLA.

*29 C.F.R. § 825.700(c).*

Plaintiff's interpretation of *29 C.F.R. § 825.700(c)* is incorrect for two reasons. First, the earliest the FMLA could have become effective is "the first time the agreement is amended *after* August 5, 1993 …." *Id.* (Emphasis added). Thus, in the absence of any agreement that the CBA was amended after August 5, 1993, the earliest possible effective date for the FMLA is August 6, 1993, and not August 5, 1993, as Plaintiff proposes.

Second, and more importantly, the exceptions to *§ 825.700(c)(1)* do not apply: Plaintiff is not covered by the Railway Labor Act; and the CBA, which governed her employment, contains an expiration date for the general terms of the agreement. [3] *HN4*[↑] The exception in which a CBA may be reopened at specified times only applies to agreements without a general expiration date. *See Lear Siegler, Inc. v. N.L.R.B., 890 F.2d 1573, 1574 (10th Cir. 1989).* A reopener clause is a contractual agreement to renegotiate certain items at a later date. *Id.* No reopener clause exists in the CBA between Cardone and the Union. Thus, *29 C.F.R. § 825.700(c)(1)* does not alter the effective date of the FMLA for the bargaining unit employees, which is February 5, 1994.

[*6]
Plaintiff argues that regardless of the effective date of the FMLA, she has alleged conduct violative of the FMLA through August 1994. Plaintiff argues that Defendants retaliated against her in August 1994 by not reinstating her to her former position which was vacant.

Plaintiff, however, admits that the alleged

Thankachen v. Cardone Indus.

retaliatory conduct in August 1994 stemmed from her claims of sexual, racial, and religious discrimination back in August 1993 when Defendants refused to reinstate her following her leave of absence. Thus, Plaintiff's cause of action occurred prior to the effective date of the FMLA. *HN5*[⬆] Plaintiff cannot allege conduct violative of the FMLA -- here retaliatory conduct -- when the conduct which spawned the retaliation did not fall within the FMLA. Permitting such retroactive effect of the FMLA would circumvent the purpose of a delayed effective date for the FMLA. Therefore, Plaintiff's FMLA claim will be dismissed.

## II. The Labor Management Relations Act claims (Counts VIII and IX).

Plaintiff seeks relief under the Labor Management Relations Act ("LMRA"): Count VIII charges Cardone with breach of contract; and Count IX charges the Union with breach of duty of fair representation. [*7] *29 U.S.C. § 301*.

Plaintiff alleges violation of the LMRA because: (1) the Union failed to process Plaintiff's grievance on August 23, 1993; and (2) after her termination the Union failed to recall her when the position again became open in August 1994.

Since Counts VIII and IX are "inextricably interdependent" they are treated as a hybrid action. *Del Costello v. International Brotherhood of Teamsters, 462 U.S. 151, 164, 76 L. Ed. 2d 476, 103 S. Ct. 2281 (1983)*; *see also Vadino v. A. Valey Engineers, 903 F.2d 253 (3d Cir. 1990)*. To prevail against either party, Plaintiff must not only show that Cardone breached the CBA, but also that the Union breached its duty of fair representation. *Del Costello, 462 U.S. at 165*.

*HN6*[⬆] The applicable statute of limitations period in a hybrid action is six months and typically, as here, applies to both defendants. *Id. at 169-72*; and *Vadino, 903 F.2d at 260*. The six-month period begins "'when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged

violation.'" *Vadino, 903 F.2d at 260* (quoting *Metz v. Tootsie Roll Industries, Inc., 715 F.2d 299, 304 (7th Cir. [*8] 1983)*, *cert. denied, 464 U.S. 1070, 79 L. Ed. 2d 214, 104 S. Ct. 976 (1984))*. Thus, in a suit for breach of duty of fair representation, the limitations period begins when a union notifies an employee that it will proceed no further with a grievance. *Vadino, 903 F.2d at 260*.

The Union refused to process Plaintiff's grievance on August 23, 1993, thereby giving notice that it would proceed no further with the grievance. Thus, Plaintiff needed to file the LMRA claim within six months of the date the Union allegedly refused to process her grievance. However, she did not file the claim until January 11, 1995, nearly 11 months after the statute of limitations expired.

Plaintiff's second allegation that the Union failed to recall her when her position again became open in August 1994 must also fail. It appears that this second allegation is related to the first allegation -- that the Union failed to process Plaintiff's grievance on August 23, 1993 -- and is thus time barred. Assuming that the allegations are different, which the court does not concede, the Plaintiff has failed to show the exhaustion of the grievance procedure under the CBA.

*HN7*[⬆] When a CBA contains a grievance procedure, [*9] "the employee-plaintiff is required to at least attempt to exhaust his or her remedies under that procedure before a *§ 301* suit can be filed against the employer." *Whittle, et al. v. Local 641, et al., 56 F.3d 487, 490 (3d Cir. 1995)* (citing *Del Costello, 462 U.S. at 163*). Here, Plaintiff did not attempt to file a grievance after her former position re-opened in April 1994. [4]

The CBA requires that:

All matters of dispute between Employer and Union, or the employees covered by this Agreement, shall be adjusted in the following manner:

* The grievance shall be submitted to the Shop Steward, and if same cannot be determined to the mutual satisfaction of all parties by said shop Steward, the matter shall then be referred to the Business Agent of the Union for his determination; should it not be satisfactorily concluded by him then the matter

Thankachen v. Cardone Indus.

shall be submitted to arbitration at the request of either party
....

(Plaint.'s Resp. to Mot. of Defs. Cardone and Thevanayanam to
Dismiss, Ex. A at P 21).

Plaintiff simply states that when the job was reopened "neither Cardone nor the union called [her] to fill this position, despite her request that she be re-instated to this position, and despite company policy and [a] union contract requiring her consideration for reinstatement." (Compl. at P 30). There is no indication that Plaintiff attempted to file a grievance with the union or that she contacted the Union's shop steward. Although Plaintiff filed a grievance with the Union and contacted the shop steward regarding the August 23, 1993 claim, no such grievance procedure was followed for the August 1994 allegation.

[*10]
The LMRA claims will be dismissed because Plaintiff: (1) did not file the claim that the Union failed to process Plaintiff's grievance on August 23, 1993, within the required statutory period; and (2) did not show that the she exhausted the grievance procedure for the claim that the Union failed to recall her when the position again became open in August 1994.

## III. Intentional Interference with Contract Claim (Count XI, misnumbered as Count VII)

Plaintiff alleges that Defendant Sam Thevanayanam intentionally interfered with Plaintiff's contractual relationship with Defendants Cardone and the Union.

*HN8*[↑] Under Pennsylvania law intentional interference with contract is defined as:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Rutherfoord v. Presbyterian-University Hospital, 417 Pa. Super. 316, 612 A.2d 500, 507 (Pa. Super*

*1992)* (quoting *Restatement [*11] (Second) of Torts, § 766*).

*HN9*[↑] A claim of intentional interference with contract claim is preempted by *§ 301* of the LMRA if the claim requires the interpretation of a CBA. *Lingle v. Norge Div., Magic Chef, 486 U.S. 399, 413, 100 L. Ed. 2d 410, 108 S. Ct. 1877 (1988)*; *see 29 U.S.C. § 185*. Section 310 preemption is invoked when "the resolution of a state-law claim is *substantially dependent* upon analysis of the terms of the agreement made between the parties in a labor contract ...." *Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220, 85 L. Ed. 2d 206, 105 S. Ct. 1904 (1985)* (emphasis added).

The issue before the court is whether Plaintiff's claim of intentional interference with contract claim can prevail without substantially depending on an analysis of the CBA.

Determining whether Thevanayanam induced Cardone to breach the contract requires an investigation of whether Plaintiff could be terminated under the terms of the CBA. In addition, the allegation that the Union refused to process Plaintiff's grievance at the inducement of Thevanayanam requires an examination of the grievance procedures in the CBA. See *Rutherfoord, 612 A.2d at 507*.

This case is similar to [*12]
*Magerer v. John Sexton & Co., 912 F.2d 525 (1st Cir. 1990)*. In *Magerer* the plaintiff claimed that his supervisor intentionally interfered with the contractual relations of his employer in violation of Massachusetts common law. As in Pennsylvania, Massachusetts law requires proof that the defendant knowingly induced a third party to breach its contract with the plaintiff. The court held that the supervisor acted as an agent of the employer, and thus, his actions regarding the intentional interference with contract claim were governed by the CBA. *Id. at 530*. In addition, the court concluded that the supervisor's alleged inducement of the employer to breach its employment contract with the plaintiff requires a finding of whether the employer was entitled to discharge the plaintiff under the terms of the CBA. *Id. at 531*. Thus, *§ 301* preempted the claim.

The cases cited by Plaintiff, *Berda v. CBS, Inc., 881 F.2d 20 (3d Cir. 1989)*, cert. denied, 493 U.S. 1062, 107 L. Ed. 2d 962, 110 S. Ct. 879 (1990); and *Sever v. Alaska Pulp Corp., 978 F.2d 1529 (9th Cir. 1992)*, are distinguishable from the present case.

*Berda* involved preemployment representations which [*13] were independent of and were not subsumed by the *CBA. 881 F.2d at 26*. Therefore, the plaintiffs' claims on the preemployment representations were not preempted by *§ 301*. *Id*. Unlike *Berda*, plaintiff here relies solely on the CBA, and not on an preemployment contract.

*Sever* is inapposite because the plaintiff: (1) complains of conduct occurring after the decertification of his union; and (2) alleges that the defendant employer interfered with his ability to obtain future employment with other companies in his community. *978 F.2d at 1540*. Unlike this case, the court in *Sever* could resolve the interference claim without reference to a CBA. [5] Plaintiff cites an additional case, *Quarles v. Remington Arms Co., 848 F. Supp. 328 (D. Conn. 1994)*, which is dissimilar from the present one. In *Quarles* the intentional interference with contract claim hinged on the conduct of a shop steward who filed negative comments about the plaintiff's job performance. *Id*. It is unclear, however, if the court there considered whether the employer was entitled to discharge the plaintiff under the terms of the CBA. Unlike *Quarles*, this case is akin to *Magerer* which involves a supervisor who is an agent of the employer. Reference to the CBA is required in part to determine if the employer was entitled to discharge Plaintiff under the terms of the agreement.

[*14] In summary, the intentional interference with contract claim is preempted by the LMRA. For the reasons discussed in Part II, however, the LMRA claims will be dismissed because they are untimely and because of Plaintiff's failure to exhaust the grievance procedures of the CBA.

## IV. Discrimination Claims Against the Union (Counts I, III, IV, VI and X)

The Union urges that the following claims should be dismissed for failing to state a claim upon which relief can be granted:

(1) Count II -- Title VII Violation for Sex Discrimination, *42 U.S.C. § 2000e, et seq*;

(2) Count III -- Title VII Violation for National Origin Discrimination, *42 U.S.C. § 2000e, et seq*;

(3) Count IV -- Title VII Violation: Protected Activity;

(4) Count VI -- Pennsylvania Human Relations Act Violation: Protected Activity; and

(5) Count X -- Violation of *42 U.S.C. § 1981*.

The Union contends that the allegations in the complaint, as they relate to the Union's actions, are conclusory and unsubstantiated.

*HN10*[↑] "Notice pleading" under the Federal Rules requires that a complaint include only "a short and plain statement of the claim showing that the pleader is entitled to [*15] relief." *Leatherman v. Tarrant County Narcotics Intell. and Coord. Unit, 507 U.S. 163, 122 L. Ed. 2d 517, 524, 113 S. Ct. 1160 (1993)* (quoting *Fed. R. Civ. P. 8(a)(2)*).

> The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

*Id*. (quoting *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*).

Plaintiff states that she is an Asian Indian and is not a Pentecostal Christian. After taking a vacation and a leave of absence, Plaintiff was told that she was laid-off. She claims that a less qualified Pentecostal male replaced her, and that since 1993, white, male, Pentecostal Christian employees took extended leaves of absence without adverse action taken against them. In addition Plaintiff alleges that Defendants Cardone and Sam Thevanayanam directed the Union to refuse to process Plaintiff's grievances [6] Plaintiff alleges that she formally exhausted the grievance procedures under the collective bargaining agreement for the August 1993 incident. No such exhaustion of the grievance procedures is alleged for the August 1994 incident.

Thankachen v. Cardone Indus.

because she was not a Pentecostal Christian. Plaintiff contends that she was not re-instated, [*16] when her position re-opened in August 1994, because she filed discrimination claims against Defendants Cardone and the Union on the basis of religion, national origin, sexual discrimination and harassment, and retaliation.

Although vague, these allegations are sufficient to pass muster under the notice standard of *Fed. R. Civ. P. 8(a)*. Therefore, the Motion to Dismiss Counts II, III, IV, VI, and X, against the Union will be denied.

## Conclusion

For the forgoing reasons the Motion of Defendants, Cardone and Thevanayanam, to Dismiss Counts VII, VIII, and XI (misnumbered as Count VII), will be GRANTED. The Motion of Defendant, the Union, to Dismiss Counts II, III, IV, VI and X, will be DENIED. The Union's motion to dismiss Count XI will be GRANTED.

## *Order*

And now [*17] this 28th day of September, 1995, upon consideration of the motions to dismiss filed on behalf of the defendants and the response thereto filed by the plaintiff, it is hereby

ORDERED

1. The motions of defendants Cardone and Thevanayanam to dismiss Counts VII, VIII and XI (misnumbered as Count VII) are GRANTED.

2. The motion of the Union to dismiss Count IX is GRANTED.

3. The motion of the Union to dismiss Counts II, III, IV, VI and X is DENIED.

## BY THE COURT:

**Joseph L. McGlynn, Jr., J.**

**End of Document**

Jeffrey Shooman